# Opinions of the Ethics Committee on The Principles of Medical Ethics

~

*With Annotations Especially Applicable to Psychiatry*

2014 Edition

**Published by the**
**American Psychiatric Association**
**Arlington, Virginia**

Copyright© 2013 American Psychiatric Association
ALL RIGHTS RESERVED
04 03 02 01 4 3 2 1
Manufactured in the United States of America
2013 Edition
(Previous editions 1979, 1983, 1985, 1989, 1992, 1993, 1995, 2001, 2009, 2014)
American Psychiatric Association
1000 Wilson Boulevard #1825
Arlington, VA 22209
www.psych.org

# TABLE OF CONTENTS

**Table of Contents**……………………………………………………………….1

**Foreword**…………………………………………………………………….. 2

**Principles of Medical Ethics**……………………………………………………3

**Opinions of the APA Ethics Committee**:

(To facilitate ease of use of this document, the Ethics Committee has categorized their opinions by topics (see below). The topics are identified by a capital letter, followed by a number which refers to one of the nine Principles of Medical Ethics. Small letters are used to identify the order in which the opinion was issued. For example, opinion "A.1.a" falls under the topic of Boundary and Dual Relationship Issues, refers to Section 1 of the Principles of Medical Ethics and is the first opinion to be issued on this topic under Section 1.)

A. Boundary and Dual Relationship Issues…………………………………… 5
B. Business Practices and Ancillary Professional Activities…………………. 16
C. Child and Adolescent Psychiatry (includes child custody and school issues)…………………………………………………….. 21
D. Confidentiality and Informed Consent…………………………………….. 26
E. Duty to Report and Professional Competency Issues………………………32
F. Ethics Procedures………………………………………………………….. 35
G. Forensic Issues…………………………………………………………….. 37
H. Interaction with Other Professionals………………………………………. 42
I. Managed Care……………………………………………………….…...... 46
J. Military and Other Government Agencies…………………….................... 48
K. Payment, Fee and Fee Splitting Issues……………………..……………… 50
L. Pharma…………………………………………………………………….. 59
M. Philanthropy, Gifts and Wills……………………………………………… 62
N. Practice Issues………………………………………………………………65
O. Professional Listings, Announcements……………………………………..76
P. Referral Practices………………………………………….................... 78
Q. Research and Scholarly Activities…………………………………………. 81
R. Resident, Student and other Trainee Issues…………………………………84

**Index**……………………………………………………………………………..87

# Foreword

The Ethics Committee of the American Psychiatric Association receives frequent requests for opinions, generally regarding the ethicality of conduct in professional and other settings. Answers to these questions are drafted by "teams" composed of members and/or consultants of the APA Ethics Committee. The answers are then reviewed by the Chairperson of the Committee before being sent to the member. After review by the full Committee for confirmation, the opinions are provided in synopsis form to the APA Board of Trustees and the APA Assembly. Beginning with the 2009 version, feedback on the content of answers to questions slated for publication was solicited from the District Branch Ethics Committees.

The questions and answers that follow in this booklet date back to 1973. They are presented in the order of the date of response. Opinion in certain areas has evolved over time due to various factors, such as the increasingly complex medical landscape upon which psychiatry is practiced. Thus this work is in part a historical document that reflects the specific questions and perspectives of the particular time an opinion was requested. Actual complaints have not been used so that this volume does not comprise a casebook of unethical conduct.

The material is presented as responses to questions related to the seven *Principles of Medical Ethics* of the American Medical Association (section citations are followed by "AMA"). References are made to *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry* by the American Psychiatric Association (section citations are followed by "APA") and the American Medical Association's *Current Opinions with Annotations of the Council on Ethical and Judicial Affairs*1 (2000–2001),herein referred to as *AMA Council Opinions*.

The published Opinions in this booklet are highly condensed versions that have been approved by the Committee. These opinions are offered to assist our members and our district branches in understanding the Principles. Only those questions and answers that address specific issues with heuristic value have been included. Questions of a routine nature or those not clearly related to a Principle have been excluded. Of note, these opinions are those of the APA Ethics Committee only. They do not represent official positions of the American Psychiatric Association. *The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry* (2013 edition) has been officially adopted by the American Psychiatric Association and is binding upon all members.

# Principles of Medical Ethics
# American Medical Association

## Preamble

The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility to patients first and foremost, as well as to society, to other health professionals, and to self. The following *Principles* adopted by the American Medical Association are not laws, but standards of conduct which define the essentials of honorable behavior for the physician.

### *Section 1*

A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.

### *Section 2*

A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.

### *Section 3*

A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.

### *Section 4*

A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.

### *Section 5*

A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.

***Section 6***

A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.

***Section 7***

A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.

***Section 8***

A physician shall, while caring for a patient, regard responsibility to the patient as paramount.

***Section 9***

A physician shall support access to medical care for all people.

# A. BOUNDARY AND DUAL RELATIONSHIP ISSUES

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### A.1.a.

**Question**: Is it ethical for a psychiatrist to perform routine and follow-up vaginal exams on his patients, lead his patients into a fantasy of having sexual relations together, disclose his own sexual experiences, or kiss his patients?

**Answer**: A psychiatrist, as a licensed physician, may carry out nonpsychiatric medical procedures providing the psychiatrist is competent to do so and the procedures do not activate transference distortions that preclude effective treatment. Pelvic examinations carry a high risk of the latter and would be better provided by another physician. The other issues are addressed by Section 2, Annotation 1 (APA). These behaviors would appear to violate the prohibition of sexual exploitation. (1989)

### A.1.b.

**Question**: What are the ethical ramifications of a psychiatrist using a "psychotherapeutic technique" in which he asks his female patients to describe vivid sexual fantasies that specifically involve him?

**Answer**: This is not usual or customary practice. The issue here is exploitation of a patient under the guise of psychotherapy that may include gratification of the psychiatrist at the expense of the patient. (1993)

### A.1.c.

**Question**: I am a retired psychiatrist. A friend and I are forming a group of 10 to 15 people who will each contribute $25 a month to be invested in the stock market. Another person invited a former patient of mine to join the group. Would it be ethical for me to participate in the same investment club as a former patient?

**Answer**: This question is important because it points out that ethics principles must be viewed in the context of the individual doctor, the individual patient, and the doctor–patient relationship. The Principle involved is that it would be unethical to exploit a patient or a former patient. (See Section 1, Annotation 1, and Section 2, Annotation 2, APA.) An investment club where the

contribution is $25 per member would not suggest exploitation of a patient or former patient. However, in the spirit of the admonition to treat patients with respect and dignity, it might be appropriate for you to contact your former patient, explain that you might be in the same investment club, inquire if that might be troublesome for the former patient, and if so, make appropriate arrangements. If you believe that social contact with this former patient might be problematic, it might be wise for you to quietly remove yourself from the investment club. (1993)

## A.1.d.

**Question**: Is it ethical for me to have a romantic relationship with a key third party associated with my patient, such as the parent of a child or adolescent patient?

**Answer**: No. Key third parties include, but are not limited to, spouses or partners, parents, guardians, surrogates, and the like. (See AMA Council on Ethical and Judicial Affairs Report, Annual 1998, and Opinion 8.14, AMA Council Opinions, 2000–2001.) Treatment of minors is typically rendered in the context of the family; a parent plays an integral role in the treatment process. Romantic relationships with parents, other family members, or key third parties may jeopardize the treatment of the child or adolescent. By entering into a dual relationship, the psychiatrist would face the incompatible task of trying to meet the medical needs of the patient simultaneous with the romantic needs of the key third party. Such involvement with a key third party raises concerns about the psychiatrist gratifying his or her own needs by exploiting the patient; there is also a risk of breaching confidentiality. The priority of the patient's needs is compromised or rendered impossible by a romantic or sexual relationship with the patient's primary caretaker or other key third party. (2000)

## A.1.e.

**Question**: I am a divorced child psychiatrist. A couple consulted me as to how to inform and support their children as they had decided to divorce. I successfully counseled them for a handful of sessions. Afterward, the then ex-wife reconsulted me for assistance in improving her relationship with one child in particular that had been polarized by the divorce. I saw her in this context for an additional series of sessions.

Months later, I learned that this former patient was interested in a personal relationship with me. She had been in long-term individual psychotherapy with another professional throughout my treatment of her. I consulted a colleague, and he said the usual prohibitions about dating a former patient would not necessarily apply given I never treated her as an individual. What is ethically appropriate in this situation? Can I date this woman now?

**Answer**: It would not be ethical for you to have a social relationship with this former patient. You have treated her and her family members. She has placed trust in you and disclosed matters of a highly personal nature. She may also have developed a positive transference toward you. Establishing a dating relationship with her could be exploitation of this therapeutic relationship. (2001)

## A.1.f.

**Question**: Is it ethical for a staff member in a psychiatric treatment facility to continue treating a patient that the staff member has brought criminal charges against? Similarly, is it ethical for a staff member to continue treating a patient when the staff member is or will be aiding in the criminal investigation and/or prosecution of that patient?

**Answer**: Either of these dual role situations would be fatal to the establishment or continuation of a mental health professional-patient relationship. The treatment relationship factors necessary -- like trust, beneficence, empathy, and confidentiality – cannot genuinely exist in these two examples. It would be necessary to assign other staff members to work therapeutically with this patient preferably assigning the patient to a separate unit with no contact to the staff member pressing criminal charges. While the need for a legal response to some patients' acts is at times necessary, the facility still has an ethical duty to provide reasonable and appropriate care for the patient. (2006)

## A.1.g.

**Question**: I am studying a new career as a coach. I plan to coach professionals and organizations. I plan to continue doing outpatient psychiatry on part-time basis while I develop my coaching career. I will most probably do psychiatry on part-time basis until I retire. Will it be considered a conflict of interest or unethical if a current or former patient of mine knowing that I am a coach wants to hire me as such?

**Answer**: You are switching a doctor-patient (or former patient) relationship to an employer-employee one, regardless of who is hiring and who is being hired. Either way, it's an exploitation of the doctor-patient relationship. In this case, it is compounded because of the overlap and potential confusion in roles between a "coach" and a "therapist", but the same admonition would apply even if the doctor was now in a totally unrelated profession. I think you would be prudent to avoid mixing your roles, and to limit you coaching clients to non-patients. (2008)

A.1.h

**Question**: We have learned that our psychiatry residents routinely "google" their patients. On one recent occasion the resident discovered that an inpatient was on a most wanted list in another state for arson despite having denied a history of illegal behavior. Is it ethical to do a google search of your patient's name? What is the ethical response to learning through a google search that your patient is wanted by the police?

**Answer**: "Googling" a patient is not, in and of itself, unethical. First and foremost, the "googling" of a patient should only be done in the interests of promoting patient care and wellbeing and never to satisfy the curiosity or other needs of the psychiatrist. Also important to consider is how such information will influence treatment, and how the clinician will ultimately

use this information. The psychiatrist should ask him or herself these questions before resorting to a google search. A clinician who routinely assumes information that cannot be verified as fact and directs treatment based on such information may be at risk for practicing incompetently. It is prudent to identify the source of information that is entered into a medical record.

The standard of practice for learning about a patient's medical condition is through face-to-face interviews, and this information may be supplemented by collateral information, e.g., medical records or family members. Refusal or inability by patients to provide important historical information is not uncommon; in this circumstance collateral data may assume an important role. “Googling” a patient in such a scenario may provide useful information. However, information obtained this way, such as on a My Space website, may not be current or accurate, especially for clinical purposes. Similarly, newspaper articles may not be reliable. Information such as birth records and sex offender registration is more likely to be trustworthy. Whenever information is obtained through “googling,” it is important to corroborate it.

Reporting requirements vary state to state; those that supersede confidentiality regulations or laws are generally relevant to public safety. Every psychiatrist should become familiar with their State reporting laws. (2010)

## A.1.i

**Question**: I just have a question on boundaries and implications with regards to jeopardizing the confidentiality with a current situation. We have a fellow therapist with whom I share clients and she wants to see me as a patient. Also the therapist’s case may be discussed (as a patient) in the team meetings we have weekly with other psychiatrists in the group. All other psychiatrists in the group also share patients with her. This is an awkward situation but the therapist wants to see me as a patient. Technically, since she is a post doctoral student and we are a part of a university we cannot refuse care if the patient wants it. I am looking for APA guidelines in this type of situation.

**Answer**: The scenario you pose is a dual agency problem. You and the post doc student already have a psychiatrist/co-therapist relationship, it would not be right to add a doctor/patient relationship on top of that. Further, of course, you couldn’t discuss her personal treatment in their team meetings with the other psychiatrists, but that would be just be the beginning of potential conflicts. You must decline to treat her yourself. What you can, and should do, is to offer to help her find a psychiatrist away from their university setting, someone whose work you respect, and thereby make a genuine effort to get her into the right hands. You shouldn’t assume that because she is part of the university you are obliged to take her as a patient. (2010)

## A.1.j

**Question**: I am a psychiatrist providing services for seriously mentally ill indigent persons. The doctors have been asked to fill out a Social Security Administration form titled Medical Source Statement of Ability to do Work-Related Activities (mental). My concern is that I am placing myself in an unethical situation of dual agency and that completing this form places me in an evaluative as well a treating role. Could you advise?

**Answer**: Psychiatrists commonly find themselves in dual roles. While there is nothing inherently unethical about dual roles, they may lead to outcomes that are not in the patient's interest. Academic psychiatrists are torn by allegiances to patient and medical school; prison psychiatrists have duties owed to their patients and to the prison system, and so on. In some contexts the balancing act is easy, and in others it requires considerable thought and reflection. An important question is whether one can adhere to both commitments, without undermining the connection to the patient.

When facing such a dilemma the clinician is well advised to think through, and perhaps discuss with a colleague, the pros and cons of conducting the evaluation. In some cases, doing the evaluation may be an act of beneficence. In other cases, doing the evaluation would be of no service to the patient and could injure the patient's interests. Similarly, not doing the evaluation could reflect the physician's lack of commitment to the patient. But not doing it could also be a reasoned outcome, as the clinician recognized an inability to do the evaluation honestly and objectively. The point is that the decision should be clinically informed and not decided casually. The spirit of the ethics guideline in this context is to protect the patient's interests. (2011)

## A.1.k.

**Question**: Is it ethical for psychiatrists to see members of the same family as individual patients?

**Answer**: Because of the complexity of factors to be considered, there is not a hard and fast rule; each case should be weighed separately. Seeing multiple members from the same family may blur boundaries of the doctor-patient relationship. Depending on the dynamics in the family, there is the possibility of causing complicated feelings of guilt, resentment, or shame if one family member responds well to treatment but the other does not. If you treat both a parent and a minor, is the parent's appointment used to communicate only about that individual, or is some of the session used to discuss the child? How do you maintain clear boundaries between communicating with the adult as a patient vs. as a parent of a patient? It is possible that a treatment recommendation for one family member may not be therapeutic for another family member? How do you balance your recommendations when, for example, what is best for the parent may not necessarily be best for the child and both are your patients?

Even if a psychiatrist avoids the accidental disclosure of information heard from one patient to another patient from the same family, a patient may have doubts about the confidentiality of their treatment if they know the psychiatrist sees a relative. These doubts may interfere with the doctor-patient relationship.

On the other hand, there may be a number of considerations that mitigate the above concerns. For example, psychiatrists practicing in rural areas, those treating underserved populations, and those with specialized expertise required by more than one member of the same family may reasonably treat members of the same family. In these instances, the psychiatrist should explicitly discuss concerns about boundaries and confidentiality at the beginning of treatment,

and should remain vigilant about all of the potential ethical complications throughout the treatments. (2013)

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

### A.2.a.

**Question**: Might there be exceptions to the statement in the code of ethics that a sexual relationship with a former patient is unethical?

**Answer**: The Principles of Medical Ethics (AMA) and the Annotations Especially Applicable to Psychiatry (APA) are not laws but standards of conduct that define the essentials of honorable behavior for the physician. If a complaint that raises this issue is filed against a member psychiatrist, it becomes the responsibility of the district branch ethics committee to deal with that complaint by careful consideration of all the relevant facts, especially any evidence indicating exploitation of the former patient. The ethics committee will then determine whether the accused psychiatrist has behaved unethically. (1975; 1993)

### A.2.b.

**Question**: Is it proper for a psychiatrist to advise a patient to make an investment from which the psychiatrist receives a finder's fee?

**Answer:** Clearly, no. Section 2, Annotation 2 (APA) states:

*The psychiatrist should diligently guard against exploiting information furnished by the patient and should not use the unique position of power afforded him/her by the psychotherapeutic situation to influence the patient in any way not directly relevant to the treatment goals.*

It would be a strange form of psychotherapy that included giving advice about investments, let alone the fact that offering such advice would obviously constitute exploitation of the treatment relationship. (1978)

### A.2.c.

**Question**: A patient of mine is a social worker. Is it ethical for me to also supervise her therapeutic work while a patient? Or, after termination of her therapy?

**Answer**: To the first question, no; it would constitute a potential exploitation as well as confusion of the therapeutic relationship. To the second, probably not, unless there is consultation for both you and the social worker that indicates no transference-countertransference issues that might harm the patient or lead you to misuse the supervisory role. (1988)

## A.2.d.

**Question A**: Is it ethical for a psychiatrist to buy property from, or sell property to, a patient or ex-patient?

**Answer**: Such business transactions run the serious risk of exploitation of the therapeutic relationship and are to be avoided. (1989)

**Question B**: What if my office landlord wishes to sell the office building to an ex-patient of mine?

**Answer**: That is between your landlord and your former patient. But if your new landlord again becomes your patient, it will be vital to explore any distortions in your altered relationship. If there are serious problems with this, it would be advisable to suggest another psychiatrist. (1989)

## A.2.e.

**Question**: I am publishing a book about a particular psychiatric disorder in hopes of reducing stigmatization. With proper informed consent (Section 4, Annotation 11, APA), I wish to present some of my patients who have benefited from treatment to the media in a book promotion tour. Their expenses will be covered by the publisher, and I will have no contact with the patients other than the public interview while on the tour. I hope to financially benefit from the publication. Any problems?

**Answer**: Yes, considerable. This is a clear deviation from the original treatment plan with which the patients were in agreement. Their consent, while "freely" given, is likely to be heavily influenced by their transference feelings, the need to please you. The "reward" in the form of free travel in your near presence is likely to create serious distortions in the relationship. But, most seriously, the entire project suggests an exploitation of your patients for your personal gain that outweighs the potential benefit of public education. (1989)

## A.2.f.

**Question**: May a psychiatrist hire a current or former patient?

**Answer**: It is not ethical to switch a doctor–patient relationship to an employer–employee one. For an ex-patient, the issue is exploitation of the former doctor–patient relationship, and, in most cases, such an arrangement would be unethical. (1990)

## A.2.g.

**Question**: A present patient of mine was hired without my knowledge by a subordinate. We have about 100 employees. When I discovered the patient had been hired, I ordered her terminated with an explanation from me that I couldn't have both a physician–patient and an employer–employee relationship with her. She has filed a complaint with the Human Rights Commission. Did I follow the ethical rule?

**Answer**: Yes, the letter of it. But, in a large organization you must make a clinical decision as to whether the treatment relationship has been compromised; for example, will she report to you or have any other nontreatment relationship with you? Not hiring her in the first place should have been a matter of agency policy, which might have been more likely understood by the patient than being terminated. (1990)

## A.2.h.

**Question**: As a former patient, I would like to have a social, nonsexual relationship with my former psychiatrist. We are also planning to work on a professional project together. Okay?

**Answer**: Your former psychiatrist should discuss this with a colleague. What is the nature of the social relationship? Will this interfere with getting further treatment if that becomes necessary? Will there be an uneven control issue on the project that might exploit unresolved issues? Caution is the word in order to avoid risk for you and your former psychiatrist. (1991)

## A.2.i.

**Question**: Can I ethically solicit the support of my patients to advocate for political or societal issues that affect their health care?

**Answer**: Implicit in your question is the recognition of the conflict between Section 2, Annotation 2 (APA), concerning protection of the unique relationship psychiatrists have with their patients from influence outside of the treatment goals, and Section 7 (APA), dealing with our responsibility to strive to improve our communities by interpreting social forces that affect mental illness treatment. It is laudable for physicians to lobby for important political and social causes, especially for those affecting the health care of our patients. However, when we seek to engage our patients in these efforts, we must exercise utmost sensitivity to the vulnerability of patients to our influence, and their desire for privacy. Conversations about political matters may be appropriate in the clinical setting with patients and their families, but vigilance must be exercised to avoid abusing the doctor–patient relationship. Blanket solicitations of support, waiting-room materials, or generalized mailings about social or political issues are usually insensitive to the unique circumstances of each patient. Optional referrals to lobbying or advocacy groups (such as NAMI) might be an effective means to avoid potential inappropriate use of the doctor–patient relationship and allow for the strengthening of the patient's freedom to choose how best to act. Finally, it is important for the ethical psychiatrist to ensure that his

or her own personal needs or biases are not influencing the request made of the patient. Indeed, our own passions about a particular cause are best directed through our own advocacy work, rather than enlisting a patient's assistance. See Opinion 9.012, AMA Council Opinions, 2000–2001. (2000)

## A.2.j.

**Question:** Is it ethical for a psychiatrist to have a platonic friendship with a sibling or a parent of a former patient?

**Answer**: The Ethics Committee advises caution regarding the establishment of a platonic friendship between a former patient and a psychiatrist. Both the APA and the AMA hold that significant third parties (e.g., relatives and caretakers) are afforded the same considerations as are patients. Thus the psychiatrist also must guard against boundary violations, third party exploitation, and breaches of patient confidentiality in interactions with third parties. For example, the psychiatrist may seek such a friendship based on information that was acquired in the context of a doctor-patient relationship. Would this ensuing friendship in any way exploit the third party? Another potential pitfall relates to confidentiality as a cornerstone of treatment. Could such a friendship exist without threatening patient confidentiality? In sum, it cannot be determined *a priori* that a social relationship of this type would be ethical or not. In most cases establishing a friendship of this sort would be ill-advised given these concerns. (2002)

## A.2.k.

**Question**: A clinic is partially supported by philanthropic donations. The psychiatrists would like to show videotaped testimonials of clinic patients to board members of their non-profit arm. Can psychiatrists approach specific patients to appear in this videotape, whether it is presented as a request or an opportunity? What about more widespread marketing of the clinic with such testimonials (using actual names and/or photographs)? Would it make any difference if someone other than the treating psychiatrist solicited the patient for this purpose?

**Answer**: The vignette presents a scenario that evokes problems of confidentiality, respect for a patient's autonomy, potential exploitation, and conflict of interest. Section 2.2 suggests that a treating psychiatrist should not ask a patient to participate in being videotaped if that activity is not related to treatment. The use of names and photographs of patients in marketing is especially problematic, as informed consent (even if properly obtained and documented) in such a context cannot be easily withdrawn. If someone other than the treating psychiatrist solicited the patient, then that might nullify the psychiatrist's conflict of interest, but the paramount goal of promoting patient beneficence would still appear to be in some degree of jeopardy. (2009)

## A.2.l.

**Question**: We are a small agency with an adolescent residential treatment program and community mental health outpatient program. We are trying to hire a parent advocate. The only

applicant is the father of an adolescent who was in our residential treatment program three years ago. Part of the psychiatric staff has raised the concern that if the agency hired this individual for that job, it would create the same ethical issues as a psychiatrist hiring a former patient in their office, and that the psychiatric staff should oppose the hire.

**Answer**: The process for peer advocacy is one that is developing across the country. In this particular case, hiring the father of a former patient would not be unethical. However, it raises confidentiality questions, but that concern should be minimized as peer advocates should not have access to any patient records. (2010)

### A.2.m.

**Question**: Can a psychiatrist use the legal services of a patient, who is an attorney, to assist in a difficult dissolution of the psychiatrist's practice from the psychiatrist's current partner?

**Answer**: No, to do so would be a boundary violation involving dual agency. A doctor cannot have both a doctor-patient relationship and an attorney-client relationship with the same individual. (2010)

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

### A.4.a.

**Question**: This is complicated. I am being sued by a former patient, the relative of a current patient who is unaware of the suit. Can I use information about the former patient provided by the current patient that would support my defense? Can my lawyer depose the current patient?

**Answer**: No, to both questions. The solution of your legal problem is not germane to your treatment responsibilities to your current patient. (1991)

## Section 6

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to servc, with whom to associate and the environment in which to provide medical care.*

## A.6.a.

**Question**: A former patient is requesting strongly that he continue to see me socially now that our therapy is complete, having transferred him to another provider three years ago. We have had one such meeting at a restaurant to bring "closure" because he said it would be easier for him long-term if he knew I had related to him at least once as something other than a patient. Prior to this, he also researched the location of my new office, traveled there uninvited, and surprised me and my staff by presenting me with a "release" that he had drafted with a lawyer promising to forfeit his right to sue me for malpractice. He previously suffered much emotional turmoil after terminating with his previous psychiatrist. This termination included him filing a Board of Medicine complaint against the previous psychiatrist and only reaching some sense of closure through final contact(s) with his previous therapist.

I am concerned that it may not be helpful to my former patient for us to continue any association, despite his ardent belief in the benefit of such an association; nevertheless, he may in fact decompensate at least somewhat without contact with me. Given his past behavior concerning both me and his previous psychiatrist, I am also concerned about his reaction to my enforcement of a policy of no further contact, and sense that if I can point to this policy as an accepted APA policy or procedure for psychiatrists concerning former patients, that might help him to perceive it as less of a personal blow.

**Answer**: You describe a very complicated patient with challenging clinical management issues. As Section 6 states, "A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care." You terminated treatment with this patient three years earlier and have no ethical obligation to resume treatment or maintain contact with him. Your description of this patient brings up concerns of dependency issues, manipulative behavior, threats to the maintenance of clear boundaries, hostility, and perhaps even impaired reality testing. As his former treating psychiatrist, you appear to have exhausted all clinically reasonable options. Compliance with his demand to transition to a friendship is strongly discouraged. If you are concerned about medico-legal issues, it may be prudent to contact your medical malpractice carrier or personal attorney. Ongoing clinical supervision with a respected colleague for complex clinical situations and/or consultation with the Ethics Committee of your local district branch may prove to be fruitful when dealing with difficult cases such as this one. (2011)

# B. BUSINESS PRACTICES AND ANCILLARY PROFESSIONAL ACTIVITIES

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### B.1.a.

**Question**: Many people in my area are very busy or have transportation problems. I propose to offer them consultation by telephone, letter, or audiotape. Among other things, I am prepared to offer stress management, bereavement and divorce counseling, and flexible, creative, Psychoanalytic therapy. Is this ethically permissible?

**Answer**: There are several questions: (1) Is the treatment contract explicit and does it allow fully informed consent? (2) Will you provide a face-to-face, thorough psychiatric examination before initiating this treatment plan? (3) Will you be available to provide face-to-face intervention when clinically necessary? (4) Are you properly trained to carry out these treatments; especially, are you trained in psychoanalysis? (5) Have you thought out carefully why you want to do this, and are you guided by the best interests of your prospective patients? If the answer to any of these questions is no, your plan is unethical. (1989)

### B.1.b.

**Question**: Is it ethical to market and offer a telephone referral and assessment service for adults who may be suffering from a mental disorder?

**Answer**: Yes, with the following cautions and provisos: (1) The use of such services calls into question the effectiveness of such modalities as a substitute for the clinical interview in a face-to-face setting. Research is incomplete in this area, and the ethical physician is obligated to support such interventions-by-telephone with clear scientific evidence of its clinical efficacy and limitations. (2) The confidentiality requirement must be met and the patient must be clearly informed of the efficacy and limitations of such telephone referral and assessment. (3) In addition, the billing for such services must be carefully approached to maintain the clearest contractual understanding with the patient. (See also Section 2, Annotation 6, APA.) (1993)

### B.1.c.

**Question**: Is it ethical to produce and sell a 30-minute infomercial that illustrates a variety of psychiatric problems and urges people with such problems to call a 900 number to discuss questions? Phone calls will be taken by psychiatrists or psychologists who will decide if the

person should be directed to a physician or facility in their area. Fees will be charged through the 900 calls. Physicians will be paid by the corporation producing the infomercial; there will be no fee splitting and no self-referrals.

**Answer**: Yes, provided that the individual psychiatrists do not violate the ethical code, do not violate state or federal laws, and there is no fee splitting. (See Section 2, Annotation 5, and Section 5, Annotation 2, APA.) We caution that ethical problems may arise, but are unable to anticipate these. (1993)

## B.1.d.

**Question**: Is it ethical to provide short-term therapy by telephone, e.g., through a toll-free line or a 900 number?

**Answer**: The concern about this is if a referral for in-person treatment will be made if needed; it is unclear how such a determination can be made over the telephone. Without the direct contact in a face-to-face initial evaluation, it is difficult for a physician to provide competent medical or psychiatric evaluation and treatment. A psychiatrist who participates in such a service might be at risk of violating several principles of medical ethics that deal with the provision of competent medical service, and so forth. (1994)

## B.1.e

**Question**: I am the treasurer of my district branch and am trying to think of some ways to increase our revenue. My idea is to sell a monthly advertising program to research groups. The DB staff would send out information describing clinical studies for which participants are needed and psychiatrists would put the brochures in their waiting rooms. If patients are interested, they can contact the research company directly. The psychiatrist would merely provide a venue for advertising in his or her office. Do you see any ethical issues with this plan?

**Answer**: We commend you in asking for an opinion prior to embarking on this enterprise. For a psychiatrist to place material in the waiting room advertising the needs of a research group, even though it would seem to be an entirely voluntary participation on the part of the patient, may be interpreted as a recommendation to the patient to participate in research, and may imply an endorsement on the part of the psychiatrist. Displaying material in the waiting room which has been placed there to raise money for the DB (an issue of self-interest) goes against the ethical principle of not influencing the patient in any way not directly relevant to the treatment goals, and your DB would be ill-advised to undertake such a scheme. (2012)

# Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## B.2.a.

**Question**: I have developed a new medical instrument. Can it be patented under my name and may I receive profits from its sale?

**Answer**: It is ethical for you to do so as long as it does not contradict local law relative to medical practice. (April 1977)

## B.2.b.

**Question**: We plan to operate a mental health referral service and have questions about how to do this ethically.

**Part A**: Can we refer a patient to an unlicensed professional for evaluation and treatment?

**Answer**: If a psychiatrist initially evaluates, he can refer to an unlicensed professional with the appropriate skills if that is allowed under local licensing laws. (1987)

**Part B**: Should we list in promotional materials the names of the therapists we refer to, whether or not licensed?

**Answer**: Again, if local law permits, if you know of the persons' qualifications and plan to refer to them, names should be provided for both licensed and unlicensed referral professionals. (1987)

**Part C**: Is it ethical to be listed with such a service, pay a listing fee, provide one's qualifications, and agree to provide 30 minutes of free consultation to a referee?

**Answer**: Nothing above is unethical, although the listing fee cannot be based on a percentage of fees. However, if you have reasons to believe this service is in other ways unethical or conducts itself to the potential detriment of patients, you should not participate. (1987)

**Part D**: Is it proper for this referral service to be listed in the Yellow Pages under "Physicians and Surgeons, Psychiatry"?

**Answer**: No. This is not a psychiatric service if it refers to other than psychiatrists. (1987)

## B.2.c.

**Question**: I am publishing a book on nudity in therapy. Some psychiatrists have told me they might be interested in such an idea but are not willing to tempt the wrath of the APA Ethics Committee. Is their concern valid?

**Answer**: Yes. (1987)

## B.2.d

**Question**: I have a question about psychiatrists treating patients who are established patients in the care of another psychiatrist, or another healthcare professional. For example, Patient X, who is in treatment with Psychiatrist Y, becomes suicidal, does not inform his/her doctor but instead overdoses and is admitted to the hospital. During that inpatient stay, hospital staff does not communicate with Psychiatrist Y. Moreover, the hospital psychiatrist tells the patient that the patient should stop working with Psychiatrist Y, and instead see a psychiatrist on staff of the hospital. The hospital staff does not encourage the patient to discuss this recommendation with the current doctor, and an appointment is set up with a hospital psychiatrist immediately following the patient's discharge. Has any wrongdoing occurred?

**Answer**: When a community psychiatrist refers a patient for psychiatric hospitalization, it is customary, Even when the outpatient psychiatrist does not initiate the patient's admission, it is still usual and good practice for this doctor to be informed of the patient's hospitalization by the inpatient team. It is also customary that the patient is redirected to the outpatient psychiatrist for follow up care after discharge.

It should be noted, however, that the preference of the patient is relevant. A patient who has been admitted under the care of an inpatient psychiatrist may choose not to consent to the release of medical information to his/her outpatient psychiatrist, and also may choose not to return to this psychiatrist's care. When making such a choice, the patient is entitled to confidentiality. However, if the inpatient psychiatrist has arbitrarily excluded the outpatient psychiatrist from the patient's care, culminating in a de facto "firing" of the outpatient psychiatrist, then the conduct and the ethical behavior of the outpatient psychiatrist is certainly called into question. (2005)

## B.2.e

**Question:** I am opening a new practice and want to put on my website my fees and that I will not be accepting insurances. I will print out claims forms for those people who want to submit claims themselves. Is it ethical to list the fees on the website -- in order to be straight-forward and clear?

**Answer:** Clearly stating one's fee and position regarding insurance assignment is consistent with Section 2, Paragraph 5, which advises the explicit establishment of the provisions of the contractual arrangement between patients and psychiatrist. In addition to posting this information on a website, it should also be a part of the contact with each patient. (2012)

# Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## B.4.a.

**Question**: My patient has been asked to repay overpayment of VA funds which has led directly the patient's vague threats of suicide. The VA agency is asking me if it is ok to proceed with asking for repayment. What is my ethical/legal responsibility?

**Answer**: The first issue is one of confidentiality. The VA cannot receive any information regarding your patient without the direct consent of the patient. In this instance, the patient would need to be informed about why the VA was requesting information, i.e., in order to have you weigh in on whether or not the patient could withstand a request for the return of funds.

The second issue is one of dual relationships. In this instance, your most important role is that of a treating psychiatrist to your patient. However, it appears that the VA wishes for you to offer a consultation regarding an administrative decision, while you are simultaneously providing clinical care. It would seem in the patient's best interest that the administrative request be satisfied through an independent assessment, made by an independent clinician, and not by you. (2002)

# C. CHILD AND ADOLESCENT PSYCHIATRY (INCLUDING CHILD CUSTODY AND SCHOOL ISSUES)

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### C.1.a.

**Question**: In a child custody case, a report was submitted to the court based solely on review of the hospital records of a child, and an interview with the ex husband, regarding the mother's mental status and continuing custody. I am wondering if it was appropriate to render an opinion without having examined the child or the mother.

**Answer**: The standard of practice in doing child custody evaluations is for all parties to be examined. It is a rare court that will give much, if any, weight to an evaluation that is "one sided", or otherwise has not taken all medical information into account. Custody and visitation cases are often very emotionally charged, and determining the best interest of the child is ideally served by a comprehensive, balanced, objective evaluation of all parties. If an evaluation report is "one sided", or based primarily on extrinsic evidence, then these limitations must be clearly set forth in the report. An explanation should be given as to why the evaluation was done in this way, and that the conclusions drawn are therefore based on incomplete information. (2003)

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

### C.2.a.

**Question**: Is it proper for a child psychiatrist to adopt a child of 12 who is a patient on his ward?

**Answer**: However well intentioned, this would constitute exploitation of the therapeutic relationship and would be unethical. Furthermore, because this child is one of many patients of the psychiatrist, the impact on other patients on the ward could be harmful. (1988)

## C.2.b.

**Question**: Is it proper for a school to refer children to a psychiatrist who is also the school's paid consultant, especially when there may be an adversarial issue between the school and the family?

**Answer**: The school can choose whom it wants for a referral, although the psychiatrist should not solicit such referrals. Regarding an adversarial situation, the psychiatrist should not accept the referral if there is a conflict of interest that impairs neutrality and objectivity. (1991)

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## C.4.a.

**Question**: Is it ethical to reveal confidential information obtained in an individual session to a therapy group of which the patient is a member, when withholding that information would be destructive to the group?

**Answer**: Yes, if the patient had been previously informed that this was part of the treatment contract and had consented to this requirement. If there had been no previous consent given by the patient, it would not be ethical to do so unless the potential for serious harm was very great. At that point, the psychiatrist has to balance the conflict between privacy and the best interest of others and make a decision. The psychiatrist cannot expect blanket assurance in advance that a decision of this order will be accepted as ethical by his or her peers. (1976)

## C.4.b.

**Question**: Another psychiatrist was asked by the parents of a child patient of mine to consult with them relative to serious family problems. The psychiatrist asked for a written report from me, which I provided after proper consent was obtained. The other psychiatrist then gave my report to the parents. Was this ethical?

**Answer**: Unless there was an overriding reason that you did not state, it appears that the second psychiatrist did not assure the minor of proper confidentiality. See Opinion 8.04, *AMA Council Opinions*, 2000–2001. Section 4, Annotation 7 (APA) states:

*Careful judgment must be exercised by the psychiatrist in order to include, when appropriate, the parents or guardian in the treatment of a minor. At the same time the psychiatrist must assure the minor proper confidentiality.* (1976)

## C.4.c.

**Question**: May I release treatment information to an insurance company about an adolescent patient? The father gave written permission.

**Answer**: It is ethical to provide sufficient information about a patient to an insurance company so that it can determine the validity of the claim. One should not provide highly personal information or speculative opinions but only that information relevant to evaluation of the claim. Written consent must be obtained. If the child is of sufficient maturity to judge the issue of complete confidentiality versus claim payment, the child should also be asked to give permission. Traditionally, this consent is blanket consent and not truly informed. To be fully informed, the patient would have to approve the report before it was sent. This creates an ethical dilemma since the parent's consent is not informed unless he sees the report also. The child may not want the parent to see the record. Judging the maturity of the child, the psychiatrist will honor the child's request for confidentiality. Section 4, Annotation 7 (APA) states:

*Careful judgment must be exercised by the psychiatrist in order to include, when appropriate, the parents or guardian in the treatment of a minor. At the same time, the psychiatrist must assure the minor proper confidentiality.*

The report should be addressed to the medical director of the insurance company, clearly marked as confidential medical information. (1977)

## C.4.d.

**Question**: Can a psychiatrist ethically examine a child at the request of the noncustodial parent and against the expressed disapproval of the custodial parent and, then, testify in court about the child?

**Answer**: No. We are not addressing the issue of seeing the child in an urgent situation when the custodial parent is not available. Section 4, Annotation 2 (APA) states:

*A psychiatrist may release confidential information only with the authorization of the patient or under proper legal compulsion.*

Since we are talking about a child, that authorization could only come from the custodial parent. If the noncustodial parent felt the consultation was necessary to protect the interests of the child, legal assistance could have been sought, and the court could have ordered the examination. (1983)

## C.4.e.

**Question**: A disturbed adolescent has been referred to me whom I consider dangerous, though to no known person, and I am personally fearful of him and do not believe him treatable.

Advising his mother would upset her and might bring retaliation from the boy. What is my ethical responsibility?

**Answer**: First, you should arrange a consultation with a colleague knowledgeable about such a condition. Then, based on that opinion, it is essential that the mother be fully advised of the clinical situation and that the boy be properly placed for care, removing yourself from the treatment if you believe you cannot help him. (1986)

## C.4.f.

**Question**: A couple I am seeing eventually divorces, and a bitter child custody dispute ensues. One spouse asks me to testify and the other asks me not to. What do I do, especially if I am subpoenaed?

**Answer**: You are obligated to protect the confidences of each equally. If ordered to testify, you should raise the issue of confidentiality; however, you may have no choice but to respond to proper legal compulsion if the best interests of the child are paramount. One possible way to preemptively avoid this unfortunate situation is to ask such a couple up front, as a requirement for treatment, to sign an agreement that they will not attempt to use you in any legal struggles. (1986)

## C.4.g.

**Question**: Is it ethical for a psychiatrist who works for a school district, or is a consultant to a committee of that district, to treat or assist independently any child who attends the school in the district? May the psychiatrist accept referrals from the district?

**Answer**: Yes. It is ethical to provide consultation or treatment. Care should be taken to assure that in doing so no exploitation of the patient or of the school district occurs. The district is not obliged to refer clients to other psychiatrists. In addition, it is possibly advantageous to the school district that it refers clients to a psychiatrist with whom it has experience. It would be the obligation of the ethical psychiatrist to inform patients that they have the right to freely choose another psychiatrist in the community. In addition, when referrals are offered, the consultant has to evaluate whether there is some hidden advantage that the referrer wishes to obtain. If accepting the referral will interfere with the consultant's objectivity (either in that particular case or in a general way), there should be consideration of refusing the referral. (1993)

## C.4.h.

**Question**: What are the ethical considerations of accepting private referrals from a school board for which the psychiatrist provides consultation to the special education department, and specifically where the consultation involves an "individualized education plan" for disabled students under PL 94–142?

**Answer**: The ethical psychiatrist may accept such a referral as long as he or she is careful to avoid any conflict of interest in rendering the consultation on a child being seen in therapy, since decisions will be made about public financing of that child's education and counseling. This would apply as well to due-process procedures that relate to the child being treated. In most cases, since the consultant knows the school district, he or she can better serve the disabled child, especially in getting appropriate available school services as long as this does not compromise the consultant's neutrality and objectivity. (1993)

## Section 6

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

### C.6.a.

**Question**: I am leaving a hospital where I am the only child psychiatrist. Is it ethical for me to turn over my child patients to psychiatrists whose competency is not known to me?

**Answer**: You owe it to your patients that they be transferred to competent replacements. If you believe they are not, to avoid possible abandonment, the hospital should be advised to seek competent replacements. (1990)

### C.6.b.

**Question**: Is it ethical for a psychiatrist to treat one of his or her own children with psychotropic medication?

**Answer**: There is no explicit statement in *The Principles of Medical Ethics* (AMA) or the *Annotations* (APA) that says it is unethical for a physician to provide psychiatric treatment or to prescribe medication to his or her own children. However, we believe that it is axiomatic that such an arrangement might be destructive and is to be avoided if at all possible. In our view, Section 6, Annotation 1 (APA) does cover such situations. It states that "preservation of optimal conditions for development of a sound working relationship between a doctor and his/her patient should take precedence over all other considerations." Clearly, treating one's own child does not preserve the optimal conditions for a sound working relationship. (1993)

# D. CONFIDENTIALITY AND INFORMED CONSENT

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### D.1.a.

**Question**: I work in a small college mental health clinic setting. On occasion we see patients who have had a recent relationship breakup with a partner that we also see or have seen in psychotherapy. Often the patient tells his/her story and forms a treatment relationship with the psychiatrist before the connection to clinician's other patient is revealed. By revealing the conflict of interest to the new patient and referring them to a colleague, we risk breaching the first patient's confidentiality. We have generally proceeded with the new treatment relationship unless:

1. We find we cannot provide reasonably impartial or effective care, or
2. One of the two in therapy reveals that they know the other is also in treatment, in which case we are able to more openly address the conflict and make an appropriate referral if indicated.

What are your recommendations?

**Answer**: Working in a small college setting is like working in a small town, or an underserved area where there are a limited number of mental health clinicians available to serve the population. In such settings, conflicts of this nature are inevitable. The solutions you describe seem reasonable as they acknowledge the need to make decisions on a case by case basis. In many cases, where the treatment is limited to psychopharmacology it may not present a conflict to treat both patients.

As you suggest, sometimes it is impossible to find some plan that will satisfy every ethical value. You are not required to do the impossible. Rather, your responsibility is to weigh the costs and benefits of the various treatment options, keeping the competing values in mind. Then, using clinical judgment, you make whatever reasonable recommendations you can to your patients. (2005)

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## D.2.a.

**Question**: Does a psychiatrist have to inform a patient that the therapy session is being taped, or may the psychiatrist surreptitiously tape a session without the patient's knowledge and/or consent?

**Answer**: The psychiatrist, ethically, should inform the patient and allow the patient to refuse to have the session taped. Reference is made to Section 2 (AMA) which states, in part,

*A physician shall deal honestly with patients and colleagues...* (1981)

## D.2.b.

**Question**: What are the ethical considerations of my using videotaped excerpts of actual therapy sessions of my patients for workshops for mental health professionals, or even on national television?

**Answer**: Please see C.2.a. For workshops with mental health professionals, this practice would be acceptable as long as there is informed consent from the patients involved. The informed consent should specifically note that there will clearly be a permanent loss of confidentiality that might result from such exposure. Although we can envision certain problems arising from presenting such a videotape to a workshop for professionals only, presenting such a tape on national television raises the stakes considerably and opens up, inevitably, issues around the public's perception of psychiatry. (1993)

## D.2.c.

**Question**: The psychiatrist has a patient who is an attorney. This patient has told him that she is a daily marijuana smoker, but has asked him not to note this fact in the medical records. Does this physician have an ethical obligation to record information that is medically/psychiatrically significant even when the patient requests otherwise?

**Answer**: Daily marijuana use is a significant medical and psychiatric issue. To avoid noting it in the medical record, and following up on it, would be to provide less than optimal, or even competent, medical care, and would therefore be an ethical violation.

## <u>Section 4</u>

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## D.4.a.

**Question**: May I release treatment information to an insurance company about an adolescent patient? The father gave written permission.

**Answer**: It is ethical to provide sufficient information about a patient to an insurance company so that it can determine the validity of the claim. One should not provide highly personal information or speculative opinions but only that information relevant to evaluation of the claim. Written consent must be obtained. If the child is of sufficient maturity to judge the issue of complete confidentiality versus claim payment, the child should also be asked to give permission. Traditionally, this consent is blanket consent and not truly informed. To be fully informed, the patient would have to approve the report before it was sent. This creates an ethical dilemma since the parent's consent is not informed unless he sees the report also. The child may not want the parent to see the record. Judging the maturity of the child, the psychiatrist will honor the child's request for confidentiality. Section 4, Annotation 7 (APA) states:

*Careful judgment must be exercised by the psychiatrist in order to include, when appropriate, the parents or guardian in the treatment of a minor. At the same time, the psychiatrist must assure the minor proper confidentiality.*

The report should be addressed to the medical director of the insurance company, clearly marked as confidential medical information. (1977)

## D.4.b.

**Question**: When preparing a training videotape on psychotherapy, must the identity of persons other than the patient who may have private matters revealed be protected?

**Answer**: Section 4, Annotation 3 (APA) applies to anyone about whom private matters may be revealed. For example, in the taped psychotherapy session, a family member of the patient may be discussed. That person's privacy must be protected to the same degree as that of the patient. (1980)

## D.4.c.

**Question**: Can I give confidential information about a recently deceased mother to her grieving daughter?

**Answer**: No. Ethically, her confidences survive her death. Legally this is an unclear issue varying from one jurisdiction to another. Further, there is a risk of the information being used to seek an advantage in the contesting of a will or in competition with other surviving family members. (1983)

## D.4.d.

**Question**: As a condition of referring patients to our hospital, Employee Assistance Program (EAP) staff requires we keep them informed about treatment progress and even sit in on treatment planning conferences. Is it ethical to agree to such a condition?

**Answer**: EAPs are very much a part of the current scene and it is acceptable, in fact advisable, to develop working relationships with them. However, patient confidences cannot be compromised. To avoid this, information provided to an EAP, or attendance at a treatment planning conference, requires informed and uncoerced consent from the patient. The latter is especially important if there is any suggestion that refusing consent may negatively impact the patient's job. (1986)

## D.4.e.

**Question**: Are there any exceptions to revealing confidential information after the death of a patient or is it always restricted?

**Answer**: Theoretically, yes, although such a circumstance has not yet been brought to our attention. As with maintaining the confidences of a living patient, exceptions can be made to protect others from imminent harm or under proper legal compulsion. However, weakening this view reduces our responsibility to living patients who trust us to protect their confidences even after their death. This is no less so if the deceased is a prominent person. (1986)

## D.4.f.

**Question**: Do I have an ethical responsibility to complete insurance forms for a former patient for services I rendered? For a current patient I am treating?

**Answer**: Yes to both questions. See Opinion C.4.g. and AMA Council Opinion 6.07, which states:
*The attending physician should complete without charge the appropriate "simplified" insurance claim form as a part of service to the patient to enable the patient to receive his or her benefits. A charge for more complex or multiple forms may be made in conformity with local custom.* (1987)

## D.4.g.

**Question**: May I use a videotape segment of a therapy session at a workshop for professionals?

**Answer**: Yes, under the following conditions:

1. The patient gives fully informed, uncoerced consent that is not obtained by an exploitation related to the treatment.
2. The proposed uses and potential audience are known to the patient.

3. No identifying information about the patient or others mentioned will be included.
4. The audience is advised of the editing that makes this less than a complete portrayal of the therapeutic encounter. (1990)

## D.4.h.

**Question**: The abusing father of a former patient who suicided is demanding the medical records of his dead son and claims, as the executor of the son's estate, the legal right to these records. I am certain the patient would never have entered treatment if he thought his father would get his records. What do I do?

**Answer**: Your ethical obligation is to withhold the records. You need a lawyer to determine your legal, *not your ethical*, position. If the father is legally right and cannot be dissuaded, your recourse may be to petition the court to determine the need for disclosure and the limitation of disclosure to what is relevant to whatever *legally proper* question the father has (insurance, for example) and not for his defensive curiosity. (1990)

## D.4.i.

**Question**: What are the obligations and responsibilities of the executors of the estate of a deceased psychiatrist with respect to the records of former patients? Specifically, should the executor notify all persons about whom there is a medical record?

**Answer**: No. Active patients will have tried to reach the doctor and will no doubt have been informed of the psychiatrist's death. There is no obligation to inform former patients and to do so may violate their right to confidentiality. (1993)

## D.4.j.

**Question**: Is it ethical to send a questionnaire to HMO members who have received psychiatric and/or substance abuse services? This will be a part of the HMO's quality assurance protocol.

**Answer**: Yes, with the appropriate assurance to patients that the material will be anonymous and confidential, and if the mailing material (envelope) does not contain information identifying the nature of the HMO services. (1993)

## D.4.k.

**Question**: Is it ethical for a physician to have his or her name listed as a creditor on a debtor's report?

**Answer**: The ethical issue is the enduring loss of confidentiality for a psychiatric patient versus the physician's right to collect his or her fees. We believe that it is best to decline to be listed as the creditor. Federal law does prohibit the physician's name from appearing on the debtor's

credit record in cases of treatment for chemical dependency. See Opinion 6.08, *AMA Council Opinions*, 2000–2001. (1994)

## D.4.l.

**Question**: I have several adult patients who are younger than 60 and who I believe need a guardian. They have no family members available and/or willing to file the paperwork to get the process started, and they don't believe they need a guardian so they will not consent to sign a release. Several attorneys who process guardianships have told me that all I need to do is let them know who the person is and they will file the necessary paperwork. Most of them tend to charge a $250 yearly fee that they deduct from the patient's income. I have spoken with the local adult protective services about this issue, but they have no jurisdiction until the patient is 60 or older, after which APS is able to petition the courts to get the patient a guardian, and the judge just appoints an attorney. Is it ethical to choose an attorney to process the paperwork, violating the patient's confidentiality by sending this information, since I ultimately believe the patient doesn't have the capacity to consent to the release of information in the first place? If the patient were to sue me for breach of confidentiality, would he/she have a valid claim?

**Answer**: The concept of confidentiality is built on two fundamental ethical principles: beneficence (doing good for patients) and non-maleficence (not doing harm to patients). There are certain instances in which the preservation of confidentiality could actually violate both of these principles. For example, when a patient is in danger to self or others, preserving the patient's confidentiality by not sharing his identity with the appropriate authorities, could lead to harm TO the patient (and/or the community). Identifying the patient to authorities can lead away from harm and towards good for the patient via access to treatment, which in turn can minimize or remove the potential for harm.

In this guardianship conundrum, rigidly adhering to the principle of confidentiality would similarly serve neither beneficence nor non-maleficence. To avoid excessive paternalism, the doctor should be doubly sure that these patients truly have no one to exercise stewardship over their vulnerability. If the ethical duty to deploy beneficence and avoid maleficence for a highly vulnerable person simply cannot be realized by passing such duty to an agency or ethically responsible family member, then it is ethical for the psychiatrist to identify this patient to the appropriate authorities or experts in order to initiate the formal process which might result in guardianship. Analogous to the patient who is an acute danger to self or others and for whom the sharing of information with authorities has long been ethical and legal practice, pursuing the first step of guardianship initiates a sequence that mobilizes authorities (police, judges, lawyers) who take things from there.

The second question requires a legal, not an ethical, response. (2012)

# E. DUTY TO REPORT AND PROFESSIONAL COMPETENCY ISSUES

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## E.2.a.

**Question**: What is considered ethical when commenting on a fellow psychiatrist's professional ability if one feels the psychiatrist is far less capable than his or her peers: to a patient, to another physician, to someone who asks your opinion of the psychiatrist's professional abilities, to other pertinent people?

**Answer**: It is ethical to expose physicians deficient in character or competence. See Opinion 9.04, AMA Council Opinions, 2000–2001, which reads in part:

*A physician should expose, without fear or loss of favor, incompetent or corrupt, dishonest or unethical conduct on the part of members of the profession.*

Section 2, Annotation 3 (APA) states:

*A psychiatrist who regularly practices outside his/her area of professional competence should be considered unethical.*

However, these references say that determination of competency should be made by peer review boards or proper medical tribunals. One who believes a fellow psychiatrist is a potential danger to patients should report this concern to the appropriate organizational component. Certainly one would not refer a patient to the psychiatrist nor recommend another physician to do so. Otherwise, discussion of the psychiatrist's competency should be conducted in the privacy of the proper peer review body. (1978)

## E.2.b.

**Question**: As a forensic psychiatrist, I am involved on the side of the defense in a charge of sexual involvement with a patient by a psychiatrist. Should I report this to the ethics committee?

**Answer**: Not unless this was in the original agreement, something unlikely for his attorney to have recommended. You owe him protection of his confidences except that which your

testimony makes public. While Section 2 (AMA) requires the reporting of offending physicians, there are limits inherent in confidential relationships unless there is imminent public danger or proper legal compulsion. (1986)

## E.2.c.

**Question A**: An ex-patient calls a psychiatrist's wife to inform her that she and the psychiatrist are having an affair. Can the spouse bring an ethics complaint?

**Answer**: Yes. (1989)

**Question B**: Do colleagues who are aware of this situation have an obligation to report this alleged behavior?

**Answer**: Yes. (1989)

## E.2.d.

**Question**: I am a psychiatrist in private practice in a fairly small town and have unfortunately come across some serious concerns about a colleague's sexual contact with a patient. The patient in question has asked that I not initiate contact with the allegedly offending colleague for fear of reprisal. I am unsure of my duties to the patient vs. the community vs. my colleague.

**Answer**: Unless you live in a state that requires reporting sexual activity with a patient (it is criminal activity in some states) you would need the patient's permission to report. Even then, your ethical duty to preserve the patient's confidentiality may supersede this legal requirement, depending on the benefits and risks for her that would be associated with reporting or not. Breaching confidentiality without the patient's consent might also put you at risk for a malpractice suit or licensing sanctions. You could consider suggesting to the patient that she report the colleague herself, possibly as part of a healing process, and she could choose whether to identify herself or not. You may also want to consult with a colleague to discuss possible courses of action in more depth. (2001)

# <u>Section 4</u>

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## E.4.a.

**Question**: Have I behaved ethically in not disclosing to state authorities that my patient had sexually abused his children? The state requires that all child abuse be reported to the authorities, and I may be subjected to a malpractice suit. In my defense, the abuse as reported by my patient

had not been as extreme as reported by the wife. Furthermore, the patient and I had been therapeutically working on the problem, and I anticipated an early resolution.

**Answer**: This is a situation in which your ethical position may come into conflict with state law. It would appear that you behaved ethically because in your clinical opinion you felt that the child abuse had been exaggerated; you and the patient were therapeutically working on the problem and anticipated an early resolution. Section 4, Annotations 1, 2, and 9 (APA) would lend support to your position. Nevertheless, where state law requires disclosure, you are ethically required to do so. The specific requirements of state law should be checked. (1981)

## Section 5

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

### E.5.a.

**Question**: Does a psychiatrist have an ethical responsibility to report a social worker's possible unethical conduct that occurred during the time the psychiatrist was the supervisor?

**Answer**: First, a psychiatrist should consult state laws to determine if any statutory or other legal requirements compel reporting. The ethical issue relates to the behavior of the social worker with a patient during a time when you were the supervisor. If the information about the unethical behavior came up during your subsequent treatment of the patient, then it would require permission from the patient to report the unethical behavior. In this situation, the issue involved a loan that the patient's father made to the treating therapist; some of the money was recovered in court. If the treatment issues came up in court, it might be appropriate to report to the National Association of Social Workers. (1997)

# F. ETHICS PROCEDURES

## SECTION 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

### F.2.a.

**Question**: A psychiatrist was accused by a former woman patient of sexual misconduct and she was encouraged by her present psychiatrist to file a lawsuit; the psychiatrist also filed a complaint with the licensing board. The original psychiatrist denies his guilt and wants to be heard by his district branch ethics committee, who did not receive a complaint. Can he request a hearing?

**Answer**: There is no provision for a potentially accused member to seek a hearing; that action lies with the complainant. Perhaps there should be such a mechanism, though the psychiatrist seeking this hearing could be subject to disciplinary actions; he cannot ask for a hearing with immunity. (1988)

### F.2.b.

**Question**: In the reverse of the usual, a "social relationship" turns into a professional relationship. Is this worthy of an investigation?

**Answer**: Yes. What is the nature of this "social relationship" and does it continue now that a professional relationship has occurred? Was the psychiatrist treating this person honestly in accepting clinical responsibility under the circumstances? And, what is the nature of the professional relationship? Some advice? Comfort in a crisis? Medications? Formal psychotherapy? Was there a treatment contract including a fee? Answering these questions through investigation should lead to a decision on whether a possible ethics violation has occurred. (1988)

### F.2.c.

**Question**: Should our ethics committee process a complaint of excessive fees?

**Answer**: The guiding issue is the nature of the contract between patient and psychiatrist. If the psychiatrist may have billed in excess of the contract, or failed to make the contract explicit, an ethics violation may have occurred and justifies your involvement. (See also Opinions E.2.g. and E.2.i.) (1990)

## F.2.d.

**Question**: Our ethics committee has trouble distinguishing between issues of ethics, law, competency, and impairment. We wonder if we err in reviewing competency issues and fear we will lose APA liability coverage.

**Answer**: To practice incompetently as a pattern of practice, especially after being so advised by peer review, or to practice in an area of medicine without proper training, is to have behaved unethically. An isolated incident of incompetent care may better be handled by other peer review mechanisms. Your district branch might use a routing mechanism to choose the most appropriate component to receive the complaint. Your ethics committee will be covered by the APA if you follow procedures correctly, since incompetency is clearly an ethical issue. (1990)

## F.2.e.

**Question**: I have personal knowledge that a colleague has behaved unethically with one or more patients. The patients are unwilling to bring an ethics complaint. Is it possible for me or any other psychiatrist who has such knowledge to bring an ethics complaint?

**Answer**: Yes. Indeed, *The Principles of Medical Ethics* include the admonition that an ethical psychiatrist's obligation is to expose unethical colleagues. The purpose behind this admonition is to lessen subsequent unethical behavior. Further, if there is extrinsic evidence such as a report of a malpractice suit that includes unethical behavior, a district branch ethics committee as a whole may bring an ethics complaint. (1993)

# G. FORENSIC ISSUES

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

## G.1.a.

**Question**: A nearby state institution for "the criminally insane" has been the object of continuing charges of patient mistreatment. Should the ethics committee investigate?

**Answer**: We would suggest that the district branch establish a special task force to conduct an investigation. If that task force uncovered evidence of unethical conduct by a member or group of members, a charge of unethical conduct should be developed and the ethics committee would be the proper hearing body for the complaints. The problems of this institution, if substantiated, may be a result of inadequate funding, mismanagement, or actual unethical conduct by individuals. "Institutional ethics" have not been sufficiently developed for the ethics committee to take a leading role in the investigation. (1974;1975)

## G.1.b.

**Question**: Can an ethical psychiatrist participate in the legal execution of a prisoner by injecting a lethal dose of a sedative?

**Answer**: Section 1 (AMA) says:

*A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity.*

Section 1, Annotation 4 (APA) states:

*A psychiatrist should not be a participant in a legally authorized execution.*

One could argue that death by injection of a sedative is more compassionate and more dignified than death by gas chamber, firing squad, or the executioner's noose. Nevertheless, the overriding meaning of this Principle is that the physician–psychiatrist is a healer, not a killer, no matter how well purposed the killing may be. (See Opinion 2.06, AMA Council Opinions, 2000–2001.) (1977)

## G.1.c.

**Question**: Is it ethical for me to provide a competency examination before the execution of a felon?

**Answer**: While it is not ethical to participate in an execution (see Opinion 1–C), it is ethical to provide a competency examination. The prisoner must be fully informed of the examination's purpose and lack of confidentiality, have legal representation, and the opinion must be rendered in keeping with accepted standards. The position of the psychiatrist at this point should not be to further his or her own opinion of capital punishment. (1990)

## G.1.d.

**Question**: Is it ethical for a psychiatrist to evaluate a family member who is a plaintiff in a civil litigation suit and then testify on the family member's behalf concerning the issue of mental damage resulting from the family member's claimed injury and damage?

**Answer**: To do the evaluation would be highly questionable from an ethical standpoint. There is too great a likelihood that the psychiatrist's clinical evaluation will be influenced by the relationship with the family member as well as the likelihood that the patient-relative's presentation of concerns will be influenced also. Any attempt to serve as an expert witness in a legal proceeding would be vulnerable to challenge. Under these circumstances, providing competent medical service would be too difficult when the patient is also a family member. (1993)

## G.1.e.

**Question**: Do the same ethics principles apply in a diagnostic/consultative relationship (e.g., performing evaluations for an insurance company) as in the physician–patient relationship?

**Answer**: Yes. Ethical physicians must comply with the code of ethics whenever providing professional services. Even when providing administrative or consultation services, physicians must conduct themselves appropriately. (But in such situations, the confidentiality expected in a therapeutic relationship may not exist.) This lack of confidentiality should be explained to the patient. (See also Sections 2 and 4, APA.) (1993)

# SECTION 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## G.4.a.

**Question**: Is it ethical for an employed psychiatrist to perform an evaluation to determine the competency of a patient to assist his hospital employer in collecting charges made to the patient?

**Answer**: No. This is clearly a situation involving a conflict of interest. Any such evaluation should be performed by a psychiatrist who has no financial relationship to the hospital. (1973)

## G.4.b.

**Question**: There has been a series of especially gruesome murders in a community. The similarity of the crimes strongly suggests they have been committed by the same individual, who in all likelihood is mentally ill. A forensic psychiatrist has drawn up a speculative psychological profile. Is it proper for the psychiatrist to make this profile public? If a local psychiatrist believes the profile may be that of a patient, should the psychiatrist report this to the police?

**Answer**: Since this profile is speculative and not representative of anyone known by the forensic psychiatrist, it is ethical to assist the police by providing them advice about the identification of the killer. If a psychiatrist believes the profile is that of one of his patients, the psychiatrist has the following options: (a) if it appears the problem is now history and future attacks will not occur, the psychiatrist should assist the patient in a decision to go to the police; (b) if there is reason to believe the attacks may continue, the psychiatrist should strongly urge the patient, perhaps with the assistance of the patient's lawyer, to go to the police; (c) if the patient refuses, it is ethical for the psychiatrist to notify the police. Section 4, annotation 8 (APA) states:

This is a permissive statement. In some jurisdictions, there is an obligation to report in a circumstance such as described above. (1977)

## G.4.c.

**Question**: I am asked to render an opinion for insurance purposes to determine if a suicide was a result of illness. Is it ethical for me to offer a diagnosis based on a review of records and without having had an opportunity to examine the patient?

**Answer**: Yes. (1983)

## G.4.d.

**Question**: I was treating a member of a prominent family when the patient was murdered along with some other family members. Under court order, I testified in the murder trial and in a civil action. Now a TV company wants to make a documentary of this and have me serve as a consultant. May I do so ethically?

**Answer**: We don't think it creates a good image of our profession for you, as the treating doctor of one of the victims, to be the named consultant. If you wish to pursue this, we don't see an inherently unethical issue, but you must reveal nothing new and provide no new insights other than those you made public in the trials. (1987)

## G.4.e.

**Question**: Can a psychiatrist evaluate a prisoner (i.e., patient) for the state and then determine that the prisoner requires involuntary hospitalization?

**Answer**: Yes. In this determination, the psychiatrist must do a proper psychiatric examination to ensure that the person meets the clinical criteria for involuntary hospitalization. It is then the psychiatrist's ethical responsibility to secure this intervention, working with other state agencies within the constraints of the law. It is important at the outset for the psychiatrist to make clear to the person to be examined the nature, purpose, and lack of confidentiality of the exam. The established criteria for involuntary hospitalization should be cited in the report to the court. (1994)

## G.4.f.

**Question**: State-licensed psychiatrists are hired as independent contractors through an independent medical services company to provide all medical and mental health services for a state's prisons. At one facility, the inmates are convicted sex offenders sentenced by the courts to a facility with special treatment capabilities for this population. The treatment is administered using a multidisciplinary team, and offenders are told their treatment records are confidential except for cases of dangerousness issues (e.g., threat of self-harm or harm to others). Psychiatrists are part of the treatment teams, and may or may not have much direct contact with inmates, but at a minimum attend every six-month review meetings where they are privy to the inmates' confidential treatment materials.

Near the end of the inmates' incarcerations, an Inmate Release Committee, composed of lay staff administrators, meets to determine which inmates should be screened for possible involuntary civil commitment as sexually violent predators. If the decision is to have them screened, two or three psychiatrists perform the evaluations. Sometimes these evaluating psychiatrists have been members of the inmates' treatment teams. At times these psychiatrists have allegedly relied upon and revealed confidential treatment material, such as from group therapies, when conducting evaluations and rendering commitment decisions on their own patients.
Is it ethical for a former treating psychiatrist to conduct an evaluation?

**Answer**: Psychiatrists who are members of a treatment team, even if their contact with inmates is limited, have nevertheless established a physician-patient relationship. Therefore, based on the background information provided, the practice of treating psychiatrists later serving as adversarial evaluators for the state governmental jurisdiction on their patients would constitute a violation of *Section 4* of *The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry*.. At the onset of treatment inmates must be informed of the

psychiatrist's dual relationship to them and to the prison system, and that their records can later be used to help determine whether they will be civilly committed as sexually violent predators (SVP). Absent that warning psychiatrists should not engage in SVP evaluations. (2004)

## Section 7

*A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.*

### G.7.a.

**Question**: I am a consultant to a Catholic diocese in the matter of approving or disapproving marriage annulments. I review reports and information gathered about the individuals and give an opinion on whether they are competent to request an annulment. I do not examine them personally. Is this ethical?

**Answer**: Yes. Consultants to various medical, social, and rehabilitative agencies are presented with data provided by agency personnel and are asked to give an opinion on such issues as rehabilitation potential and competency, or consultants are asked to recommend a treatment regimen. To ask them to perform a personal examination in each case would be impractical and prevent such agencies from benefiting from psychiatric consultation. The psychiatrist must, of course, observe the rules of confidentiality (Section 4, Annotation 4, APA) and of proper relationships with other health professionals (Section 5, Annotations 2, 3, and 4, APA). (1976)

### G.7.b.

**Question**: A psychiatrist testifies for the state in a criminal case about the competency of the defendant. The psychiatrist based the testimony on medical records and did not examine the defendant nor have the defendant's approval to render an opinion. Was this ethical?

**Answer**: Yes. See Section 7, Annotation 3 (APA): On occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention or who has disclosed information about himself/herself through public media. In such circumstances, a psychiatrist may share with the public his/her expertise about psychiatric issues in general. However, it is unethical for a psychiatrist to offer a professional opinion unless he/she has conducted an examination and has been granted proper authorization for such a statement. Confusion has arisen by taking the second sentence above and not connecting it to the first sentence as was intended. It is common for forensic experts to offer opinions as was done according to the question. Further, it would be too great an extension of the Goldwater Rule to say that a person, by being a defendant in court, has entered into "the light of public attention." This annotation was developed to protect public figures from psychiatric speculation that harms the reputation of the profession of psychiatry and of the unsuspecting public figure. (1983)

# H. INTERACTION WITH OTHER PROFESSIONALS

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## H.2.a.

**Question**: I work in a group practice, and one of our psychologists is being sued by a former patient for their having had a sexual relationship. The psychologist has admitted to it. We fired him, sent a letter to his patients indicating that he was no longer with the practice, and that we would help arrange for alternative care should they wish to continue treatment with our group. The letter did not indicate that he was fired or why he was no longer without practice.

I share several patients with this psychologist, who is now in solo practice. He sees them for therapy and they see me for medication management. Should I continue to see these ongoing patients, or should I tell them that I am no longer working with this psychologist? If so, how much should I tell them about the reason why I will no longer work with him?

**Answer**: You could indicate to those patients who continue to see you and the psychologist that (1) you are no longer working with him and (2) you can either refer them to another psychiatrist, or they can ask the psychologist to refer them to another psychiatrist. (2002)

## H.2.b.

**Question**: I work in a group practice and recently learned that a psychologist in the group is giving medication advice to patients, including specific medication directions. I have reported this to the psychologist's supervisor who indicated action will be taken after a review with the department chief. Am I required to report this to the psychology board?

**Answer**: Reporting this to the supervisor and contacting the Psychology Board to get its input (regarding whether they welcome a report) is wise. The psychologist may have practiced medicine without a license. This is a licensing issue and in some states could rise to a criminal offense. You have been responsibly proactive and have fulfilled an ethical duty to report another professional who may have put a patient in harm's way. (2012)

# Section 5

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

## H.5.a.

**Question**: Is it ethical to teach counseling principles to the clergy? Is it ethical to give them advice in the management of specific cases?

**Answer**: It is ethical to teach counseling principles to the clergy. The second question is more complex. Section 5, Annotation 3 (APA) states:

*When the psychiatrist assumes a collaborative or supervisory role with another mental health worker, he/she must expend sufficient time to assure that proper care is given. It is contrary to the interests of the patient and to patient care if the psychiatrist allows himself/herself to be used as a figurehead.*

Formal supervision of a pastoral counselor would not differ from the supervision of other nonpsychiatrist professionals. It is in informal contacts that problems arise. A cleric might call a psychiatrist for advice or seek a “curbstone opinion.” Perhaps a cleric might bring up a specific case during a seminar with a group of other clergies. Ethical psychiatrists should refrain from giving specific patient management advice, assuming there is not an emergency situation, unless they are very much aware of the capabilities of the receiver of the advice and have sufficient information about the patient to make the advice reliable. Psychiatrists are both ethically and legally responsible for the advice they give. (1975)

## H.5.b.

**Question**: Is it ethical for a psychiatrist and a psychologist to form a professional corporation as equal partners?

**Answer**: Usually there are local laws governing professional corporations that prevent this possibility. Where there are no such laws, such a corporation is permissible. Such a corporate arrangement, if agreed to, should not have features that interfere with the psychiatrist’s medical judgment, nor may the psychiatrist delegate to the psychologist any matter that requires medical judgment. This corporation must observe all ethical requirements that an individual physician must meet. The responsibility to see that this occurs falls upon the psychiatrist partner. See Section 5, Annotations 2, 3, and 4 (APA). (1978)

## H.5.c.

**Question**: Is it proper for a psychiatrist to be the "medical director" of a private clinic, the rest of whose staff are nonmedical professionals, when the psychiatrist spends very little time at the clinic?

**Answer**: It is not ethical for the psychiatrist to lend his or her name to the clinic merely to legitimize it. The psychiatrist must spend sufficient time at the clinic to assure that proper care is given and that nonmedical staff are not assuming responsibilities requiring medical training. See Section 5, Annotations 2, 3, and 4 (APA). (1978)

## H.5.d.

**Question**: Can I market a tape that helps people stop smoking? It will encourage relaxation and instill the idea of being an active nonsmoker rather than quitting smoking and is based on my office experience where I utilize a light hypnotic trance.

**Answer**: It is ethical to market useful health assistance and information to the public. However, you are subject to the usual ethical constraints to not make exaggerated claims and to provide material that reflects competent medical opinion. (1987)

## H.5.e.

**Question**: A mental health management company wants me to sign a contract with them that says my services would be limited to evaluation and medications (unless otherwise expressly approved), thus serving as a consultant to nonmedical professionals. This doesn't seem proper to me.

**Answer**: Our Principles and Annotations (Section 5, Annotations 2, 3, and 4, APA) state that you cannot delegate responsibility to those not competent nor serve as a figurehead to cover other practitioners. If you believe this organization demands you do so, don't join. We cannot judge the ethics of the health plan, but we can judge those of any psychiatrists who participate. (1990)

## H.5.f.

**Question**: Our hospital proposes that attending psychiatrists provide medical management and that other hospital-employed professionals provide psychotherapy. We don't have to do this if we think it clinically unwise, but the hospital will preferentially refer patients to those who do. Your opinion, please.

**Answer**: We do not address the ethics of hospitals but those of the psychiatrists practicing there. It is ethical to delegate treatment to other professionals if the psychiatrist is confident they are competent and it will not compromise the patient's welfare. It is not ethical, however, for the

psychiatrist to make that decision if financial inducement (patient referrals) takes precedence over the best interests of the patient. Further, a direct quid pro quo referral arrangement would be an unethical payoff. (1990)

## **Section 6**

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

## H.6.a.

**Question**: Is it ethical for a psychiatrist to be a party to a clinic whose lay advisory board responsibilities include “shall establish or recommend policies regarding the case intake and termination process, duration of treatment, diagnostic groups to be served, scope of services and program evaluation”?

**Answer**: Section 1, Annotation 3 (APA) states:

*It is ethical for a physician to submit his/her work to peer review and to the ultimate authority of the medical staff executive body and the hospital administration and its governing body.*

Clearly, a lay board cannot set a policy that requires a psychiatrist to give improper care. However, public-funded clinics are responsible to the public and its representatives, and a public decision can be made that sets general guidelines and limitations for the clinic staff: for example, age groups and diagnostic categories to be served, outpatient or day care or inpatient services, nondiscriminatory policies, and so forth. The clinic cannot do everything for everybody because of finite funding; it is the governing body’s responsibility to set the limits with professional advice provided by the clinic staff. (1977)

# I. MANAGED CARE

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### I.1.a.

**Question**: What are the responsibilities and the ethical requirements of a psychiatrist functioning within a managed care entity? Can the psychiatrist in the managed care setting be investigated and sanctioned based on the Principles of Medical Ethics that govern the conduct of treating physicians?

**Answer**: Regardless of the setting or context, the ethical psychiatrist must always provide service with compassion and respect for the dignity of the patient. Because of the trust that the patient places in the psychiatric profession, and thus in the psychiatrist, it would be expected that the ethical psychiatrist would provide treatment, including appropriate consultation, in a managed care setting or managed care role, with the patient's needs as the first priority. (See Section 1, Annotation 1 and Addendum 1, APA.) Conduct contrary to this Principle would be open to investigation if a formal complaint was lodged; sanctions would be imposed if an adverse finding was reached. (1993)

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

### I.4.a.

**Question**: Should I answer telephone inquiries from a UR nurse working for a managed care system asking about my patient's need for treatment and progress?

**Answer**: If the patient has given his or her consent and you are confident of the identity of the caller, you may do so. However, you should provide only that information relevant to the question and not reveal information about privacies not relevant to the question. The privilege rests with the patient who has made a decision to relinquish it as a cost of insurance coverage. (1987)

## I.4.b.

**Question**: Is it ethical for a physician to provide patient charts to a managed care company for an audit? Is this a breach of patient confidentiality?

**Answer**: For the physician to provide these charts, it is suggested that an informed consent be obtained from any patient whose chart is to be the subject of such an audit. A general informed consent, obtained at the time one applies for insurance, is inadequate. Charts should be reviewed by an appropriate clinician and the review take place in the physician's office where he or she can be certain that only appropriate clinicians see the files. Only the charts of patients who have their insurance paid by a managed care company should be provided for review. As with court-ordered release of records, attention must be paid to the release of confidential information about persons other than the patient. This may require that records be redacted for sensitive material by the treating physician. (1998)

## Section 6

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

## I.6.a.

**Question**: A local PPO does things I feel are unethical. They encourage their members to use PPO psychiatrists, unfairly compete with those of us who didn't join, and use draconian utilization control methods, even interviewing the patients themselves or calling them on the telephone. Do you agree they (the PPO's psychiatrist staff) are unethical?

**Answer**: Psychiatrists who participate in managed care systems are not inherently unethical if:

1. Patients and prospective patients (or their employers) make an informed decision to participate, which includes knowledge of the following:
   a. their other options;
   b. benefit limits;
   c. the pre-authorization and current authorization process;
   d. their right to appeal a utilization decision;
   e. the limits as to whom they can see without having to make a greater financial investment; and
   f. the potential invasion of their privacy by the review process.
2. No exaggerated claims of excellence are made.
3. Care provided is competent and meets patient needs within the contracted benefit limits.
4. The utilization review process is not unduly invasive of the doctor–patient relationship.
5. Reviewers are not financially rewarded for denying care.

Failure to meet these requirements may justify an ethics complaint against a psychiatrist involved. (1990)

# J. MILITARY AND OTHER GOVERNMENT AGENCIES

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### J.1.a.

**Question**: In an INS investigation, is it ethical for a psychiatrist to certify that an immigrant has revealed his or her homosexuality to the psychiatrist when that is the sole purpose of the "examination" and certification? This will result in exclusion of the person from the United States.

**Answer**: Section 1, Annotation 2 (APA) states:

*A psychiatrist should not be a party to any type of policy that excludes, segregates, or demeans the dignity of any patient because of ethnic origin, race, sex, creed, age, socioeconomic status, or sexual orientation.*

If the psychiatrist's only role is an administrative one that requires a physician's signature confirming a statement of homosexuality, the action is unethical. The psychiatrist would be a party to a policy that excludes because of sexual orientation. (1986)

## Section 3

*A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.*

### J.3.a.

**Question**: As a military psychiatrist, I have a responsibility to examine personnel who have used drugs, to determine if it is medically safe to proceed with the administrative process of rehabilitation and separation. Some of these people are one-time users, do not need rehabilitation, nor deserve separation. I object to such participation and believe it is unethical. Am I correct?

**Answer**: We do not believe you are, although we recognize your dilemma. The service regulations are the law under which you as a military officer serve. You may advise as to your

belief that the law is incorrect. However, your opinion that it is medically safe to proceed with requirements of regulations does not place you in an unethical position. (1985)

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

### J.4.a.

**Question**: A patient gave a signed release for me to respond to a government intelligence agency in the process of seeking a security upgrade. I refused as I believed this was an improper invasion of the treatment, and I do not believe the patient is a security risk. Was my action ethical?

**Answer**: If the patient knowingly and without coercion gave his or her consent, the privilege of maintaining or not maintaining his or her confidences is the patient's, not yours. There may be coercion here (no release, no security upgrade), but that is the patient's choice since presumably the upgrade is to his or her advantage. Your last point raises another issue: are you, or psychiatrists in general, knowledgeable and skilled in determining security risks? Clearly, any deception on your part, or the offering of an incompetent opinion, could be a violation of Section 2 (AMA). (1986)

## Section 6

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

### J.6.a.

**Question**: In an isolated, small metropolitan area exists a major military establishment. Is it proper for the local civilian psychiatrists to advise the local military commander for or against allowing military psychiatrists to "moonlight"?

**Answer**: No, since it would interfere with fair competition and the patients' freedom to choose their own practitioners. See Opinions 6.11 and 9.06, *AMA Council Opinions*, 2000–2001. (1974)

# K. PAYMENT, FEE AND FEE SPLITTING ISSUES

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## K.2.a.

**Question**: A new psychiatrist in town who works for a local clinic needs a part-time office where he can start up his private practice. To help him, I told him he could use my office in the evenings and pay me a small percentage of his billings. Is this ethical?

**Answer:** The proper arrangements are to negotiate a reasonable charge for the use of space, secretarial coverage, and other expenses. Greater use, or lesser, would require renegotiation of what constitutes reasonable charges. Though the agreed-upon amount might be similar to what would have resulted from a percentage arrangement, the appearance of fee splitting—the office owner benefiting from referring patients to the new psychiatrist—would be avoided. (See Opinions 6.02 and 6.03, AMA Council Opinions, 2000–2001.) (1975; 1976; 1978; 1984)

## K.2.b.

**Question**: A psychiatrist brings a colleague into the office. What is a proper means of paying that colleague for his or her services? Would it be any different if the colleague is not a psychiatrist but a nonmedical mental health professional?

**Answer**: See Section 2, Annotation 7 (APA):

*An arrangement in which a psychiatrist provides supervision or administration to other physicians or nonmedical persons for a percentage of their fees or gross income is not acceptable; this would constitute fee splitting. In a team of practitioners, or a multidisciplinary team, it is ethical for the psychiatrist to receive income for administration, research, education, or consultation. This should be based on a mutually agreed-upon and set fee or salary, open to renegotiation when a change in the time demand occurs.*

A physician is licensed by the people of a state to provide medical care. He is not licensed to establish an entrepreneurial business when the care of patients is subordinated to profit. His role as “captain of the ship” does not entitle him to profit from the efforts of nonmedical practitioners nor from psychiatrists dependent upon him for an opportunity to enter the community. He may

pay a salary to the new colleague commensurate with his professional work. If the arrangement provides for the colleague(s) to collect fees, he may only charge that colleague(s) what is appropriate for services he provides, such as space, secretarial support, supervision, and consultation. To the extent psychiatrists ignore this ethical requirement, they lose the support of public trust. (1976;1978;1990)

## K.2.c.

**Question**: Is it ethical for psychiatrists to charge for telephone calls from their patients?

**Answer**: Yes, if this charge was established in the treatment contract. See Section 2, Annotation 5 (APA):

*Psychiatric services, like all medical services, are dispensed in the context of a contractual arrangement between the patient and the treating physician. The provisions of the contractual arrangement, which are binding on the physician as well as on the patient, should be explicitly established.* (1976)

## K.2.d.

**Question**: Quite often I have patients in my psychiatric practice who let large balances accumulate over and above what their health insurance pays. I've heard that some offices ask the patient in continuing treatment to sign a payment schedule agreement when this happens. Is this ethical?

**Answer**: Yes. This should be established with the patient's consent as part of the contractual agreement. See Section 2, Annotation 5 (APA). It would also be permissible to add a service charge for the actual administrative costs of rebilling. (See Opinion 6.08, AMA Council Opinions, 2000–2001.) (1977; 1979)

## K.2.e.

**Question**: Is it ethical to charge for missed appointments? To raise fees in the middle of treatment?

**Answer:** Yes to both questions, but with consideration of the following ethical statements:

*Psychiatric services, like all medical services, are dispensed in the context of a contractual arrangement between the patient and the treating physician. The provisions of the contractual arrangement, which are binding on the physician as well as on the patient, should be explicitly established. (Section 2, Annotation 5, APA)*

*It is ethical for the psychiatrist to make a charge for a missed appointment when this falls within the terms of the specific contractual agreement with the patient. Charging for a missed appointment or for one not canceled 24 hours in advance need not, in itself, be considered*

*unethical if a patient is fully advised that the physician will make such a charge. The practice, however, should be resorted to infrequently and always with the utmost consideration of the patient and his/her circumstances. (Section 2, Annotation 6, APA)*

Clearly, problems exist only when the psychiatrist fails to establish the financial aspects of the treatment relationship with the patient. (1978)

## K.2.f.

**Question**: I have two psychologists in my group practice. They receive case supervision from me on a regular schedule, and I charge them a specific and agreed-upon fee. Is this ethical?

**Answer**: It certainly is. Section 2, Annotation 7 (APA) states:

*An arrangement in which a psychiatrist provides supervision or administration to other physicians or nonmedical persons for a percentage of their fees or gross income is not acceptable; this would constitute fee splitting. In a team of practitioners, or a multidisciplinary team, it is ethical for the psychiatrist to receive income for administration, research, education, or consultation. This should be based on a mutually agreed-upon and set fee or salary, open to renegotiation when a change in the time demand occurs*.

See also Section 5, Annotations 2, 3, and 4 (APA). (1978)

## K.2.g.

**Question**: Is it ethical for a psychiatrist to charge exorbitant fees for treatment rendered to patients?

**Answer**: As a general matter, subject to the guidelines below, the setting of a fee is a matter to be mutually agreed upon by the physician and patient. Opinion 6.05 of the AMA Council Opinions, 2000–2001 states:

*A physician should not charge or collect an illegal or excessive fee. For example, an illegal fee occurs when a physician accepts an assignment as full payment for services rendered to a Medicare patient and then bills the patient for an additional amount. A fee is excessive when after a review of the facts a person knowledgeable as to current charges made by physicians would be left with a definite and firm conviction that the fee is in excess of a reasonable fee. Factors to be considered as guides in determining the reasonableness of a fee include the following:*

*(1) the difficulty and/or uniqueness of the services performed and the time, skill, and experience required;*
*(2) the fee customarily charged in the locality for similar physician services;*
*(3) the amount of the charges involved;*
*(4) the quality of performance;*

*(5) the experience, reputation, and ability of the physician in performing the kind of services involved.* (1981)

## K.2.h.

**Question**: A patient with limited resources pays a small fee for psychotherapy, unaware her mother pays the remainder. The patient assumes she is being seen for a reduced rate. Is this unethical?

**Answer**: On the face of it, no. However, we would suggest consultation to determine the treatment implications of this arrangement. This might reveal transference distortions significant enough to constitute a violation of Section 2 (AMA):

*A physician shall deal honestly with patients...* (1984)

## K.2.i.

**Question**: It has been brought to our attention by angry ex-patients that a colleague not only charges for missed appointments canceled more than 24 hours in advance but also charges for future appointments after the patient refuses to continue treatment. If these arrangements were in the original treatment contract, are they ethical?

**Answer**: There are limits to how much a contract can commit a patient since it can be argued that the contract was not drawn between equal parties. When a patient discontinues treatment, charging for appointments made for the future may be a futile exercise and incomprehensible to most patients and medical colleagues. However, more important than a legalistic view of contracts is Section 1 (AMA):

*A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity.*

There are occasions when issues of fees have to be given secondary importance if aggressive pursuit of payment is experienced by the patient as an assault upon his or her dignity and integrity. The wise and ethical physician recognizes times when it is best to accept the position of the patient. We believe your colleague's behavior is not ethical. (1985)

## K.2.j.

**Question**: Is the following arrangement ethical? I practice forensic psychiatry, and a group of lawyers will provide my name as an expert to prospective clients for a proportion of my fee.

**Answer**: No. Opinion 6.02, AMA Council Opinions, 2000–2001, states:

*Payment by or to a physician solely for the referral of a patient is fee splitting and is unethical.*

In our opinion, it is equally unethical if the fee is split with an attorney. (1985)

## K.2.k.

**Question A**: A group of us cover for each other during vacations and sometimes for convenience, such as providing ECT for each other's patients. Is it proper for the attending psychiatrist to bill for colleagues' services and share the payments with them?

**Answer**: Yes, with three conditions: the billing indicates who provided the services, the patient is advised and agrees to the arrangement, and there is no fee splitting. (1986)

**Question B**: If the insurance company requires the covering physician to bill separately rather than the attending, is that ethical?

**Answer**: Yes, as above, and if the covering charge represents actual services performed. (1986)

## K.2.l.

**Question**: A hospital owned by a psychiatrist plans to pay each admitting doctor $300 for the admission and completion of an "admission plan." Is this ethical?

**Answer**: No. It is expressly termed unethical by the AMA (Opinion 4.01, AMA Council Opinions, 2000–2001). It is also illegal in many jurisdictions and nationally for federally funded patients. It is not clear what an "admission plan" is. If it is the initial treatment plan, this is the normal responsibility of the attending physician to complete. (1986)

## K.2.m.

**Question**: I billed my patient's insurance company for his care and when no payment was received, I billed the patient. When the patient did not pay, I utilized a collection agency that eventually collected the full amount but kept one-third as their share. Then the insurance company paid and the patient demanded the money. I want to keep the amount I lost to the collection agency. Is that ethical?

**Answer**: No. You should refund to the patient the payments received from the insurance company. Fees and their payment are a contractual agreement with the patient. In this situation, there was a presumption the insurance company would pay a portion of the bill, something the patient relied upon. Their failure does not make the patient liable for your collection costs. Collection costs, like other billing expenses, are part of the practice overhead built into your fee schedule. (1986)

## K.2.n.

**Question**: A private referral organization will make referrals to me in return for payment proportional to the number of referrals I receive. Is this unethical fee splitting?

**Answer**: It would certainly appear to be. Charges could be made on the basis of cost of the business plus a desired profit but not tied to the amount of fee-generating business volume. Additionally, the psychiatrist needs to be assured that he or she is a participant in an operation that is competent and ethical in other regards: no exaggerated claims, referral only to competent professionals, and referrals themselves made in a competent manner based on patient need. (December 1986)

## K.2.o.

**Question**: A psychiatrist sees a patient at a reduced fee until she obtains insurance, and he then bills the insurance company his full amount. Is this ethical?

**Answer**: It is ethical to alter fees as a patient's economic situation changes, including the addition of insurance benefits. However, the way this is presented is important: if the psychiatrist misstates previous fees to the patient as a justification for the full fee or states the patient was not seen at a reduced fee but a deferred fee (which the psychiatrist did not expect to receive), this may be fraudulent; but if the psychiatrist clearly states that this is the normal fee and, if the insurance company asks, that a reduced fee was charged previously in consideration of the patient's plight, the psychiatrist has behaved ethically. (1987)

## K.2.p.

**Question**: Is it ethical to allow the father of a former patient to provide construction services to me to pay off the bill and to pay off his own bill since the father is now my patient?

**Answer**: It is ethical to receive goods or services in lieu of fees for the son's bill as long as it is at fair market value and does not exploit the patient. However, while not clearly unethical relative to the father's bill, we recommend against such an arrangement with a current patient because of the likelihood of impairing the treatment relationship. (1988)

## K.2.q.

**Question**: Is it proper for me to pay a psychology group a percentage of my fees for office space, secretarial coverage, and billing costs? I am entirely independent of them to avoid any shared liability problems.

**Answer**: While this is a common practice, unfortunately, it is not ethical and constitutes fee splitting. The costs of these services should be established at market value and paid per your agreement or contract. Whether this is a sufficiently arms-length arrangement to avoid shared liability requires a legal opinion. (1988)

## K.2.r.

**Question**: Would hiring an attorney to pursue collection of a longstanding balance from the husband for my services to his deceased wife be considered "a harsh or commercial collection practice," discouraged by the AMA?

**Answer**: Much is left out in your question. Did the husband know of his wife's treatment? Did he agree and was he satisfied? What are his financial circumstances? Have you talked with him and tried to negotiate a payment schedule? Answers to these questions should be available to you before you go the legal route, which, in itself, is ethical. (1990)

## K.2.s.

**Question**: For inpatient work that may be prolonged and collection of fees potentially difficult and protracted, may I insist on prospective payment?

**Answer**: The guiding principle is that of contract. If the patient knowingly and without coercion agrees, it is ethical. Careful consideration, however, must be given to the patient's condition, as it may affect his or her ability to assess the contractual obligation. (1990)

## K.2.t.

**Question**: A psychological care company is considering the development of a working arrangement with a treatment services program that contracts with various facilities to provide care and staff training. Initially, the program will provide billing services for the providers, keeping 6% of monies; 10% of collections are kept to cover other services. Is this considered fee splitting?

**Answer**: An arrangement in which a fixed percentage of provider fees is retained by the contracting entity raises the question of fee splitting. However, an arrangement in which you charge providers a set fee for fixed and variable expense overhead (rent, office supplies, supervision, and so forth) would not raise the question of fee splitting. (See also the APA Ethics Committee's Ethics Newsletter on "Conflicts of Interest," and Opinion 6.02, AMA Council Opinions, 2000–2001.) (1995)

## K.2.u.

**Question**: I am treating a patient in regular weekly psychotherapy; the patient occasionally is unable to attend and cancels at the last minute due to business demands. The patient wants to pay for these missed appointments. Is it ethical to bill her?

**Answer**: Psychiatrists should explicitly review with the patient any policy about charges for missed appointments. (See Section 2, Annotations 5 and 6, APA.) If a physician has not charged for missed appointments and is now thinking of a change, consideration of the motives for the change is important. The new policy should apply to all patients. If the patient understands and

agrees to the policy, then it is entirely ethical to bill for missed appointments. The bill should explicitly identify the charge as being for a missed appointment. Charging a fee and billing as a medical psychotherapy session is improper, deceptive, and opens the physician to possible allegations of insurance fraud, billing fraud, or both. Billings now include other payers in addition to the patient. Some contracts for services, including federal and state programs, clearly exclude the option of billing for missed appointments. The ethical psychiatrist must honor his or her agreement under the contract's terms. In some states, laws may prohibit billing for missed appointments under any circumstances. Such billing might be construed as representing services that were not provided, thus placing the physician at risk of being unethical. (See Section 3, APA, which states in part: "A physician shall respect the law...")

So the answer is: "It depends." Do review any contractual agreements you may have and the state law. (1998)

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

### K.4.a.

**Question**: Can a physician use a private detective firm to determine where a former patient works in order to collect a fee awarded in small claims court?

**Answer**: Yes, a physician has the right to take reasonable steps to be paid an agreed-upon fee. In this situation, since the patient did not question your bill and did not appear in court to contest your request for payment, you can use whatever legitimate procedures to collect the fee in question. In using a private detective, care should be taken to limit the identification of the patient to those with an absolute need to know. For example, it would be improper for the investigator to have contact with the patient's employer. (1994)

## Section 5

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

## K.5.a.

**Question**: Is it ethical for a psychiatrist to bill for services provided by a nonmedical professional?

**Answer**: Yes, as long as the psychiatrist indicates the role was supervisory and what the discipline of the nonmedical professional was. It would not be ethical, in fact it would probably be fraudulent, to bill for the services of another as if performed by the psychiatrist himself or herself. (1977)

## Section 6

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

## K.6.a.

**Question**: A local hospital privileges only members of a psychiatric group, not accepting those who are not members. The hospital excluded local child psychiatrists who are not group members, but it claims to provide child psychiatric services. Further, the group charges a percentage of fees for administration from its members. Is the hospital unethical?

**Answer**: Our function is to keep our members ethical, not hospitals. Hospitals may contract exclusively with a medical group. Deceptive advertising is not proper for a hospital, and this may be occurring. The psychiatric group relationship appears to constitute fee splitting and may not be ethical. While we may not declare a hospital unethical, our members who participate in such questionable activities, or benefit from them, may be called before an ethics committee. (1990)

# L. PHARMA

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

## L.1.a.

**Question**: The APA Ethics Committee was asked to offer an opinion about "shadowing," where physicians permit drug sales representatives to sit in on sessions with patients to allow the drug reps "to develop a better understanding of the role of pharmaceuticals in a typical physician's practice"....quote from Lilly policy. Most often there is a requirement to obtain consent from the patient, and typically the physician is paid for being a "preceptor."

**Answer**: This practice violates several of our *Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry*. It is a violation of the dignity of the patient to bring a third party observer into the treatment room, and even if consent is obtained, there is no way to assure that the patient does not feel coerced into giving consent. Further, when the physician takes money as a preceptor, it is exploiting the patient for the doctor's gain. It puts the doctor into a dual relationship, caregiver to the patient, and preceptor to the drug sales representative.

There is also the clear potential that while the pharmaceutical company representative is not overtly marketing, his or her presence would cause the preceptor/physician to prescribe that company's product.

It is important to distinguish this practice of "shadowing" from the practice of physicians receiving a fee for clinical teaching, which is not unethical. It is also important to distinguish this practice from the well established traditions of teaching medical students and residents in a clinical setting. (2003)

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## L.2.a.

**Question**: Can a physician buy stock in a company that makes a medication that one prescribes for patients?

**Answer**: The key consideration is if there is a conflict of interest. For example, is there exploitation of the physician–patient relationship for the physician's financial gain (i.e., does the physician's ownership influence the clinical decision)? This seems unlikely if a physician owns shares of stock in a publicly held company and prescribes one of the medications that the company makes. However, if the physician has control of a pharmacy committee of a large organization and can direct that only one brand of a certain class of drugs will be available, then there is more likelihood of some conflict. (1994)

## L.2.b.

**Question**: Is it ethical for a psychiatrist to accept payments from pharmaceutical companies for referring patients to participate in drug studies?

**Answer**: It depends on how the patients are enlisted for the referrals. It is not unethical to enlist patients through newspaper ads. Potential research subjects should be fully informed about funding sources for the study as well as benefits and risks (see Section 4, Annotation 12, APA). On the other hand, patients seeking treatment through ordinary channels are not expecting to be enlisted in a research study. It would be unethical for a psychiatrist to refer these patients when a fee is involved for such a referral. The psychiatrist is placed in a situation where there is a conflict of interest—he is being paid to make a decision that may not be in the best interests of his patient. (1997)

# Section 5

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

## L.5.a.

**Question**: Is it ethical to use funds from drug companies for mandated continuing medical education programs?

**Answer**: This is a rather tender subject. Without advertising from drug companies, our journals would be very expensive. Lectureships as well as other worthwhile projects are sponsored by drug companies. Many of our members see this as a mutual exploitation. At this time, it is ethical to use such funds, but this acceptance should not be tied to blatant advertising; only discreet

credit should be given to the company without mention of their products. Because mandated continuing medical education involves a psychiatrist's license and/or professional society membership, it would be proper if he or she assumed the full cost of such programs. See Opinion 9.011, *AMA Council Opinions*, 2000–2001. (1978)

## L.5.b.

**Question**: It seems inappropriate for me to attend a presentation by a drug company at a nice hotel with a free dinner buffet and then be paid $100. Do you agree?

**Answer**: Yes we do and so does the AMA. Acceptable would be a modest meal and no fee plus a squinty-eyed attitude toward what is presented. See Opinion 8.061, *AMA Council Opinions*, 2000–2001. (1990)

## L.5.c.

**Question**: A drug company will pay me a dollar for completing a questionnaire about my use and experience with its drug. I am not comfortable with this.

**Answer**: We share your discomfort and certainly do not applaud such activity. However, it does not appear to be inherently unethical if you believe the questions are couched in such a way to gather relevant clinical information. The dollar for your time does not present an ethical issue. (1991)

# M. PHILANTHROPY, GIFTS AND WILLS

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### M.1.a.

**Question**: My patient of almost 5 years has a terminal illness. With my assistance she has been able to more effectively deal with her approaching death. She has no family and wishes to bequeath her estate to me. Would it be ethical for me to accept?

**Answer**: It would not be advisable for you to knowingly permit yourself to be the beneficiary. To do so gives the appearance of impropriety and raises the possibility of exploitation of the therapeutic relationship. We advise you to encourage your patient to make this gift to a trust, foundation, educational institution, or public charity whose purposes are consistent with the patient's wishes. (1983)

### M.1.b.

**Question**: A patient of mine died and, without my prior knowledge, bequeathed a painting to me. Is it ethical for me to accept this bequest?

**Answer**: Questions to be asked are the relative value of the painting compared with amounts left to the family, their feelings on the matter, and your sureness of no element of coercion on your part. On the face of it, considering you had no chance to advise the patient on this matter before death, it would appear to be ethical to accept this bequest as a token of appreciation. (1986)

### M.1.c.

**Question**: A group of former patients have organized a nonprofit foundation to raise funds to promote a particular form of therapy of mine. None of the money comes directly to me. Is this ethical?

**Answer:** The issue is whether this is unethical exploitation of former patients by endeavors not directly relevant to the treatment goals. It would appear to be and, thus, is unethical. (1990)

## M.1.d.

**Question**: Our university asks us to solicit donations from former patients to support research. I wonder if this is ethical.

**Answer**: It would appear not to be ethical as it exploits the therapeutic relationship for purposes not relevant to the treatment goals. This would be even more so if you or other treating psychiatrists personally benefited from the donations. (1990)

## M.1.e.

**Question**: I am the executive director of an institute where I direct research and produce teaching events, among other things. Is it ethical to solicit present or former patients to contribute to this charitable institute?

**Answer**: The ethical issue is whether the psychiatrist exploits the special relationship with a patient or a former patient. Receiving the benefits of a fundraising effort, even if this includes contributions from patients, does not in and of itself create an ethical problem as long as there is no exploitation or coercion. For example, if there is a general fundraising effort in which the general public is solicited by your organization, no violation of ethics principles has occurred. On the other hand, if you suggest to a fundraiser that one or more particular persons (current or former patients) might be receptive to a solicitation, then you may have crossed over the ethical line, exploiting the physician–patient relationship, and perhaps breaching the patient's confidentiality. (1993)

# Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## M.2.a.

**Question**: I have been the psychiatrist for a family, seeing various members when necessary for the past 5 years. The father, knowing my concern and knowledge of the family and their trust of me, asks if I will consent to be executor of his estate and possible trustee of the children. Ethically, may I accept such a responsibility, perhaps waiving the usual executor or trustee fees?

**Answer**: We believe this responsibility would be an unethical and unwise mixture of roles that opens the possibility of information gained in the confidence of treatment to alter your performance as an executor or trustee. This information might result in impairing your necessary objectivity to conduct either or both of these responsibilities. (1989)

## M.2.b.

**Question**: Is it ethical to accept a large monetary gift from a current patient that was given in appreciation of recommending an attorney at the patient's request, a recommendation that was financially beneficial to the patient?

**Answer**: No. Taking such a gift, even if unsolicited, very likely exploits the physician–patient relationship and generally would result in a contamination of the treatment process to the disadvantage of the patient. (1993)

## M.2.c.

**Question**: A psychiatrist has been named in the will of a former patient; the will stipulates that scholarships be given in honor of the psychiatrist. Is this ethical?

**Answer**: Yes. As long as the psychiatrist does not participate in the selection of the candidates or other uses of funds, there is no possible exploitation or conflict of interest. (1994)

## Section 7

*A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.*

## M.7.a

**Question**: Is it ethical for a physician to make a memorial contribution to a scholarship fund, established for a patient who recently took her life?

**Answer**: It is ethical for a physician to respond with a reasonable contribution to the memorial scholarship fund established on behalf of her now deceased patient. As Karl Menninger said, "When in doubt, be human." Furthermore, physicians are encouraged to participate in activities that will lead to the betterment of the community and public health, and making a contribution to a scholarship fund would be one example of how to advance these ethical goals. *(2001)*

# N. PRACTICE ISSUES

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

### N.1.a

**Question**: Should an ethical psychiatrist allow his clinical performance to be reviewed and supervised by a hospital medical staff committee? Should he allow the committee to force him to change his treatment approach?

**Answer**: Section 1, Annotation 3 (APA) states:

*In accord with the requirements of law and accepted medical practice, it is ethical for a physician to submit his/her work to peer review and to the ultimate authority of the medical staff executive body and the hospital administration and its governing body.*

If the clinical performance of the psychiatrist is questioned, the medical staff can establish an appropriate level of supervision. If the psychiatrist is conducting the treatment in a manner that could be destructive to the patient, the psychiatrist can be ordered to change his approach or be removed from the case. However, he should have avenues of appeal available to him; and decisions of his peers, as well as those of the administration and the governing body, must not be capricious or unreasonable. (1975)

### N.1.b.

**Question**: Is it ethical for a colleague to make a diagnosis of mental illness solely because the individual has joined a “new religion” or “cult”?

**Answer**: No. See Section 1 (AMA):

*A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity.*

and Section 1, Annotation 2 (APA):

*A psychiatrist should not be a party to any type of policy that excludes, segregates, or demeans the dignity of any patient because of ethnic origin, race, sex, creed, age, socioeconomic status, or sexual orientation.*

While a person who joins a "cult" might be mentally ill, that decision must be made based on the accepted diagnostic standards, not "cult" membership per se. (1984)

## N.1.c.

**Question**: Is it proper for a psychiatrist to practice "Christian psychotherapy," taking fundamentalist positions on such issues as homosexuality, sex outside of marriage, and failure of faith and prayer causing illness?

**Answer**: If the patient is fully informed of the psychiatrist's views and seeks "Christian psychotherapy," yes. Obviously, this does not absolve the psychiatrist of providing competent care. A potential ethical problem arises if the patient is unaware of the psychiatrist's orientation, and the psychiatrist criticizes or diminishes the value of the patient's beliefs. This would violate Section 1, Annotation 2 (APA), which prohibits demeaning the dignity of a patient because of his creed. (1986)

## N.1.d.

**Question**: A reviewing psychiatrist for an insurance company has not examined my patient. Is it ethical for the reviewing psychiatrist to tell me how to treat my patient?

**Answer:** No; but it is ethical for the reviewing psychiatrist to raise questions about the care or offer suggestions. The treating psychiatrist is decision maker about the treatment. However, the contract between the patient and the insurance company includes the right of review and the right of the insurer, in some circumstances, to terminate the benefits. Generally, there is also a right of appeal by the patient and the treating physician. Outright rejection by the reviewing psychiatrist may result in benefit termination, throwing the financial responsibility upon the patient. Ultimately, patients have a right to participate in the decision to have their care undergo review, understanding that refusal to allow review might jeopardize their insurance coverage. (1987)

## N.1.e.

**Question**: We have a difficult time getting other physicians to do our hospital physical examinations. Some of our psychiatrists are doing them. Is this ethical?

**Answer**: Yes, in fact it is the standard of practice in some areas. The psychiatrist as a licensed physician can do this quite appropriately, assuming he or she has the necessary skills and calls in another psychiatrist if he or she believes it could be harmful in a particular situation. (1990)

## N.1.f.

**Question**: My public hospital requires me to assume more clinical responsibility than my salaried time allows me to manage competently. Is my attempt to do this unethical?

**Answer**: Your first effort should be directed at getting the hospital to remedy the situation. That failing, you might feel compelled to resign. If you remain and do your best, you are behaving ethically. For us to declare otherwise might place an even greater burden upon our underfunded public institutions. (1990)

## N.1.g.

**Question**: Is it ethical to restrict admission of chronic psychiatric patients to a state facility to those who agree to accept a trial of Clozaril therapy?

**Answer**: No, unless the state provides a facility with equivalent services to those patients who refuse the clozaril therapy. If this is a state government policy, then the remedy should be sought by directing a complaint and arguments to the official agency responsible for such a policy. If such a policy was made at the sole discretion of the chief psychiatrist at the facility, then a complaint should be made so that the district branch may carefully evaluate such a deviation from ethical standards. (1993)

## N.1.h.

**Question**: Is it ethical for a psychiatrist to perform full physical examinations, including vaginal examinations, on female patients either in the office or in the hospital?

**Answer**: A physical examination by a psychiatrist is not in and of itself unethical. Physical examinations should be performed with the usual safeguards to avoid any exploitation of the patient. It is also essential that the psychiatrist not practice outside of his or her area of professional competence. (1993)

## N.1.i.

**Question**: Does the psychiatrist have an ethical obligation to use interpreters when dealing with patients of limited English proficiency?

**Answer**: The ethical issues involve providing competent medical services and ensuring that the patient can provide informed consent on the treatment determinations. (See Opinion 8.08, AMA Council Opinions, 2000–2001.) To the extent possible, a psychiatrist should arrange his or her practice so that all patients are able to communicate effectively. A psychiatrist who finds himself or herself with many patients of limited English proficiency has an obligation to take reasonable steps to make effective medical interpretation available. (1993)

## N.1.j.

**Question**: Is it ethical to engage in a therapy (such as reparative or conversion therapy) to change sexual orientation?

**Answer**: No. Although successful and ethical treatments for legitimate psychiatric diagnoses may sometimes lead to some changes in sexual behavior, any treatment that is based on an assumption that homosexuality per se is a mental disorder, or is based on an assumption that the patient should change his or her sexual orientation, is by its nature unethical, as it violates numerous ethics principles. Such so-called "treatment" ignores established scientific evidence, demeans the dignity of the patient, succumbs to individual and social prejudice and stigma, and has often been significantly harmful to patients, families, others, and their relationships. (1999)

## N.1.k.

**Question**: Three of my employees are leaving my practice, and are setting up an office within a pre-agreed upon non-compete radius of five miles. Who is supposed to inform patients of their switching practices? Are they allowed to put their contact phone numbers on the letter, which may be seen as patient solicitation, in violation of their contract? I have proposed sending a certified letter containing their emergency contact information to only patients deemed to be high risk. I will also include information on how these patients may get their medical records.

On another note, since these clinicians have violated a number of agreements in their contracts, am I allowed to terminate them and collect their keys to this building?

**Answer**: Your questions/concerns are largely legal in nature. You would best be served by consulting an attorney. The issue of patient abandonment has strong ethical implications, however. You must be careful not to interfere with the ability and means of the departing practitioners' patients to be able to find, communicate with, and continue to see their clinicians. For instance, the concern about "patient solicitation" cannot supersede the continuity of appropriate and adequate patient care. (2006)

## N.1.l.

Question: I am working with a patient currently who is being transferred to Europe temporarily for her husband's job. She has been doing well with her current mental health team and wants to continue working with us while she is in Europe. Her plan is to return to her home state every 2-3 months and would see us in person during those visits. She would like me to continue to provide her with medication management services when she is in Europe, speaking on the phone or doing telemedicine appointments monthly or as needed.

I asked the state medical board if they thought this arrangement was acceptable and they said yes. How does the APA view this arrangement?.

Answer: As you describe your plan for the continued treatment of this patient who is moving to Europe temporarily, it should not pose an ethical problem. She wants to continue with her current treatment team, and she plans to periodically return for face-to-face visits. Any interim contact by phone or telemedicine would only be supplemental to her in-person visits, and you are making a thoughtful accommodation to maintain her continuity of care.

If you do use telemedicine you are engaging in the trans-border practice of medicine, and trans-border licensure issues have not been resolved. Further, if you plan to bill your patient's insurance company, they may not pay for telemedicine care. This should be clearly understood by your patient beforehand. Finally, your malpractice liability carrier may not extend coverage to you for any direct care you render to a patient who is out of the country. These are all additional aspects that you should consider before undertaking this endeavor. (2011)

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

### N.2.a.

**Question**: Is it ethical for a medical school to offer services already provided by private psychiatrists in the community? Is it ethical for the medical school to establish a contract with a labor union to provide services for its members?

**Answer**: It is not unethical for a medical school or a professional corporation to provide services in competition with private practitioners or to enter into contracts with businesses, labor unions, or consumer groups. (See Opinion 6.11, AMA Council Opinions, 2000–2001.) (1973)

### N.2.b.

**Question A**: Is it ethical for a psychiatrist to have an understanding with a hospital that the more patients he admits, the more the hospital will refer to him?

**Answer**: Yes, if the psychiatrist is the proper one by training and competence to care for the patient and if no pressure is placed on the psychiatrist to admit the patient for other than clinical reasons. (1986)

**Question B**: Is it ethical for a hospital to use nonpsychiatrist unit directors?

**Answer**: The ethical question is for the psychiatrist to decide if the hospital provides the quality of care needed for his patients and, if not, to use another hospital. This does not necessarily, nor only, hinge upon specific degrees assuming local licensure laws are followed. (1986)

### N.2.c.

**Question**: In my role as a forensic examiner of sexual offenders for a state agency, it is clear there is an expected opinion from me. What is my ethical responsibility?

**Answer**: To give the opinion to which your professional judgment leads you. If you submit to pressure to alter your opinion, you would be unethical. Section 2 (AMA) states:

*A physician shall deal honestly with patients and colleagues...*

Further, if your efforts to remedy the situation are to no avail, you may withdraw. (1986)

## N.2.d.

**Question**: Is a group contract to provide evaluations for medication purposes ethical if it prohibits a physician from discussing anything else with the patient?

**Answer**: Such a contract is not ethical because it places the physician in clear violation of his or her obligations under ethics principles. A psychiatrist cannot withhold information that a patient needs to make informed treatment decisions, including treatment options not provided by the psychiatrist. (See also Section 5 and Addendum 1, APA.) (2000)

## N.2.e.

**Question**: Has the APA formulated any position regarding the use of placebos in a clinical, non research setting?. I have a psychiatric colleague who regularly uses placebos with his patients who have chronic pain and chemical dependency issues with the justification that if they voice pain relief with the use of the placebo (which he informs them is active drug), then that tends to confirm that the pain "isn't real." It is my understanding that such a practice is unethical but I have not been able to find any documentation from the APA (including a thorough review of the The Principles of Medical Ethics with Annotations Especially Applicable to Psychiatry, 2001 Edition).

**Answer**: The use of placebos in routine clinical practice with the specific intent to deceive the patient is unethical, and represents a violation of Section 2 of The Principles of Medical Ethics which calls for honesty in all professional interactions. This is unlike the use of placebo in research which usually occurs only under very specific circumstances, with a clear scientific justification and with multiple specific safeguards to prevent exploitation of research volunteers. You may also wish to see the section in the *AMA Council Opinions* entitled, *Placebo Use in Clinical Practice*. An excerpt from this section follows:

"*A placebo is a substance provided to a patient that the physician believes has no specific pharmacological effect upon the condition being treated. In the clinical setting, the use of a placebo without the patient's knowledge may undermine trust, compromise the patient-physician relationship, and result in medical harm to the patient.*

*Physicians may use placebos for diagnosis or treatment only if the patient is informed of and agrees to its use. A placebo may still be effective if the patient knows it will be used but cannot identify it and does not know the precise timing of its use.* (2004)

## Section 3

*A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient.*

## N.3.a

**Question**: Is it ethical for a psychiatrist to direct an acupuncture clinic where he or she supervises Chinese acupuncturists?

**Answer**: Section 2, Annotation 3 (APA) states:

*A psychiatrist who regularly practices outside his/her area of professional competence should be considered unethical.*

If providing acupuncture treatment, is the psychiatrist competent to do so based on training and experience? Section 5, Annotation 3 (APA) states:

*When the psychiatrist assumes a collaborative or supervisory role with another mental health worker, he/she must spend sufficient time to assure that proper care is given. It is contrary to the interests of the patient and to patient care if the psychiatrist allows himself/herself to be used as a figurehead.*

Is the psychiatrist providing sufficient supervision to assure that good care is being given? Because acupuncture is a recognized form of therapeutics in many jurisdictions, if the answer to the above question is positive, the psychiatrist is behaving ethically. Section 3, Annotation 2 (APA) states*:*

*Where not specifically prohibited by local laws governing medical practice, the practice of acupuncture by a psychiatrist is not unethical per se. The psychiatrist should have professional competence in the use of acupuncture. Or, if he/she is supervising the use of acupuncture by nonmedical individuals, he/she should provide proper medical supervision.* (1973)

## N.3.b.

**Question**: Am I unethical if I abide by court decisions prohibiting necessary treatment (medications) for my patient? Is it unethical to continue to practice in a hospital controlled by such court decisions?

**Answer**: Section 3 (AMA) states: *A physician shall respect the law and also recognize a responsibility to seek changes in those requirements which are contrary to the best interests of the patient*. No to both questions. The public has a right to make decisions with which we may disagree, and our recourse is to convince the public otherwise.
(1989)

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

### N.4.a

**Question**: I terminated employment with a public clinic. Do the patient records belong to me or the clinic?

**Answer**: Common practice would say the records belong to the clinic. If any of the patients are to continue to see the psychiatrist in private practice, copies of the records should be made available for the psychiatrist by the clinic with the approval of the patient. Since the treatment contract was with the clinic and the patient might return to the clinic in the future, the best interests of the patient are met by the clinic maintaining the records. See Opinions 7.01 and 7.02, *AMA Council Opinions*, 2000–2001. (1977)

### N.4.b.

**Question**: I recently terminated therapy with a very troublesome patient after providing proper notice and choices of alternate treatment. The patient continues to harass me with endless vituperative phone calls. For the telephone company to intervene, I will have to provide the patient's name. Can I ethically do this?

**Answer**: We would suggest you consult with a colleague knowledgeable in the handling of such situations to see if there may be an alternative. If not, then consult with your attorney to weigh your risk of a lawsuit. As a last resort, it would be ethically permissible to contact the phone company if the calls continue to be seriously disruptive and the former patient has received ample warning. (1988)

### N.4.c.

**Question**: In a malpractice case where I am a defendant, as part of a possible settlement, I am being asked to surrender my records of the consultation that led to the suit. The alternative recipients are the state, which is a codefendant, or the court. This may result in the destruction of the records. Is it ethical to comply?

**Answer**: Your records are the evidence of your professional conduct and an essential component of your care of the patient. To surrender them as a bargaining chip in negotiating a settlement, short of a proper compulsion of the court, is to fail to properly safeguard the

confidences of the patient. Although it is the patient's request, the essence of your opinion is known to the patient and this apparently triggered the suit. The facts as you gathered them and evaluated them cannot be expunged. (1988)

## N.4.d.

**Question**: Family members, as well as patients, occasionally complain that the psychiatrist will not share information with them about diagnosis, treatment recommendations, and treatment alternatives. What are the ethical requirements?

**Answer**: A patient has the right to be fully informed about these issues to be able to give consent to the treatment plan but with consideration that the information will not be harmful. Family members, however, are very limited in the amount of information they can receive unless the patient gives consent. There are exceptions, of course, such as imminent danger to self or others or incompetence of the patient who needs family protection. States have different laws limiting release of information about patients, and this should be well understood by psychiatrists in each state. At the same time, the psychiatrist should help family members understand the legal and ethical limits of divulgence and provide them with support and understanding within those limits. To not do so makes the psychiatrist appear to be indifferent to family distress. (1989)

## N.4.e.

**Question**: What are the obligations and responsibilities of the executors of the estate of a deceased psychiatrist with respect to the records of former patients? Should records be given to former patients if they request them?

**Answer**: No. The records may be sent to a psychiatrist or other mental health professional who is assuming the care of the patient if proper release is obtained. Local laws will determine how long such records must be retained before they are destroyed. (1993)

## Section 5

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

## N.5.a.

**Question**: Is it ethical for a supervising psychiatrist to sign a diagnosis on an insurance form for services provided by another professional that he or she is supervising and when the supervising psychiatrist has not examined the patient?

**Answer**: Section 5, Annotation 3 (APA) clearly states that the supervising psychiatrist must expend sufficient time to assure that proper care is given and not allow the role to be that of a figurehead. Further, the insurance form must indicate the role of both supervisor and the person supervised. If these provisions are met, the answer is yes. (1988)

## N.5.b.

**Question**: If the family of an adult patient requests a second opinion, what are the obligations of the consultant? Can he or she disagree with the treating psychiatrist?

**Answer**: We are assuming the patient is competent, in which case, the second opinion is his or her request. If the patient is not competent, it is the family's request. The treating psychiatrist should agree to the request. With proper consent, the treating psychiatrist may discuss the case with the consultant. Also, with proper consent, the consultant may discuss his or her opinion with the treating psychiatrist; however, the consultant is not obligated to do so since he or she was employed by the patient or family to give *them* advice, and the choice to include the treating psychiatrist is theirs alone. Of course, the consultant can disagree with the course of treatment based on his or her professional judgment, or there would be no purpose in obtaining a second opinion. (1989)

# Section 6

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

## N.6.a.

**Question**: Because of ill health, it has become necessary for me to retire. I have sent a written announcement to that effect to all my patients 90 days in advance. Full-fee patients have been accepted by other psychiatrists, but I am having great difficulty placing my Medicaid patients. The local public clinics have long waiting lists. Will I be abandoning my patients?

**Answer**: No. Ninety days written announcement is quite adequate. It is unfortunate you are having such difficulty placing your Medicaid patients, but you have done all you can be expected to do. Your colleagues might wish to consider their roles as ethical practitioners in assisting you and your patients in your time of need. (1978)

## N.6.b.

**Question**: Is it ethical for a psychiatrist to admit and treat staff members or their families in the hospital where the staff member works?

**Answer**: This does not appear to be an ethical question, but rather a question of what is best for the patient, primarily, and the feeling of hospital staff, secondarily. Ideally, the patient should be admitted to another hospital. However, availability of needed special services or continuity of care may take precedence (e.g., the admitting psychiatrist was treating the patient before admission and this is the psychiatrist's only hospital). (1985)

## N.6.c.

**Question**: In our underserved area, the doctors at a local mental health center do not have or want privileges at a local hospital and do not feel they have responsibility if a patient of theirs needs to be hospitalized. Is this ethical?

**Answer**: The decision does not appear to be ethical and may constitute patient abandonment. A solution could be provided by a contract between the mental health center and the hospital and its medical staff to provide services when needed that are not provided by the mental health center and its psychiatrists. (1988)

## N.6.d.

**Question**: Is it ethical for a psychiatrist practicing in a small community to treat an adult member of another psychiatrist's family when there is much family acrimony? The psychiatrists do not work together and have infrequent contact.

**Answer**: The treating psychiatrist must assure confidentiality, of course, and provide a treatment environment in which the patient feels secure. Further, any relationship with the parent psychiatrist must not preclude a sense of trust on the part of those involved. Another consideration is whether there is another psychiatrist within reasonable distance. With proper consideration of those concerns, it would not be unethical. (1989)

# O. PROFESSIONAL LISTINGS, ANNOUNCEMENTS

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

### O.2.a.

**Question**: A member lists himself in the telephone Yellow Pages as a "certified psychoanalyst." His colleagues know he is not a psychoanalyst. Is he unethical?

**Answer**: Section 2, Annotation 3 (APA) states:

*A psychiatrist who regularly practices outside his/her area of professional competence should be considered unethical. Determination of professional competence should be made by peer review boards or other appropriate bodies.*

It is not ethical to claim a competence not possessed. The ethics committee would want to know what the psychiatrist's actual training and experience were. The title "psychoanalyst" is not owned exclusively by any organization. Thus, a person might not be unethical in using that title, even though he or she was not a graduate of an accredited training center, if training from other sources reasonably related to the task of being a psychoanalyst had been received. (1978)

### O.2.b

**Question**: Can an ethical psychiatrist list himself in a professional directory?

**Answer**: While the answer to this question is generally yes, one is advised to seek guidance from the local medical society on all matters related to what can be broadly called advertising. Certainly it would be unethical for the psychiatrist to misrepresent himself or to make fraudulent claims. Deception of the public by misleading, inflated, and self laudatory claims is to be avoided. (See Opinion 5.02, AMA Council Opinions, 2000–2001.) (1978)

### O.2.c.

**Question**: I plan to purchase a solo psychiatric practice and request information on the ethical aspect of this situation. What sort of notices can be sent to other physicians and how can I indicate that I am taking over a practice?

**Answer**: It is ethical for you to send an announcement to other physicians and agencies from whom you expect referrals that you are taking over another doctor's practice. If you have questions about the format, your local medical society should be consulted. For additional guidance see Opinions 7.03 and 7.04, AMA Council Opinions, 2000–2001. (1980)

## O.2.d.

**Question**: May I send out notices to doctors and lawyers in my neighborhood stating I would appreciate referrals?

**Answer**: Yes, as long as the notices are not deceptive, misleading, or false. Claims of unusual or special competence would be improper. (1990)

## Section 7

*A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.*

## O.7.a.

**Question**: Is it ethical for a psychiatrist to offer his or her professional services to a public figure based on data from the media?

**Answer**: No. Section 7, Annotation 3 (APA) cautions against drawing clinical conclusions based on information gleaned outside the clinical setting. Furthermore, it would seem unwise for a physician to solicit patients by such means. (1994)

## P. REFERRAL PRACTICES

## <u>Section 2</u>

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

### P.2.a.

**Question**: A colleague and I wish to own and manage a day hospital. Will it be a conflict of interest if I refer my patients there?

**Answer**: Not if it is clinically appropriate to do so and your patients are informed in advance of your financial interest. This also requires that you make other arrangements for them if they object. (1991)

### P.2.b.

**Question**: Our state hospital has an arrangement with a public clinic to have the clinic's psychiatrists treat their patients in our hospital and refer patients back to the clinic at discharge. Any problems?

**Answer**: No, assuming the psychiatrist taking the discharge referral is the clinically proper person. This is the standard practice in the private sector attending model. (1991)

## <u>Section 5</u>

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

### P.5.a.

**Question**: Is it ethical for a psychiatrist to refer a patient to a qualified mental health professional who happens to be his wife?

**Answer**: Yes. However, the psychiatrist has the same ethical responsibilities in making that referral as he would have if the person were not his wife. He cannot refer cases requiring medical care to her, nor can he give her only token supervision. He should also make clear to the patient that the referral is to the spouse. (1976)

## P.5.b.

**Question**: Is it proper for a public clinic to establish a referral list that excludes some psychiatrists? All psychologists?

**Answer**: Only if the exclusions are based on reasonable grounds. For example, the clinic might limit the list to psychiatrists willing to take emergencies, or to reduce their fees, or be available to provide hospital care, and so forth. The clinic certainly has a right, in fact an obligation, not to refer to a psychiatrist it has good reason to believe is not ethical or competent. The clinic would not be obligated to refer a child to a general psychiatrist if a child psychiatrist were available. Excluding psychologists is another matter if this is a blanket exclusion. Since laws governing the practice of psychology are so different, this would have to be determined by local laws. It would not be appropriate to refer a patient who needs the special skills of a psychiatrist to a psychologist. Section 5, Annotation 4 (APA) states:

*In relationships between psychiatrists and practicing licensed psychologists, the physician should not delegate to the psychologist or, in fact, to any nonmedical person any matter requiring the exercise of professional medical judgment.* (1978)

## <u>Section 6</u>

*A physician shall, in the provision of appropriate patient care, except in emergencies, be free to choose whom to serve, with whom to associate, and the environment in which to provide medical care.*

## P.6.a.

**Question**: Is it ethical for a psychiatrist to continue to see a patient in his or her private practice whom the psychiatrist began seeing as an employee of a public clinic? Can other professional members of the clinic refer patients to the psychiatrist?

**Answer**: The issue is what is best for the patient, rather than for the physician or the clinic. Patients must have the right of free choice of their physician. See Opinion 9.06, *AMA Council Opinions*, 2000–2001:
*Free choice of physicians is the right of every individual. One may select and change at will one's physicians, or one may choose a medical care plan such as that provided by a closed panel or group practice or health maintenance or service organization. The individual's freedom to*

*select a preferred system of health care and free competition among physicians and alternative systems of care are prerequisites of ethical practice and optimal patient care.* (1979; 1981)

## P.6.b.

**Question**: A patient had been seeing a particular psychiatrist. The patient now is covered by a PPO of which the psychiatrist is not a participant. An emergency occurs, and the primary care physician refers the patient to a mental health clinic that contracts with the PPO; the clinic states the patient will go on its waiting list for services. Who is responsible?

**Answer**: If the mental health clinic's contractual responsibilities do not include emergency care, the primary care physician must make another appropriate referral out of plan, ideally to the original psychiatrist. The PPO would be obligated to cover that service unless the insurance benefit excludes such care. If the mental health clinic is contracted to cover such services, it must do so and cannot use a waiting list for an emergency. (1989)

# Q. RESEARCH AND SCHOLARLY ACTIVITIES

## Section 4

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## Q.4.a.

**Question**: Are there ethical problems in writing a psychoanalytic casebook?

**Answer**: Section 4, Annotation 3 (APA) states:

*Clinical and other materials used in teaching and writing must be adequately disguised in order to preserve the anonymity of the individuals involved.*

The problem of disguising is not always easily resolved. Close friends, family members, or the patients themselves might see through the disguise. This could lead to legal liability as well as a charge of unethical conduct. Thus, the psychiatrist-writer must give special attention to this matter and may have to sacrifice some scientific accuracy for the sake of preserving privacy. On occasion, the psychiatrist-writer has shown the material in advance to his or her patients and received their informed consent for its publication. (1976)

## Q.4.b.

**Question**: A convict has sued me for a number of reasons including violation of his confidentiality, and he seeks to prevent my publication of any case based on his history. He has made my manuscript part of the court record. I believe the court will rule in my favor, but what about the ethical issue? Section 4, Annotation 3 (APA) requires adequate disguisement, but Annotation 10 (APA) requires fully informed consent as does Annotation 11 (APA).

**Answer**: Taken in total, presenting case material requires that patient identity be hidden; if this is not possible (for example, the patient or a video is presented), then fully informed consent is required. In this situation, however, since the patient has made known that the manuscript applies to him, it is not possible to hide his identity so that informed consent is necessary. A court decision may settle the legal issues but not the ethical issues. (1989)

## Q.4.c.

**Question**: What are the obligations and responsibilities of the executors of the estate of a deceased psychiatrist with respect to the records of former patients? May they be used for scientific or research purposes?

**Answer**: The ethical issue is one of confidentiality. Any disclosure of any record must have the consent of the individual patient. Medical records, although generally the property of the doctor, must be used only for the benefit of patients and their medical care. The use of such records even for such lofty purposes as science and research puts one on thin ice indeed. For these records to be seen, examined, analyzed, or otherwise used by researchers or scientists would require highly informed consent. (1993)

# Section 5

*A physician shall continue to study, apply, and advance scientific knowledge, maintain a commitment to medical education, make relevant information available to patients, colleagues, and the public, obtain consultation, and use the talents of other health professionals when indicated.*

## Q.5.a.

**Question**: Elderly patients often cannot give consent to be research subjects, but there is a great need for more knowledge about the aging process. What is the ethical position in this dilemma?

**Answer**: Obviously, if there is no ethical way to do research on our most disabled patients, we will be seriously hindered in developing preventive and therapeutic approaches for those most in need of help. The federal government has adopted regulations relating to this problem when the research is federally funded. Those regulations should be checked as guidelines. In addition, we suggest the following:

a. The preparation of a “living will” at the time the person was competent, which would indicate the desire to be a subject for research that is not dangerous and extend authority to some person to give approval. Such a living will would be very desirable, though obviously not always available, because individual may not have considered these issues during the time of his or her competency.

b. A determination of competency with the appointment of a conservator or guardian to be sure that the individual is not, in fact, now able to agree or refuse to be a subject. This conservator or guardian would have a responsibility not only to give approval, but also to provide continuous monitoring of the welfare of the conservatee.

c. It goes without challenge that there needs to be careful peer review of this research, heightened by the use of subjects who are not able to make this determination for themselves. It is very necessary that the peer review mechanism consider the welfare and best interests of the subjects.

d. Even though incompetent, the individual should retain the right to withdraw at any time as a subject from the project. See Opinion 2.07, *AMA Council Opinions*, 2000–2001. (1977)

## Section 7

*A physician shall recognize a responsibility to participate in activities contributing to the improvement of the community and the betterment of public health.*

## Q.7.a.

**Question**: Does the ethical prohibition embodied in Section 7, Paragraph 3 of the Annotations apply to psychologically informed leadership studies based on careful research that do not specify a clinical diagnosis and are designed to enhance public and governmental understanding?

**Answer**: The psychological profiling of historical figures designed to enhance public and governmental understanding of these individuals does not conflict with the ethical principals outlined in Section 7, Paragraph 3, as long as the psychological profiling does not include a clinical diagnosis and is the product of scholarly research that has been subject to peer review and academic scrutiny, and is based on relevant standards of scholarship. (2008)

# R. RESIDENT, STUDENT AND OTHER TRAINEE ISSUES

## Section 1

*A physician shall be dedicated to providing competent medical care, with compassion and respect for human dignity and rights.*

## R.1.a.

**Question**: I run a process group for psychiatric residents at a training hospital, and I have learned that some of the residents refuse to admit patients from certain hospitals or with certain diagnoses. Are the residents' actions unethical? What are my ethical responsibilities as the process group leader, given the constraints of confidentiality for this group?

**Answer**: Your question raises a number of issues for consideration.. We assume the residents were informed of the limitations to confidentiality at the beginning of the process group? Either way, it would be incumbent upon the leader to reveal confidential information as necessary if the practice under discussion could endanger patients. (See Section IV, Para 8 of the Principles of Medical Ethics with Annotations Applicable to Psychiatry).

Refusing admission of patients can occur for a variety of reasons, some ethical and some not. An exploration of the reasons residents refused patient admissions would need to occur to understand the ethical implications. Additionally, the residents' actions could potentially be illegal, and possibly unethical as well, if they violated the Emergency Medical Treatment and Active Labor Act (EMTALA) passed by Congress in 1986. Hospitals are obligated to provide treatment to patients who are medically unstable. The question does not address whether these patients were stable or not at the time their admission was refused. (2006)

## Section 2

*A physician shall uphold the standards of professionalism, be honest in all professional interactions, and strive to report physicians deficient in character or competence, or engaging in fraud or deception, to appropriate entities.*

## R.2.a.

**Question**: One of our young male residents on one occasion asked the wife of a man he saw in consultation for a date and on another accepted a ride from a woman patient of his with an eroticized transference toward him. Has he behaved unethically and should he be sanctioned?

**Answer**: Although we have not received a complaint about which we can make a judgment, your query suggests to us the resident has shown poor judgment at best and evidence of failure to understand the limits of the doctor–patient relationship. We would recommend special education and supervision for him to avoid any such behavior in the future. (1987)

## R.2.b.

**Question**: A resident had acted unethically and then transferred residency programs. The first program did not inform the new residency training director about the resident's improper behavior. Can a residency training director initiate an ethics complaint?

**Answer**: Yes. The APA has developed "A Basic Model Ethics Curriculum for Psychiatric Residents" as a guide for residency training directors. In addition, faculty members are expected to act as role models for their students and are bound to conduct themselves in a professional and ethical manner. A psychiatrist should expose physicians deficient in character or competence. The physician writing the letter may support the transfer but fail to communicate immoral or incompetent behavior. A complaint may be filed against a resident who is a member of the APA; it can be based on extrinsic evidence, such as university or licensing board rulings or actions. (1997)

## R.2.c.

**Question**: Several years ago as a psychiatric resident I was involved in the psychopharmacological treatment of an adolescent patient. She has since moved out of her mother's home. Recently I encountered the patient's mother in a Divorce Recovery Course. We subsequently met for coffee. Is it ethical for this to become a dating relationship?

**Answer**: A doctor-patient relationship is established when a psychiatrist provides treatment to a patient; this includes provision of "split treatment. Parents are typically an integral part of the treatment of children or adolescents. For example, parents must provide informed consent when psychotropics are prescribed to a minor in most instances, thereby assuring their active participation. Romantic involvement either during or subsequent to treatment with key family members may be construed as exploitation of the patient and family; it could be a method by which a psychiatrist meets his or her own needs. Furthermore, this romantic involvement may discourage the original patient and other family members from seeking subsequent treatment with the trusted psychiatrist. Romantic involvement with key family members is also unethical. (2003)

# <u>Section 4</u>

*A physician shall respect the rights of patients, colleagues, and other health professionals, and shall safeguard patient confidences and privacy within the constraints of the law.*

## R.4.a.

**Question**: As a student health service psychiatrist, I treat some students psychotherapeutically and see others for administrative reasons. Do I have a potential ethical conflict?

**Answer**: You certainly do if you do not define your roles clearly and in advance to the student. You cannot give an administrative opinion if the student has made a psychotherapeutic contract with you. This is a classic example of "double-agentry." If the college demands that you confuse your roles, you should refuse to participate and must ethically withdraw from the arena if the college will not relent. Even a student's consent for you to make an administrative report after a period of psychotherapy does not resolve your conflict since the consent may not be freely given but coerced. The college should be advised to seek an administrative opinion from a psychiatrist not involved in a treatment relationship with the student. (1977)

## R.4.b.

**Question**: In a training program in psychotherapy, do trainees need to obtain informed consent from patients in order to present the patient's therapy in class discussions and in supervision groups?

**Answer**: No, provided that the patient's confidentiality and identity are preserved and patients are aware of the supervisory processes. (1993)

**Index**

**A**
Acupuncture, 71
Adoption, 21
Advertising
  to research groups, 17
  in the Yellow Pages, 76
AMA. See American Medical Association
AMA Council Opinions (Current Opinions with Annotations of the Council on Ethical and Judicial Affairs), 2
American Medical Association (AMA), 2
American Psychiatric Association (APA), 2
Announcements. See Professional listings and announcements
APA. See American Psychiatric Association

**B**
Boundary and dual relationship issues, 5–15
  choice of whom to serve, 14–15
  competing dual agencies, 8–9
  confidentiality, 8
  conflict of interest, 7
  criminal charges conflict with patient, 7
  dating a former patient, 6
  dedication to providing competent medical care, 3, 5–10
  dual roles of physicians, 8–9
  legal suits and, 14
  patient wanted by the police, 7–8
  physician–patient investment club, 5–6
  physician seeing members of the same family, 9–10
  respect the rights of patients, colleagues, and other health professionals, 14
  romantic relationship with third party associated with patient, 6
  sexual fantasies, 5
  sexual relations with patient, 5
  standards of professionalism, 10–14
  state reporting laws, 8
Business practices and ancillary professional activities, 16–20
  advertising to research groups, 17
  consultation not in person, 16
  nudity in therapy, 18
  patents, 18
  patient hospitalization, 19
  physician fees and acceptable insurances, 19
  referrals to unlicensed professionals, 18
  repayment of overpayment, 20

sale of infomercials, 16–17
telephone referral and assessment service, 16
telephone therapy, 17

**C**
Child and adolescent psychiatry, 21–25
adoption of a child patient, 21
child abuse, 33–34
divorce and, 24
inclusion of parents or guardian in treatment of, 22–23
private referrals for a child with an IEP, 24–25
release of treatment information, 23, 28
revealing confidentiality, 22
treatment of a dangerous child, 23–24
treatment of child in the district by a psychiatrist who works in the district, 24
treatment of physician's own children, 25
Child custody, 21–25
standard of care for, 21
Child school issues, 21–25
Clergy, 43
Clinics
employees of, 79–80
PPOs and, 80
referral list, 79
Community, 4, 41
Competency examination, 38
in a criminal case, 41
Confidentiality, 8, 20, 26–31
breach of, 26
disclosure of patient use of marijuana, 27
divorce and, 24
of executors of the estate of a deceased psychiatrist, 82
identification of persons in the videotape, 28
managed care and, 46
release of treatment information, 23
revealing, 22
survival after death, 28, 29
treatment of another psychiatrist's family, 75
videotaped testimonials of patients, 13
violation of, 81
Conflict of interest, 7, 78, 86
in buying and selling of property, 11
in buying stock in a company making medication, 60
in dual agencies, 14
Continuity of care, 68–69
Criminals. See also Prisoners

criminal charges conflict with patient, 7
patient wanted by the police, 7–8
"Cult," 65
Current Opinions with Annotations of the Council on Ethical and Judicial Affairs (AMA Council Opinions), 2

**D**
Dating, 84–85
Death. See also Forensic issues; Wills
confidentiality and, 28, 29
gifts from a patient, 62
Divorce, 24. See also Marriage, annulment of
Doctor–patient relationship, 12, 20, 38, 40–41, 85
exploitation of, 11

**E**
EAP. See Employee Assistance Program
Employee Assistance Program (EAP), 29
Employment, of current or former patient, 11, 12
Ethics
complaint against a colleague, 36
of fellow psychiatrist's professional ability, 32
procedures, 35–36
teaching counseling principles to the clergy, 43
Ethics Committee
complaint of excessive fees, 35
description of, 2
distinguishing between ethics, law, and competency, 36
Executors
of estate of physicians, 30, 82
psychiatrist as, 63

**F**
Family
evaluation of a family member who is a plaintiff in a civil litigation suit, 38
physician seeing members of the same family, 9–10
psychiatrist not sharing information, 73
Fees, 50–58
alteration of, 55
to attend presentations by a drug company, 61
bartering, 55
charges for calls from patients, 51
for clinical teaching, 59
collection of longstanding balances, 56, 57
complaint of excessive, 35
for completing a questionnaire about a certain drug, 61

contractual obligations for, 56
exorbitant, 52–53
fee sharing, 53–54
fee splitting, 50, 54–55
future appointment charges, 53
hospital fees to physicians, 54
missed appointment charges, 51–52, 53, 56–57
not paid by insurance company, 54
parents paying fees for patient, 53
payment for referrals, 54–55
payment to colleague, 50–51
provider, 56
for providing supervision to other physicians, 52–53
reduced, 55
for services provided by a nonmedical professional, 58
Forensic issues, 37–41. See also Death
competency examination before execution of a felon, 38
competency examination in a criminal case, 41
consultant to a documentary, 39–40
doctor–patient relationship, 40–41
evaluation of a family member who is a plaintiff in a civil litigation suit, 38
fee sharing, 53–54
marriage annulment, 41
patient diagnosis based on a review of records, 39
patient mistreatment, 37
profiling, 39
psychiatrist participation in legal execution of a prisoner, 37
psychiatrist's evaluation of a prisoner, 40
Fund raising, 62

**G**
Gifts, 62–64
bequest from a patient, 62
from a patient, 62, 64
from a physician to a memorial scholarship fund, 64
Guardians
inclusion in treatment of minors, 22–23
for patients, 31

H
Health maintenance organization (HMO), 30
HMO. See Health maintenance organization
Homosexuality, 48
Honesty. See Physicians, standards of professionalism
Hospitals
clinical responsibility of physicians, 66–67

ethics of, 44–45
fees to physicians, 54
patient in hospital, 19
physician owned and managed, 78
privileges, 58, 75
psychiatrists doing physical examinations, 66
refusing admission of patients at a training hospital, 84
review of psychiatrist's clinical performance, 65
state facilities, 67

**I**
IEP. See Individualized education plan
Immigration, 48
Individualized education plan (IEP), 24–25
Infomercials, 16–17
Informed consent, 11, 16, 26–31, 70
Insurance company
diagnosis on an insurance form, 73–74
ethics principles and, 38
fees not paid by, 54
physicians' completion of forms for a former patient, 29
psychiatrist review of, 66
release of information, 23, 28
suicide as the result of illness, 39
Interpreters, 67

**L**
Legal suits, 14
"Living will," 82–83

**M**
Malpractice, 72–73
Managed care, 46–49
confidentiality and, 46
patient charts for auditing, 47
physicians and, 47
PPOs and, 47
psychiatrist within the entity of, 46
Marijuana, disclosure of patient use of, 27
Marriage, annulment of, 41. See also Divorce
Medical education, 3, 34, 55–58, 60–61
Medical schools, 69
Medical Source Statement of Ability to do Work-Related Activities (mental), 8–9
Medicine, psychologist practicing, 42
Military and other government agencies, 48–49
civilian psychiatrists in, 49

drug use in, 48–49
homosexuality, 48
immigration, 48
security upgrade, 49

**N**
"New religion," 65
Nudity, 18

**P**
Parents
divorce and, 24
of a former patient, 30
inclusion in treatment of minors, 22–23
marriage annulment, 41
paying fees for patient, 53
Patents, 18
Patients
abandonment of, 68
bequests to physicians, 62
best interests of, 71
buying and selling of property to physician, 11
competency of, 39
confidentiality with, 8
contractual obligations for fees, 56
criminal charges conflict with, 7
dating a former physician, 6
disclosure of use of marijuana, 27
elderly, 82–83
employment of current or former, 11, 12
fees not paid by insurance company, 54
financial benefit from, 11
former, 29
gifts to physicians, 62, 64
guardian for, 31
harassment on telephone, 72
hospitalization of, 19
informed consent, 11
investment club with physicians, 5–6
mistreatment of, 37
parents of former, 30
peer advocacy and, 13–14
physician seeing members of the same family, 9–10
platonic friendships with a sibling or parent of a former patient, 13
politicial/societal solicitation from physicians, 12–13
records of, 72

romantic relationship with third party associated with patient, 6
sexual fantasies with physician, 5
sexual relationship with a former, 10
social relationship with physician, 12, 15
soliciting donations from former, 63
videotaped testimonials of, 13
wanted by the police, 7–8
Payment issues, 50–58
fee splitting for space use, 50
from patients, 51
Peer advocacy, 13–14
Peer review, 45
Pharma, 59–61
fees for completing a questionnaire about a certain drug, 61
fees to attend presentations by a drug company, 61
payments from pharmaceutical companies, 60
"shadowing," 59
stock in a company making medication, 60
use of funds from drug companies for mandated continuing medical education, 60–61
Philanthropy, 62–64
fund raising, 62
soliciting donations from former patients, 63
Physicians
access to medical care for all people, 4, 14–15
appropriate patient care and, 47
buying and selling of property to patient or ex-patient, 11
commitment to medical education, 3, 34
competency of, 25, 32–34
complaint against a colleague, 36
confidentiality with patients, 8
conflict of interest, 7
continuation of medical education, 3, 34, 55–58, 60–61
criminal charges conflict with patient, 7
dating a former patient, 6
dedication to medical care, 3, 5–10, 16–20
diagnosis of mental illness because of "new religion" or "cult," 65
dual roles of, 8–9
employment of current or former patient, 11, 12
estate of, 30
fee for clinical teaching, 59
fees and acceptable insurances, 19
financial benefit from patients, 11
finder's fee for financial advice, 10
hospital clinical responsibility of, 66–67
hospitals and, 44–45
interaction with other professionals, 42–45

investment club with patients, 5–6
limitation of services, 44
name listed as a creditor on a debtor's report, 30–31
obligations and responsibilities of executors of estate of, 30, 73
participation in improvement of community and public health, 4, 41, 64, 83
platonic friendships with a sibling or parent of a former patient, 13
politicial/societal solicitation from patients, 12–13
practice issues, 65–75
practicing outside of professional competence, 32, 71
professional ability of fellow psychiatrist, 32
providing competent medical care, 21, 25, 26, 37–38, 45, 46–49, 48, 59, 62, 65, 84
psychiatrist and psychologist forming a professional corporation, 43
psychiatrist participation in legal execution of a prisoner, 37
psychologist practicing medicine, 42
"psychotherapeutic techniques" of, 5
referral of children by school to, 22
release of treatment information, 23, 28
respect of the law, 3, 48–49, 71, 72, 81–82
respect of the rights of patients, colleagues, and other health professionals, 3, 14, 19–20, 22–25, 27–31, 33–34, 38–41, 46–47, 49, 57
responsibility to patient, 4
retirement of, 74
romantic relationship with third party associated with patient, 6
seeing members of the same family, 9–10
sexual relations with patient, 5, 32–33
social relationship with patient, 12, 15
standards of professionalism, 3, 10–14, 17–18, 21–22, 26–27, 32, 35–36, 42–45, 50, 59–60, 63–64, 69–70, 76, 78, 84–86
supervision of a social worker, 10–11
treatment of child in the district by a psychiatrist who works in the district, 24
treatment of his or her own children, 25
treatment of staff workers, 75
withholding records of a former patient, 30
Placebos, 70
Platonic friendships, 13
PPO. See Preferred provider organization
Practice issues, 65–75
"Christian psychotherapy," 66
continuity of care, 68–69
diagnosis on an insurance form, 73–74
executors of estate of physicians, 30, 63, 73
hospital clinical responsibility of physicians, 66–67
hospital privileges, 58, 75
informed consent, 70
interpreters, 67
law and, 71

malpractice, 72–73
medical school services, 69
patient abandonment, 68
patient harassment on telephone, 72
patient records, 72
placebos, 70
policy that excludes, segregates, or demeans the dignity of any patient, 65–66
practicing outside of professional competence, 32, 71
psychiatrist not sharing information with the patient's family, 73
psychiatrist performing physical examinations, 67
referrals, 69
retirement of physicians, 74
reviewing psychiatrist for an insurance company, 66
second opinions, 74
sexual offender responsibility by the physician, 69–70
sexual orientation changes, 67–68
state facilities, 67
treatment of another psychiatrist's family, 75
treatment of staff workers, 75
Preferred provider organization (PPO), 47, 80
Principles of medical ethics, 3–4
The Principles of Medical Ethics With Annotations Especially Applicable to Psychiatry, 2
Prisoners. See also Criminals
doctor–patient relationship, 40–41
psychiatrist participation in legal execution of, 37
psychiatrist's evaluation of, 40
Professional activities. See Business practices and ancillary professional activities; Physicians, interaction with other professionals; Physicians, standards of professionalism
Professional listings and announcements, 76–77
listing in a professional directory, 76
notices about referrals, 77
services to a public figure, 77
taking over a practice, 76–77
Yellow Page advertising, 76
Profiling, 39, 83
Psychiatrist
advisory board responsibilities of, 45
civilian in a military establishment, 49
doing hospital physical examinations, 66
as executor of estate, 63
within a managed care entity, 46
as medical director of a private clinic, 44
performing physical examinations, 67
providing supervision to other physicians, 52
and psychologist forming a professional corporation, 43
review of clinical performance of, 65

Psychologist
    practicing medicine, 42
    and psychiatrist forming a professional corporation, 43
Psychotherapy, "Christian," 66
Psychotropic medication, 25
Public health, 4, 41

**R**
Records
    patient diagnosis based on a review of, 39
    withholding, 30
Referrals, 69
    of children by school to physicians, 22
    from a clinic to a PPO, 80
    from EAP, 29
    list of, 79
    notices about, 77
    payment for, 54–55
    to physicians wife, 78–79
    practices of, 78
    private, from a school board, 24–25
    to unlicensed professionals, 18
Research and scholarly activities, 81
    "living will" for elderly patients, 82–83
    profiling of historical figures, 83
    violation of confidentiality, 81
    writing a psychoanalytic casebook, 81
Resident, student, and other trainee issues, 84–86
    complaint about a resident, 85
    conflict of interest, 86
    dating, 84–85
    doctor–patient relationship, 85
    refusing admission of patients at a training hospital, 84

**S**
Schools
    private referrals from a school board, 24–25
    referrals to physicians, 22
    treatment of child in the district by a psychiatrist who works in the district, 24
Second opinions, 74
Sexual fantasies, 5
Sexual misconduct, 5, 32–33, 35
Sexual offenders, 69–70
Sexual orientation, 67–68
Sexual relations, 5, 42
"Shadowing," 59

Social relationships, 12, 13, 15
    into a professional relationship, 35
Social worker
    physician supervision of, 10–11
    unethical conduct of, 34
Standards of professionalism, 3, 10–14
    sexual relationship with a former patient, 10
Suicide, 39

**T**
Telephone
    charges for calls from patients, 51
    patient harassment on, 72
    referral and assessment service, 16
    therapy, 17
    Yellow Page advertising, 76
Testimonials, videotaped of patients, 13
The Principles of Medical Ethic, 2
Therapy
    nudity in, 18
    taping the session, 27
    videotaping, 27

**V**
Videotaping
    for cessation of smoking, 44
    the session, 27
    testimonials of patients, 13
    at a workshop for professionals, 29–30

**W**
Website, posting fees and acceptable insurances, 19
Wills, 62–64
    of deceased physician, 82
      psychiatrist as executor of estate, 63