IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

PORTIA B. ISHEE                                                    PLAINTIFF

V.                                    CIVIL ACTION NO. 2:13-CV-234-KS-MTP

FEDERAL NATIONAL MORTGAGE
ASSOCIATION, *et al.*                                          DEFENDANTS

### MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Court **grants** the Motion for Summary Judgment [212] filed by Defendant Federal National Mortgage Association, **grants** the Motion for Summary Judgment filed by Defendant Green Tree Servicing, LLC, and **denies** the Motions for Partial Summary Judgment [214, 223, 225, 226, 228, 231] filed by Plaintiff.

### I. BACKGROUND

This dispute arises from the servicing of a mortgage loan. Plaintiff signed a promissory note in November 2006, in favor of GMAC Mortgage, LLC ("GMAC"), and in the principal amount of $100,000. The note was secured by a deed of trust encumbering Plaintiff's property. Defendant Federal National Mortgage Association ("Fannie Mae") bought the note in December 2006, but GMAC continued to service the loan.

On September 23, 2010, Plaintiff's home was destroyed by a fire. At the time of the fire, it was insured under a policy issued by Alfa Insurance Corporation ("Alfa"). On November 4, 2010, Alfa issued a check to GMAC in the amount of $99,623.48 – the payoff amount provided by GMAC to Alfa's adjuster. GMAC received the check, but

instead of applying the funds to the note, it deposited them to escrow.

Throughout this time period, GMAC continued to charge Plaintiff for payoff requests and site inspections, despite the property having been destroyed and the insurer having paid an amount in excess of the payoff amount. GMAC also force-placed insurance on the property, even though it was vacant and destroyed. As a result of the force-placed insurance and various other charges, the principal on the note ballooned past what it was when Plaintiff's insurer provided the payment. Plaintiff made multiple requests for GMAC to apply the insurance funds as they should have been applied in November 2010, but it failed to do so. GMAC went bankrupt in May 2012.

In November 2012, Defendant Green Tree Servicing, LLC ("Green Tree") acquired GMAC's right to service Plaintiff's note, effective February 1, 2013. Fannie Mae consented to the transfer of rights. After receiving the loan information from GMAC, Green Tree tried to contact Plaintiff, but she failed to respond. In late August 2013, she finally contacted Green Tree and asked them to apply the insurance funds to the loan as they should have been applied in November 2010. After a brief investigation, Green Tree applied the funds to the loan, canceled the deed of trust, refunded the excess funds to Plaintiff, and otherwise fixed the mess that GMAC had created – almost three years after the insurance funds had first been paid. At present, Plaintiff's note is paid in full, her property is released from the deed of trust, and she was refunded $1,474.56.

Plaintiff brought this lawsuit against Fannie Mae and Green Tree, asserting the following claims: breach of contract, willful breach of contract, conversion, fraud,

breach of the duty of good faith and fair dealing, intentional infliction of emotional distress, defamation, violations of the Fair Debt Collection Practices Act ("FDCPA"),[1] and violations of the Mississippi S.A.F.E. Mortgage Act ("SAFE Act").[2] Plaintiff also alleged that Fannie Mae is liable for the actions of its loan servicers, GMAC and Green Tree, under theories of *respondeat superior* and ratification, and that Green Tree is liable for GMAC's actions as a successor in interest. She demanded actual damages, emotional damages, punitive damages, interest, and attorney's fees.

The parties filed a variety of dispositive motions. Each Defendant filed its own Motion for Summary Judgment [212, 217]. Plaintiff filed several Motions for Partial Summary Judgment [214, 22, 225, 226, 228, 231]. The Court will now address each issue raised in the parties' motions.

## II. STANDARD OF REVIEW

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010). "An issue is material if its resolution could affect the outcome of the action." *Sierra Club, Inc.*, 627 F.3d at 138. "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010).

---

[1] 15 U.S.C. § 1692, *et seq.*

[2] MISS. CODE ANN. § 81-18-3, *et seq.*

3

The Court is not permitted to make credibility determinations or weigh the evidence. *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009). When deciding whether a genuine fact issue exists, "the court must view the facts and the inference to be drawn therefrom in the light most favorable to the nonmoving party." *Sierra Club, Inc.*, 627 F.3d at 138. However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial." *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002).

### III. FANNIE MAE'S LIABILITY FOR ITS SERVICERS' ACTIONS [212, 228]

The first issue presented by the parties' motions is the extent of Fannie Mae's liability for the actions of its loan servicers. Plaintiff argues that Fannie Mae is liable under theories of *respondeat superior* and ratification. She further argues that Fannie Mae had a non-delegable duty to properly service the loan, and that it is judicially estopped from denying liability for its loan servicers' actions.

### A.    *Judicial Estoppel*

Plaintiff contends that Fannie Mae is judicially estopped from arguing that it can not be liable for the acts of its loan servicers because it took a directly contradictory position in GMAC's bankruptcy proceeding. She claims that Fannie Mae executed a stipulation in which it accepted payment from GMAC in exchange for taking on its liabilities.

"The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous

proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573-74 (5th Cir. 2011). The doctrine has three elements: "(1) the party against whom the judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Id.* at 574.

Plaintiff's judicial estoppel argument rests upon a false premise. Fannie Mae and GMAC executed a stipulation [230-5] in which Fannie Mae accepted $297,600,000.00 to cure GMAC's own defaults under its servicing agreements with Fannie Mae. The stipulation says nothing about GMAC's liabilities or obligations to third parties. Furthermore, Plaintiff provided no evidence that "a court accepted the prior position." *Id.* For these reasons, her judicial estoppel argument has no merit.

## B.    *Respondeat Superior*

Plaintiff argues that Fannie Mae is responsible for the actions of GMAC and Green Tree – its loan servicers – under a theory of *respondeat superior*. This Court previously discussed the same issue in a different case. *See Neel v. Fannie Mae*, No. 1:12-CV-311-HSO-RHW, 2014 U.S. Dist. LEXIS 28891, at *15-*23 (S.D. Miss. Mar. 6, 2014). The question hinges on whether GMAC and Green Tree were Fannie Mae's employees or independent contractors.

"Generally, an employer is liable for the negligent acts of its employees done in the course and scope of his employment under the doctrine of *respondeat superior*, but an employer is not liable for the negligence of an independent contractor." *McKee v. Brimmer*, 39 F.3d 94, 96 (5th Cir. 1994). Fannie Mae's 2012 Servicing Guide [212-7]

provides that its loan servicers are "independent contractors and not . . . agents, assignees, or representatives of Fannie Mae . . . ." However, "an employer [can not] escape liability by drafting a contract which labels its employee an independent contractor, but retains employer-like control over him." *Id.* at 98.

The Mississippi Supreme Court provided a non-exhaustive list of factors to consider:

> [1] Whether the principal master has the power to terminate the contract at will; [2] whether he has the power to fix the price in payment for the work, or vitally controls the manner and time of payment; [3] whether he furnishes the means and appliance for the work; [4] whether he has control of the premises; [5] whether he furnishes the materials upon which the work is done and receives the output thereof, the contractor dealing with no other person in respect to the output; [6] whether he has the right to prescribe and furnish the details of the kind and character of work to be done; [7] whether he has the right to supervise and inspect the work during the course of employment; [8] whether he has the right to direct the details of the manner in which the work is to be done; [9] whether he has the right to employ and discharge the subemployees and to fix their compensation; [10] and whether he is obliged to pay the wages of said employees.

*Richardson v. APAC-Mississippi*, 631 So. 2d 143, 148-49 (Miss. 1994) (quoting *Kisner v. Jackson*, 132 So. 90, 90 (Miss. 1931)); *see also Woodring v. Robinson*, 892 F. Supp. 2d 769, 776 (S.D. Miss. 2012). "The overarching inquiry in the factoring analysis is whether the employer exhibited the requisite amount of control over the engaged party to categorize the party as an employee." *Woodring*, 892 F. Supp. 2d at 776. "When the facts are undisputed, determining the type of relationship is a legal question." *Id.*

The evidence regarding Fannie Mae's relationships with the two loan servicers is virtually identical. Therefore, the Court will address both GMAC and Green Tree at the same time, as the parties did in briefing.

6

1.      *Whether Fannie Mae Could Terminate Its Servicers' Contracts at Will*

Fannie Mae's contract with GMAC [230-4] provided that GMAC could "terminate the provisions of [the] Contract covering the servicing of mortgages . . . by giving us notice at any time." Likewise, Fannie Mae could terminate the contract's servicing provisions "for any reason, by giving [GMAC] notice of the termination."

The 2012 Servicing Guide [212-7] – which pertains to both GMAC and Green Tree – provided that either the servicer or Fannie Mae "may terminate the servicing arrangement without cause." However, the Guide also provides that a "servicer may not terminate its servicing rights for less than all of the mortgage loans . . . it is servicing for Fannie Mae," without Fannie Mae's written consent. Likewise, the 2012 Guide provides certain procedures that Fannie Mae must follow in order to terminate the servicing relationship without cause, potentially including the payment of a termination fee.

The evidence discussed above demonstrates that either Fannie Mae or its loan servicer may terminate the relationship for any reason. The 2012 Servicing Guide places procedural requirements on both parties before termination. Therefore, this factor weighs in favor of finding that GMAC and Green Tree were independent contractors. *See Neel*, 2014 U.S. Dist. LEXIS 28891 at *16-*17 (citing *Walker v. McClendon Carpet Serv.*, 952 So. 2d 1008, 1010 (Miss. Ct. App. 2006)).

2.      *Whether Fannie Mae Had Power to Fix the Price or Control the Manner or Time of Its Servicers' Payment*

The 2012 Servicing Guide [212-7] provides: "As compensation for servicing

mortgage loans for Fannie Mae, Fannie Mae pays the servicer servicing fees and allows it to retain late charges, fees charged for special services, yield differential adjustments, and, in some cases, either a share or all of any applicable prepayment premiums . . . ." Fannie Mae's 30(b)(6) representative [215-7] clarified that it pays its servicers a servicing fee whenever they collect a payment. Therefore, if a borrower does not make any payments, the servicer would not receive any fees for servicing that loan – creating an incentive for the servicer to keep its loans current. The servicer has the freedom, however, to propose and execute modifications and workouts under certain circumstances, for which they can receive fees. The servicer likewise has the freedom to impose late charges and other special fees on the borrower, for which it also receives a servicing fee.

As this Court has previously observed, Fannie Mae's servicers possess substantial control over the conditions of their payment, as they are "paid based on the loans [they are] able to keep current and the delinquent loans [they are] able to salvage." *Id.* at *17. If they elect to impose a late charge or other special charge on a borrower, they receive a servicing fee. Therefore, because they have "as much, if not more, control over these conditions [of payment] as Fannie Mae," this factor weighs in favor of finding that GMAC and Green Tree were independent contractors. *Id.*

3.    *Whether Fannie Mae Furnished Means or Appliances for its Servicers' Work*

Fannie Mae's 30(b)(6) representative testified [215-7] that its loan servicers provide their own facilities, buildings, equipment, printers, office furniture, fax

machines, and printers. However, Fannie Mae provided its loan servicers with proprietary software for managing loan portfolios. This factor weighs in favor of finding that GMAC and Green Tree were independent contractors. *Id.* at \*18 (citing *Walker*, 952 So. 2d at 1010 (where carpet cleaner used chemicals provided by alleged employer but used its own van and equipment, the factor weighed in favor of independent contractor status)).

4.     *Whether Fannie Mae Controlled Its Servicers' Premises*

Fannie Mae's 30(b)(6) representative provided undisputed testimony [215-7] that Fannie Mae does not control its loan servicers' premises, and that it must receive permission from its servicers before visiting their facilities. Fannie Mae's 2011 Servicing Guide [348] requires servicers to maintain records according to "sound and generally accepted accounting principles," and Fannie Mae retains the right to conduct "periodic procedural reviews during visits to the servicer's office or the document custodian's place of business . . . ." The 2012 Servicing Guide [309-3] imposes the same requirements.

The right to review records, however, does not necessarily imply control of the premises upon which the records are stored. The Court concludes that this factor weighs in favor of finding that GMAC and Green Tree were independent contractors. *Woodring*, 892 F. Supp. 2d at 777 (job sites controlled by the independent contractor); *Neel*, 2014 U.S. Dist. LEXIS 28891 at \*18-\*19; *Hill v. City of Horn Lake*, No. 2012-CA-01748-SCT, 2015 Miss. LEXIS 15, at \*11 (Miss. Jan. 15, 2015) ("[T]he right to inspect, in itself, is not sufficient to trigger a master-servant relationship.").

5.      *Whether Fannie Mae Furnished Materials to Its Servicers for Work or*
        *Received Output Thereof*

The Court doubts that this factor is applicable here, as this case does not involve the provision of raw materials and output of a finished product. However, according to Fannie Mae's 30(b)(6) representative [215-7], its loan servicers report to credit agencies, force place insurance, refer loans for foreclosure, hire and fire legal counsel for foreclosure, apply hazard loss proceeds, assign deeds of trust, and release deeds of trust at their own discretion. These are arguably forms of "output." *See Neel*, 2014 U.S. Dist. LEXIS 28891 at *19. However, Fannie Mae also imposes certain reporting requirements on its servicers [309-4], another form of "output." The Court concludes that this factor is either inapplicable or neutral.

6.      *Whether Fannie Mae Had the Right to Proscribe and Furnish the Details*
        *of the Kind and Character of Work to Be Done*

Fannie Mae provides Servicing Guides [212-7], which "set forth broad parameters under which servicers should use their sound professional judgment as mortgage servicers in the performance of their duties." Fannie Mae specifically prescribes that its servicers "maintain the discretion to apply appropriate judgment in dealing with borrowers and mortgage loans on a case-by-case basis, consistent" with its broad servicing policies. While it requires loan servicers to maintain "established written procedures that are consistent with [its] servicing policies," it does not specify the contents of those procedures or the manner in which servicers are required to implement them. Fannie Mae's loan servicers may collect late charges and other fees

as they wish, consistent with the loan documents and applicable law [212-7]. Servicers may also propose loan modifications under certain circumstances [212-6].

Plaintiff argues that Fannie Mae exercises "just short of absolute" control over its servicers' work, citing the table of contents from the Servicing Guides. However, this factor concerns "details." Although the Servicing Guides address a wide variety of subject matter, they only provide general goals and parameters, rather than specific details regarding the servicing of each loan. Accordingly, this factor weighs in favor of independent contractor status. *Id.* at *20 (citing *Kossuth Trucking, Inc. v. Caterpillar, Inc.*, 941 So. 2d 903, 910 (Miss. Ct. App. 2006) (where manufacturer provided shop with service manuals and guides, that did not constitute control over the details of the work)); *Chisolm v. MDOT*, 942 So. 2d 136, 141-42 (Miss. 2006) (while MDOT provided specifications for work, the construction company retained control over performance of specific aspects of the work).

### 7.   *Whether Fannie Mae Had the Right to Supervise and Inspect the Work*

Fannie Mae has the right to examine and audit its loan servicers' records at any time [309-3]. Specifically, it may monitor monthly accounting reports, conduct periodic procedural reviews, audit internal records and operating procedures, and perform underwriting reviews of loans on a random sample basis. Fannie Mae's 30(b)(6) representative testified [215-7] that Fannie Mae had an "audit group," but he denied that Fannie Mae supervises its servicers' operations. He also testified that Fannie Mae has limited access to some servicers' electronic data systems.

The Court finds that, on the whole, Fannie Mae does not supervise its servicers'

11

work, but it does inspect their work. This factor is neutral. *Cf. Neel*, 2014 U.S. Dist. LEXIS 28891 at*20-*21; *Hill*, 2015 Miss. LEXIS 15 at *11 ("[T]he right to inspect, in itself, is not sufficient to trigger a master-servant relationship.").

8. *Whether Fannie Mae Had the Right to Direct the Details of the Manner in Which Its Servicers Worked*

The Court discussed the evidence relevant to this factor in subsection 6, above. The record demonstrates that Fannie Mae provides broad guidelines which its loan servicers must follow, but it does not dictate the details of their day-to-day work. The Servicing Guides only provide general parameters, rather than specific details regarding the servicing of each loan. Accordingly, this factor weighs in favor of independent contractor status. *Neel*, 2014 U.S. Dist. LEXIS 28891 at *21-*22; *Kossuth Trucking*, 941 So. 2d at 910 (where manufacturer provided shop with service manuals and guides, that did not constitute control over the details of the work); *Chisolm*, 942 So. 2d at 141-42 (while MDOT provided specifications for work, the construction company retained control over performance of specific aspects of the work).

9. *Whether Fannie Mae Had the Right to Employ, Discharge, or Fix Compensation for Its Servicers' Employees*

Fannie Mae's 30(b)(6) representative provided undisputed testimony [215-7] that Fannie Mae does not have the right to employ, discharge, or fix compensation for its loan servicers' employees. Therefore, this factor weighs in favor of independent contractor status. *Neel*, 2014 U.S. Dist. LEXIS 28891 at *22.

10. *Whether Fannie Mae Was Obligated to Pay Its Servicers' Employees*

Fannie Mae's 30(b)(6) representative provided undisputed testimony [215-7] that Fannie Mae does not pay its loan servicers' employees. Therefore, this factor weighs in favor of independent contractor status. *Neel*, 2014 U.S. Dist. LEXIS 28891 at *22.

   *11.    Conclusion*

After consideration of the factors outlined in *Richardson v. APAC-Mississippi*, 631 So. 2d 143, 148-49 (Miss. 1994), the Court concludes that GMAC and Green Tree were independent contractors of Fannie Mae. Most of the factors weigh in favor of independent contractor status. On the whole, the record does not demonstrate that Fannie Mae exercised the sort of detail-oriented, day-to-day control over the loan servicers' work that is required for employee status. At best, Fannie Mae provided broad guidelines under which GMAC and Green Tree were required to function – not the sort of substantial control exercised in an employer-employee relationship. Therefore, the Court finds that GMAC and Green Tree were Fannie Mae's independent contractors, rather than its employees or agents. *Neel*, 2014 U.S. Dist. LEXIS 28891 at *23.

## C.    *Ratification*

Plaintiff also argues that Fannie Mae is liable for the actions of its loan servicers, GMAC and Green Tree, because it ratified their actions. Mississippi law defines ratification as "the affirmance by a person of a prior act which did not bind him but which was done or proffesedly done on his account, whereby the act, as to some or all persons is given effect as if originally authorized by him." *Barnes, Broom, Dallas & McLeod, PLLC v. Cappaert*, 991 So. 2d 1209, 1212 (Miss. 2008).

> Ratification does not arise by operation of law; rather, a person ratifies an act by (a) manifesting assent that the act shall affect that person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents. It is true that, under some circumstances, a principal's inaction can result in ratification, but only where the principal has notice that others will infer from his silence that he intends to manifest his assent to the act.

*Kinwood Capital Group, LLC v. BankPlus*, 60 So. 3d 792, 797 (Miss. 2011).

"[I]n order that there be a ratification there must be a voluntary assumption of the unauthorized act either on full information or on less than full information if undertaken deliberately in disregard of the fact that all knowledge of the transaction available has not been obtained." *Green Acres Farms v. Brantley*, 651 So. 2d 525, 528-29 (Miss. 1995). Unless the purported principal deliberately disregards his own ignorance of relevant facts, his lack of knowledge renders any alleged ratification invalid. *Id.* at 530. As the Mississippi Supreme Court has stated:

> The principal, before a ratification becomes effectual against him, must be shown to have had previous knowledge of all the facts and circumstances in the case, and if he assented to or confirmed the act of his agent while in ignorance of all the circumstances, he can afterwards, when informed thereof, disaffirm it. And the principal's want of such knowledge, even if it arises from his own carelessness in inquiring or neglect in ascertaining facts, or from other causes, will render ratification invalid. His knowledge is an essential element.

*Id.*

Plaintiff's argument focuses on three specific interactions between Fannie Mae and the loan servicers, all of which concern the submission of "Form 176," a form by which the loan servicers make recommendations to Fannie Mae regarding the

application of insurance proceeds.[3] The loan servicer receives the insurance proceeds and makes a recommendation to Fannie Mae. Fannie Mae then approves or disapproves the recommendation based on the information provided in the form. At all relevant times, the loan servicer manages and applies the insurance proceeds. Ultimately, the decision is driven by the homeowner, who communicates with the loan servicer, and Fannie Mae would only know of the homeowner's instructions if the loan servicer provided the information to Fannie Mae.

In December 2011, GMAC submitted a Form 176 to Fannie Mae, in which GMAC told Fannie Mae that the total outstanding balance on the loan was $114,040.65. GMAC recommended that Fannie Mae apply the Alfa Insurance proceeds of $99,623.48, and take a loss on the loan of $14,417.17. GMAC did not inform Fannie Mae that Plaintiff had made any request concerning the insurance proceeds. Fannie Mae responded by asking GMAC to resubmit the Form 176 with an opinion as to the property's current value, so that Fannie Mae could determine whether there was any value in the property to be recovered through foreclosure. In the meantime, Fannie Mae recommended that GMAC proceed with foreclosure. Fannie Mae's corporate representative explained that accepting insurance proceeds of $99,623.48 as a complete payment for a note of $114,040.65 would result in a loss of $14,417.17.[4] Therefore,

---

[3]Most of the pertinent facts concerning this issue are contained in the exhibits at Docket Nos. [215-7], [212-11], [309-12], [230-2], and [230-3], among others.

[4]Although their figures are different, Plaintiff's counsel at the time agreed [136-18] with GMAC that application of the insurance proceeds would leave a deficiency.

absent an opinion that there was no value to recover in the property, Fannie Mae recommended that GMAC continue with foreclosure, in an effort to minimize the loss. GMAC, however, never resubmitted the Form 176 with additional information.

In August 2012, Fannie Mae received another Form 176 from GMAC, recommending a short payoff. As more time had passed, more interest would have accrued on the debt, increasing the deficiency. GMAC provided a valuation report showing that the property's as-is value was $90,000, and it did not inform Fannie Mae that Plaintiff had made any request concerning the insurance proceeds. Accordingly, Fannie Mae again recommended that GMAC proceed with a foreclosure sale to minimize the loss.

Finally, in May 2013, Green Tree submitted a Form 176 in which it recommended that it apply the insurance proceeds to the mortgage, as the repair or restoration of the property was not economically feasible. However, a Green Tree representative's email accompanying the form asked to "hold the claim funds until the foreclosure has been completed." Additionally, the form represented that the property's value "as repaired" was $100,000, that the estimated cost of repair was $99,623.48, and that the property's value "as is" was $100,000. The form also included a property inspection report showing that there was an occupied mobile home on the property. Green Tree did not inform Fannie Mae that Plaintiff had made any request concerning the insurance proceeds. Therefore, based on the information provided by Green Tree, Fannie Mae concluded that repair was actually economically feasible, as the cost to repair did not exceed the estimated value as repaired. It told Green Tree to continue

16

with the foreclosure sale and reduce the bid by the insurance proceeds.

Plaintiff argues that Fannie Mae's responses to GMAC's and Green Tree's Form 176 recommendations constituted ratification of the loan servicers' actions – their failure to correctly apply the insurance proceeds to the loan. In response, Fannie Mae argues that its recommendations were based on the incomplete and/or incorrect information provided to it by GMAC and Green Tree.

It appears to be undisputed that Fannie Mae's decisions were based on faulty information. All three forms indicated that the deficiency would be greater than it would have been if the insurance proceeds had been correctly applied in November 2010. Fannie Mae's representative provided undisputed testimony that its responses to Form 176 requests are based on the information provided in the form, that its loan servicers manage and apply insurance proceeds, and that Fannie Mae has no knowledge of homeowners' requests unless notified by the servicer.

Plaintiff has not cited to any evidence in the record tending to show that Fannie Mae knew its servicers provided it with incorrect and/or incomplete information. Likewise, Plaintiff has not cited to any evidence that Fannie Mae deliberately disregarded its own ignorance. *Id.* At best, the facts demonstrate that Fannie Mae negligently failed to investigate the facts provided by GMAC and Green Tree, and that is not sufficient to create a ratification. As noted above:

> The principal, before a ratification becomes effectual against him, must be shown to have had previous knowledge of all the facts and circumstances in the case, and if he assented to or confirmed the act of his agent while in ignorance of all the circumstances, he can afterwards, when informed thereof, disaffirm it. And the principal's want of such knowledge, even if it arises from his own carelessness in inquiring or neglect in ascertaining facts, or from other causes,

will render ratification invalid. His knowledge is an essential element.

*Id.* "A principal's mere carelessness or simple neglect is generally not enough to support a finding that he deliberately disregarded the information available to him." *Myatt v. Sun Life Assur. Co.*, No. 3:10-CV-701-CWR-FKB, 2012 U.S. Dist. LEXIS 157648, at *7-*8 (S.D. Miss. Nov. 2, 2012).

Plaintiff failed to provide any evidence that Fannie Mae had all of the information relevant to its handling of the Form 176 requests, or that it deliberately disregarded its own ignorance. Her argument on this issue is based on nothing but conjecture and speculation about what Fannie Mae could or purportedly should have done, rather than what it actually did or knew at the time. Therefore, the Court finds that Fannie Mae did not ratify the actions of GMAC or Green Tree. *See First Trinity Capital Corp. v. W. World Ins. Group, Inc.*, No. 2:12-CV-156-SA-SAA, 2014 U.S. Dist. LEXIS 14503, at *22-*25 (N.D. Miss. Feb. 5, 2014); *First Trinity Capital Corp. v. Canal Indem. Ins. Co.*, No. 2:12-CV-157-SA-SAA, 2014 U.S. Dist. LEXIS 14502, at *22-*24 (N.D. Miss. Feb. 4, 2014).

### D.    *Nondelegable Duty*

Plaintiff also argues that Fannie Mae is liable for the actions of its loan servicers, GMAC and Green Tree, because servicing of loans is a non-delegable duty. Plaintiff has not cited – and the Court was unable to find – any Mississippi law providing that the servicing of mortgage loans is a non-delegable duty. In the absence of such authority, it would be inappropriate for a federal court exercising diversity jurisdiction to extend state law by creating a new non-delegable duty. *See Morris v.*

*Homco Int'l, Inc.*, 853 F.2d 337, 343 (5th Cir. 1988) ("As a federal court sitting in diversity jurisdiction, the district court should have hesitated, as we would, to extend [state] law beyond the boundaries currently established in the state's own courts."); *Horton Archery, LLC v. Farris Bros., Inc.*, 2014 U.S. Dist. LEXIS 160223, at *5-*6 (S.D. Miss. Nov. 22, 2014). The Court further notes that the act of servicing a mortgage loan does not implicate the sort of obvious physical safety issues typically at stake in cases involving non-delegable duties. *See Neel*, 2014 U.S. Dist. LEXIS 28891 at *25-*26 (citing multiple cases).

**E.    *Prospectus***

Finally, Plaintiff argues that Fannie Mae should be held to certain representations made in a Prospectus [230-6] sent to its investors. Plaintiff has not demonstrated, however, that Fannie Mae's representations to its shareholders have any bearing on its relationships with loan servicers. The Prospectus is wholly irrelevant to this issue.

**F.    *Conclusion***

For the reasons provided above, the Court concludes that Fannie Mae is not liable for the actions of its loan servicers. The Court grants Fannie Mae's Motion for Summary Judgment [212] and denies Plaintiff's Motion for Partial Summary Judgment [228] as to this issue.

### IV. GREEN TREE'S LIABILITY FOR GMAC'S ACTIONS [217]

The next issue presented by the parties' motions is the extent of Green Tree's liability for GMAC's actions. Plaintiff argues that Green Tree is liable under theories

of successor liability and ratification.

**A.**    ***Successor Liability***

The general rule in Mississippi is "that a corporation which acquires all of the assets, but no stock, of another corporation does not also acquire the debts and liabilities of the original." *Huff v. Shopsmith*, 786 So. 2d 383, 387 (Miss. 2001). There are only four exceptions to the general rule: "(1) When the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) When the transaction may be considered a de factor merger; (3) When the successor may be considered a mere continuation of the predecessor; or (4) When the transaction was fraudulent." *Id.* at 388. Plaintiff argues that Green Tree is liable under the first option – that it expressly or impliedly agreed to assume GMAC's liabilities. The record tells a different story.

Ocwen Loan Servicing, LLC ("Ocwen") purchased certain servicing rights from GMAC pursuant to its Chapter 11 bankruptcy, including the right to service Plaintiff's loan. The United States Bankruptcy Court for the Southern District of New York entered an Order [217-9] approving and setting forth the conditions of the sale. That Order provided:

> 23.  **No Successor Liability.**   Neither the Purchaser, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for an Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Debtors or is related to the Purchased Assets prior to the Closing. The Purchaser shall not be deemed, as a result of any action taken in connection with the Ocwen APA or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Purchased Assets, to: (i) be legal successors, or otherwise be deemed successors to the Debtors; (ii) have, de facto or otherwise, merged with or into the Debtors; or (iii) be a

mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors. Without limiting the foregoing, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for an Interests, including under any theory of successor or transferee liability, de facto merger or continuity, environmental, labor and employment, and products or antitrust liability, whether known or unknown as of the Closing, no existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated.

An Asset Purchase Agreement ("APA") was attached as an exhibit to the Order. The APA provided that the "Purchaser shall assume and be responsible for all of the Assumed Liabilities," but that "[o]ther than the Assumed Liabilities, Purchaser shall not assume any Liability of any nature or kind whatsoever." The APA defined "Assumed Liabilities" as "the Liabilities arising under any Assumed Contract to the extent such Liabilities arose on and after the Closing," and "all Liabilities of the Business or Purchased Assets to the extent arising from the conduct of the Business on or after the Closing, other than any Retained Liabilities." The definition of "Retained Liabilities" includes "any action, inaction, event, state of facts, circumstance or condition occurring or failing to occur, or existing or failing to exist, on or prior to the Closing Date and any third-party Claim or defense related thereto, regardless of when asserted . . . ."

The APA also granted Ocwen the right to assign any rights acquired from GMAC to an entity owned by Walter Investment Management Corporation ("Walter"), Green Tree's parent corporation. The APA specifically provided that "[u]pon any such permitted Walter assignment, the references in this Agreement to Purchaser shall also apply to any such Walter Entity to the extent such references pertain to the" assets

assigned to the Walter subsidiary by Ocwen. Walter agreed [243-7] to be bound by the APA with respect to the assets assigned to it.

The parties apparently required Fannie Mae's approval of the transaction. Therefore, Green Tree and Fannie Mae entered into an "Agreement with Respect to Servicing Transfer." Therein, the parties represented that Green Tree was "not willing to assume" GMAC's warranties and obligations predating the transfer of servicing rights, and that GMAC would "retain its liability and responsibility" for all warranties and obligations predating the transfer, as provided by the APA. GMAC executed an "Assignment and Assumption Agreement" [243-7] with Green Tree, in which it "agreed to assign to [Green Tree] all of its rights and obligations" as identified in the APA, which was attached as an exhibit.

It is clear, therefore, that GMAC and Ocwen intended to execute a sale of GMAC's servicing rights without any their accompanying encumbrances, claims, or liabilities. The Bankruptcy Court approved the sale, and its Order [217-9] declared that the servicing rights were purchased "free and clear of all Claims, Liens, encumbrances, or other interests . . . ." Green Tree did not "expressly or impliedly agree[] to assume the liabilities of" GMAC, *id.* at 388, and Plaintiff's successor liability argument has no merit.

**B.    *Judicial Estoppel***

Plaintiff argues that Green Tree is judicially estopped from arguing that it can not be liable for GMAC's actions because Fannie Mae initially objected to the transfer of servicing rights in GMAC's bankruptcy. "The doctrine of judicial estoppel prevents

a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed*, 650 F.3d at 573-74. The doctrine has three elements: "(1) the party against whom the judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Id.* at 574.

Green Tree did not oppose the transfer of servicing rights free and clear of liabilities. Therefore, Plaintiff's judicial estoppel argument has no merit.

## C.   *Production/Disclosure*

Plaintiff argues that the Court should not consider the Bankruptcy Court's Order and APA [217-9] because they were not produced during discovery, but Green Tree provided undisputed evidence [315-1] that the Order and APA were, in fact, produced on July 31, 2014.

Plaintiff also argues that the Court should not consider the "Agreement with Respect to Servicing Transfer" between Fannie Mae and Green Tree [222-1]. The Court already addressed this issue in its Orders of [351, 354] of December 2 and 11, 2014. The Court offered Plaintiff a chance to cure whatever prejudice might have accrued to her by Defendants' failure to timely produce the contract, but she declined the opportunity.

## D.   *Hearsay/Authentication*

Plaintiff also argues that the "Agreement with Respect to Servicing Transfer" between Fannie Mae and Green Tree [222-1] is hearsay. However, "[s]igned instruments such as . . . contracts . . . are writings that have independent legal

significance, and are nonhearsay." *Kepner-Tregoe, Inc. v. Leadership Software*, 12 F.3d 527, 540 (5th Cir. 1994); *see also* FED. R. EVID. 803(15). "To introduce a contract, a party need only authenticate it." *Kepner-Tregoe*, 12 F.3d at 540. Green Tree authenticated the contract with the declaration of its 30(b)(6) representative and Regional Manager, Brad Hardwick [217-4]. Hardwick's declaration demonstrates that he is a proper declarant and that he has sufficient knowledge to confirm that the contract is what it purports to be. FED. R. EVID. 901(b)(1).[5]

## E.    *Ratification*

Finally, Plaintiff argues that Green Tree is liable for GMAC's actions under a theory of ratification. However, ratification is "the affirmance by a person of a prior act which did not bind him but which was done or proffesedly done *on his account*, whereby the act, as to some or all persons is given effect as if originally authorized by him." *Cappaert*, 991 So. 2d at 1212 (emphasis added). None of GMAC's actions were "done or professedly done on [Green Tree's] account . . . ." *Id.* Green Tree did not contract with GMAC or otherwise engage it to perform any services whatsoever. There is no principal/agent, independent contractor, or employer/employee relationship between them. The theory of ratification is inapplicable.

## F.    *Conclusion*

---

[5]Of course, Plaintiff also objects to Hardwick's declaration. The Court declines to address Plaintiff's counter-motion to strike Hardwick's declaration, as it was not separately filed. *See* L.U.Civ.R. 7(b)(3)(C). The Court further notes that Plaintiff's objections concerning legal conclusions and conclusory allegations in Hardwick's declaration are irrelevant to the bare facts concerning the authenticity of the document.

For the reasons provided above, the Court concludes that Green Tree is not liable for GMAC's actions. The Court grants Green Tree's Motion for Summary Judgment [217] and denies Plaintiff's Motion for Partial Summary Judgment [228][6] as to this issue.

## V. BREACH OF CONTRACT [212, 214, 217]

In Mississippi, a party asserting a breach of contract must prove 1) the existence of a valid and binding contract, and 2) that the opposing party has broken, or breached it. *Business Communs., Inc. v. Banks*, 90 So. 3d 1221, 1224-25 (Miss. 2012). If a party seeks monetary damages as a remedy for breach of contract, they "must also put into evidence, with as much accuracy as possible, proof of the damages being sought." *Id.* at 1225. Plaintiff claims that Defendants breached Fannie Mae's servicing guides and the deed of trust/promissory note.

### A.    *Servicing Guides*

Plaintiff first argues that Defendants breached Fannie Mae's Servicing Guides, of which she is a third-party beneficiary. "The right of a third party beneficiary to maintain an action on the contract must 'spring' from the contract terms." *Trammell v. State*, 622 So. 2d 1257, 1260 (Miss. 1993). "A person or entity may be deemed a third-party beneficiary if: (1) the contract between the original parties was entered for that person's or entity's benefit, or the original parties at least contemplated such benefit

---

[6]Although Plaintiff titled her motion "Partial Motion for Summary Judgment as to Defendants' Liability for the Acts of Its Servicing Agents," she only addressed Fannie Mae's liability for GMAC's actions. Nevertheless, it is denied to the extent she intended it to address Green Tree's liability for GMAC's actions.

as a direct result of performance; (2) the promisee owed a legal obligation or duty to that person or entity; and (3) the legal obligation or duty connects that person or entity with the contract." *Simmons Hous., Inc. v. Shelton*, 36 So. 3d 1283, 1286 (Miss. 2010). "A third-party beneficiary also must benefit directly from the contract. A mere incidental or consequential benefit is insufficient." *Id.*; *see also Trammell*, 622 So. 2d at 1260.

This Court has previously ruled that "borrowers are not third-party beneficiaries of mortgage servicing guidelines." *Pennell v. Wells Fargo Bank, N.A.*, No. 1:10-CV-582-HSO-JMR, 2012 U.S. Dist. LEXIS 96426, at *23-*25 (S.D. Miss. July 12, 2012) (citing multiple authorities), *aff'd*, 507 F. App'x 335 (5th Cir. 2013); *Neel*, 2014 U.S. Dist. LEXIS 28891 at *10-*11. In fact, the Court specifically addressed Fannie Mae's servicing guidelines and reached the same conclusion. *Neel*, 2014 U.S. Dist. LEXIS 28891, at *10; *see also Hinton v. Fed. Nat'l Mortgage Assoc.*, 945 F. Supp. 1052, 1057 (S.D. Tex. 1996) (borrower was not a third-party beneficiary of Fannie Mae servicing guidelines).

Plaintiff has provided no evidence or argument to persuade the Court to revisit this issue. She failed to identify any provision in the servicing guides that expresses an intention to make mortgagors third party beneficiaries. *Pennell*, 2012 U.S. Dist. LEXIS 96426 at *25. Rather, the servicing guides are "set[s] of instructions from a lender-principal to a servicer-agent . . . ," with no mention or contemplation of mortgagors. *Hinton*, 945 F. Supp. at 1057. Therefore, pursuant to the Court's previous decisions and the abundant authorities cited therein, the Court finds that Plaintiff is

not a third-party beneficiary of Fannie Mae's servicing guides and has no standing to enforce them. *See Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 357 (5th Cir. 1977) (plaintiff was incidental beneficiary of mortgage guideline handbook, rather than an intended beneficiary); *Deerman v. Fed. Home Loan Mortg. Corp.*, 955 F. Supp. 1393, 1404-05 (N.D. Ala. 1997); *Hinton*, 945 F. Supp. at 1057-58; *Neel*, 2014 U.S. Dist. LEXIS 28891 at *11; *Pennell*, 2012 U.S. Dist. LEXIS 96426 at *25 (citing multiple cases).

### B.   *Promissory Note/Deed of Trust*

Plaintiff also argues that Defendants breached the promissory note and deed of trust. She alleges that they 1) failed to apply the insurance funds to her loan, 2) failed to release the deed of trust, 3) improperly force-placed insurance on the property, and 4) sent inspectors to the property.

#### 1.   *Fannie Mae*

First, the Court notes that each of these alleged breaches involves a loan servicer's duty, rather than a duty accruing to Fannie Mae. It is undisputed that Fannie Mae did not receive any insurance payments. It is likewise undisputed that Fannie Mae did not force-place insurance or send inspectors to the property. The alleged breaches argued by Plaintiff involve actions and duties of the loan servicers, rather than Fannie Mae. As the Court held above, Fannie Mae is not liable for the actions of its loan servicers. Therefore, these breach of contract claims do not lie against Fannie Mae.

#### 2.   *Failure to Apply Alfa Insurance Payment*

Plaintiff argues that Green Tree breached the promissory note and deed of trust by failing to apply the Alfa Insurance payment to her loan balance. It is undisputed, however, that immediately after Plaintiff contacted Green Tree and requested that it apply the insurance funds to her loan, Green Tree investigated the matter, reversed the interest and charges that GMAC had charged to Plaintiff's account, applied the insurance funds to the loan, and issued a refund to Plaintiff for the balance. Therefore, Green Tree did not fail to apply the insurance proceeds, and, as the Court held above, it can not be held liable for GMAC's actions.

3.      *Failure to Release the Deed of Trust*

Next, Plaintiff argues that Green Tree failed to release the deed of trust. This allegation is simply not true. On November 25, 2013 – after Green Tree applied the funds to the loan, reversed GMAC's charges, and issued a refund to Plaintiff for the balance – it filed an "Authorization to Cancel" [217-10] in the Perry County Chancery Clerk's Records of Deeds. Therein, it asked the Clerk "to enter satisfaction of and cancel" the Deed of Trust. Green Tree even went a step further and later filed an "Amended and Restated Limited Power of Attorney" between it and GMAC [269-2] and a "Corrected Authorization to Cancel" after Plaintiff's counsel complained that Green Tree "had no authority" to release the deed of trust – despite the fact that Fannie Mae owned the loan and contracted Green Tree to service it. Therefore, the Court finds that Green Tree did, in fact, release the deed of trust, and, as the Court held above, it can not be held liable for GMAC's actions.

4.      *Force-Placing Insurance*

Plaintiff also argues that Green Tree breached the deed of trust by force-placing insurance on the property after the house had burned down. The Deed of Trust [216-5] provides, in pertinent part:

> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. . . .

> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. . . . Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

Therefore, the Deed of Trust specifically provided that the Borrower must maintain whatever insurance coverage the Lender requires on any current or future improvements. If the Borrower fails to maintain such coverage, the Lender may obtain it at the Borrower's expense.

After Green Tree started servicing Plaintiff's loan, it did not know that her house had burned down. All it knew was that the loan was in foreclosure status; that a certain amount was purportedly owed in principal, interest, and fees; and that a lesser amount of unapplied funds was in escrow. Green Tree sent Plaintiff four letters [217-21, 217-22, 217-23, 217-24] advising of the servicing transfer. She failed to respond to any of them.

Green Tree then sent Plaintiff a letter [217-25] asking for her to provide proof

of insurance. She failed to respond. As, the property was in foreclosure status and was not insured, Green Tree obtained an inspection report, which showed that an occupied single family dwelling with a market value of $100,000 existed on the property. Accordingly, Green Tree sent another letter asking Plaintiff to provide proof of insurance [217-26]. She again failed to respond. Therefore, Green Tree acquired insurance coverage on the property. After Plaintiff eventually contacted Green Tree, explained what had occurred with GMAC, and asked that the insurance funds be applied to the loan amount from November 2010, Green Tree cancelled the insurance and reversed all charges to Plaintiff's account.

The Court concludes that Green Tree did not breach the Deed of Trust. The contract specifically provided that the Lender could require the Borrower to maintain whatever amount and type of insurance the Lender desired on the property – including any future improvements. It further provided that the Lender could obtain such coverage if the Borrower failed to do so. Therefore, Green Tree was entitled to force-place insurance on the property.

### 4. Inspections

Finally, Plaintiff argues that Green Tree breached the deed of trust by sending inspectors to the property nine times between October 8, 2010, and September 11, 2011. It is undisputed that Green Tree did not begin servicing the loan until February 2013, and the Court previously held that it is not liable for GMAC's actions.

To the extent Plaintiff complains of the April 2013 inspection, the Deed of Trust specifically provides: "Lender or its agent may make reasonable entries upon and

30

inspections of the Property." When Green Tree started servicing the loan, it did not know that her house had burned down, but it did know that the loan was in foreclosure status. Plaintiff then failed to respond to four letters [217-21, 217-22, 217-23, 217-24] from Green Tree advising of the servicing transfer, and one letter [217-25] asking for proof of insurance. Accordingly, it was well within its rights to obtain the April 2013 inspection report.

## C.    *Conclusion*

For all of the reasons provided above, the Court finds that Plaintiff has failed establish or to even create a genuine dispute of material fact as to any claim for breach of contract. Accordingly, the Court denies Plaintiff's Motion for Partial Summary Judgment [214] and grants Defendants' Motions for Summary Judgment [212, 217] as to this issue.

## VI. IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING [212, 217]

Plaintiff argues that Defendants breached the implied covenant of good faith and fair dealing. "All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement." *Limbert v. Miss. Univ. for Women Alumnae Ass'n, Inc.*, 998 So. 2d 993, 998 (Miss. 2008). Good faith has been described as "faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party." *Harris v. Miss. Valley State Univ.*, 873 So. 2d 970, 987 (Miss. 2004). "The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness or reasonableness." *Id.* Bad judgment or negligence does not constitute bad faith. *Id.* Instead, "bad faith implies some conscious

31

wrongdoing because of dishonest purpose of moral obliquity." *Lippincott v. Miss. Bureau of Narcotics*, 856 So. 2d 465, 468 (Miss. Ct. App. 2003).

Plaintiff offered no evidence whatsoever that the named Defendants – Fannie Mae and Green Tree – engaged in "conscious wrongdoing because of dishonest purpose or moral obliquity." *Id.* Likewise, she provided no evidence of "conduct which violates standards of decency, fairness or reasonableness." *Harris*, 873 So. 2d at 987. She apparently conflates Defendants' actions with those of GMAC, and the Court already ruled that neither Fannie Mae nor Green Tree may be held liable for GMAC's actions. The Court further notes that there can be no breach of the duty of good faith and fair dealing without a breach of contract, *Frye v. S. Farm Bureau Cas. Ins. Co.*, 915 So. 2d 486, 492 (Miss. Ct. App. 2005), and Plaintiff has no valid claim for breach of contract. Threefore, the Court grants Defendants' Motions for Summary Judgment [212, 217] on this issue.

## VII. SAFE ACT [212, 217]

Plaintiff argues that Defendants violated Mississippi's SAFE Act, MISS. CODE ANN. § 81-18-3, *et seq.* In response, Defendants argue that the SAFE Act does not provide a private cause of action.

The SAFE Act regulates the activities of "mortgage brokers," "mortgage lenders," and "mortgage loan originators." *See* MISS. CODE ANN. §§ 81-18-3, 81-18-27. Among other things, it provides a licensing process,[7] imposes record-keeping requirements,[8]

---

[7]*See, e.g.* MISS. CODE ANN. § 81-18-9.

[8]*See, e.g.* MISS. CODE ANN. § 81-18-21.

prohibits certain activities,[9] regulates the fees charged to borrowers,[10] and authorizes the Commissioner of the Mississippi Department of Banking and Consumer Finance ("the Commissioner") to promulgate rules and regulations.[11] Enforcement of the SAFE Act was vested in the Commissioner, through cease-and-desist orders and civil penalties. MISS. CODE ANN. § 81-18-39.

"[A] mere violation of a statute or regulation will not support a claim where no private cause of action exists. The general rule for the existence of a private right of action under a statute is that the party claiming the right of action must establish a legislative intent, express or implied, to impose liability for violations of that statute." *Tunica County v. Gray*, 13 So. 3d 826, 829 (Miss. 2009). The Mississippi Supreme Court "has declined to find a private right of action for violations of various statutes and regulations in the absence of legislative intent." *Id.*; *see also Hill*, 2015 Miss. LEXIS 15 at *20.

"As the party asserting a right of action, [Plaintiff has] the burden of establishing the required legislative intent." *Hill*, 2015 Miss. LEXIS 15 at *20 (citing *Tunica County*, 13 So. 3d at 829). But Plaintiff cited no legislative history, regulations, or other authorities indicating that the Mississippi legislature intended to create a private right of action for violations of the SAFE Act. The structure and language of the Act indicate that the legislature intended its provisions to be "conditions attached

---

[9]*See, e.g.* Miss. Code Ann. §§ 81-18-27, 81-18-55.

[10]*See, e.g.* MISS. CODE ANN. § 81-18-28.

[11]*See* MISS. CODE ANN. § 81-18-29.

to the exercise of a legislative privilege to be enforced by the" Mississippi Department of Banking and Consumer Finance, "not a source of tort law to be invoked by private litigants . . . ." *Major Mart, Inc. v. Mitchell Distributing Co., Inc.*, No. 3:13-CV-942-HTW-LRA, 2014 WL 4723599, at *10 (S.D. Miss. Aug. 14, 2014) (quoting *Stone v. Farish*, 23 So. 2d 911, 913 (Miss. 1945)). The Court further notes that the United States District Court for the Northern District of Mississippi previously found that there was no private remedy for violations of the Mississippi Mortgage Consumer Protection Law, the predecessor to the SAFE Act. *See Hambrick v. Bear Stearns Residential Mortg.*, 2008 U.S. Dist. LEXIS 98659, at *5-*6 (N.D. Miss. Dec. 5, 2008).

Accordingly, the Court finds that Plaintiff has not demonstrated that the Mississippi legislature intended to create an implied private remedy for violations of the SAFE Act. This Court declines to create a private right of action where none previously existed. Defendants' Motions for Summary Judgment [212, 217] are granted as to this issue.

## VIII. RESPA [223]

Plaintiff argues that Defendants' violated certain provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.* In response, Defendants argue that Plaintiff did not plead a claim for relief under RESPA, and, therefore, no such claim is properly before the Court.

On October 21, 2013, Plaintiff filed her initial Complaint [1]. Therein, she asserted claims of breach of contract, willful breach of contract, conversion, fraud, breach of duty of good faith and fair dealing, intentional infliction of emotional distress,

defamation, and violation of the Fair Debt Collection Practices Act. The Complaint [1] contained no mention of RESPA, and Plaintiff alleged no facts indicating that Defendants had violated RESPA.

On June 12, 2014, Plaintiff filed a Motion to Amend [68] her Complaint to assert legal theories of respondeat superior and ratification. The proposed Amended Complaint [68-6] contained no mention of RESPA, and Plaintiff alleged no facts indicating that Defendants had violated RESPA.

On June 18, 2014, Plaintiff filed a Revised Motion to Amend [80] her Complaint. She sought permission to assert legal theories of respondeat superior and ratification, and to assert violations of Mississippi's SAFE Act. Accordingly, the proposed Amended Complaint [80-5] contained new theories of respondeat superior and ratification, as well as a claim that Defendants had violated the SAFE Act. Plaintiff block-quoted several sections of the SAFE Act, and one of the sections referred to RESPA. *See* MISS. CODE ANN. § 81-18-55(1). Plaintiff also alleged that Defendants violated the SAFE Act by failing "to comply with . . . requirements imposed by Sections 6 and 10 of" RESPA.

On July 8, 2014, the Court granted [131] Plaintiff's Revised Motion to Amend [80] and denied her initial Motion to Amend [68] as moot. On the same day, Plaintiff filed an Amended Complaint [136] as previously proposed [80-5].

Plaintiff sought leave to amend her Complaint and add three new claims: respondeat superior, ratification, and the SAFE Act. She did not seek leave to add a RESPA claim, nor was she granted such leave. As the SAFE Act incorporates certain requirements of RESPA, *see* MISS. CODE ANN. § 81-18-55(1), Plaintiff's bare mention

of RESPA in her SAFE Act claim did not provide sufficient notice to Defendants that she sought relief under both statutes. Defendants would have had to essentially guess that Plaintiff sought relief under RESPA in addition to the SAFE Act – a result far from the goal of "notice pleading." Accordingly, Plaintiff did not assert a RESPA claim, and no such claim is properly before the Court. *Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005).[12] The Court denies Plaintiff's Motion for Partial Summary Judgment [223] as to this issue.

## IX. FDCPA [212, 217]

Both Defendants seek summary judgment [212, 217] as to Plaintiff's claims under the FDCPA.

### A.    *Fannie Mae*

According to the Amended Complaint [136], Plaintiff asserted no FDCPA claim against Fannie Mae. Therefore, no such claim is currently before the Court. *Cutrera*, 429 F.3d at 113. To the extent Plaintiff argues that Fannie Mae is vicariously liable for the actions of its loan servicers, the Court rejects that argument for the reasons stated above.

### B.    *Green Tree*

In the Amended Complaint [136], Plaintiff alleged that Green Tree violated several sections of the FDCPA – 15 U.S.C. §§ 1692c(a)(2), (b); 1692e(2)(A)(B), (5), (8);

---

[12]*Johnson v. City of Shelby*, 135 S. Ct. 346, 190 L. Ed. 2d 309 (2014), cited by Plaintiff in a supplement which she did not seek or receive leave to file, is inapposite. *Johnson* merely provides that parties seeking money damages for the violation of constitutional rights do not have to specifically invoke 42 U.S.C. § 1983 in their complaint. 135 S. Ct. at 347.

and 1692f(1) – but she failed to allege any specific facts in support of the claim. Likewise, in her response [294] to Green Tree's Motion for Summary Judgment [217], she failed to identify the specific actions by Green Tree which she believes violated the FDCPA or cite to any evidence of such actions.

The Court declines to search the record for evidence in support of Plaintiff's claims. "Where the burden of production at trial ultimately rests on the nonmovant, the movant must merely demonstrate the absence of evidentiary support in the record for the nonmovant's case." *Cuadra*, 626 F.3d at 812 (citation and punctuation omitted). The nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* Green Tree demonstrated the absence of support in the record for Plaintiff's claims, and Plaintiff failed to respond with specific facts showing that there was a genuine issue for trial.

## C.   *Conclusion*

For these reasons, the Court grants Defendants' Motions for Summary Judgment [212, 217] as to Plaintiff's FDCPA claims.

## X. DEFAMATION [212, 217, 226]

Plaintiff asserted defamation claims against each Defendant. To establish a defamation claim, she must prove these elements: "(1) a false and defamatory statement concerning plaintiff; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence on part of publisher; (4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication." *Armistead v. Minor*, 815 So. 2d 1189, 1193 (Miss. 2002). Plaintiff admitted

in briefing that the alleged defamatory statements at issue are "Repossession/Foreclosure" codes on reports submitted to credit reporting agencies from March 2011 to January 2013 – while GMAC was servicing the loan.[13]

Fannie Mae's 30(b)(6) representative provided undisputed testimony [212-4] that Fannie Mae does not make reports to credit agencies. Rather, Fannie Mae's loan servicers do so at their own discretion. Therefore, Fannie Mae did not make the alleged statements, and the Court previously held that it is not liable for the actions of its loan servicers.

Green Tree's 30(b)(6) representative provided undisputed testimony [217-5] that Green Tree never made any negative reports to credit agencies about Plaintiff. Furthermore, it is undisputed that Green Tree did not begin servicing Plaintiff's loan until February 2013 – after the alleged statements had already been made. In fact, Green Tree asked the credit agencies to delete GMAC's negative report from Plaintiff's record after it applied the insurance funds to her loan and cleaned up GMAC's mess [269-1], and the Court previously ruled that Green Tree is not liable for GMAC's actions. The Court further notes that Plaintiff failed to provide any evidence that Green Tree republished GMAC's negative credit reports. *See Fairley v. ESPN, Inc.*, 879

---

[13]Plaintiff also complains of Defendants' alleged statements to counsel – both their own and hers. "Statements made in connection with judicial proceedings, including pleadings, are, if in any way relevant to the subject matter of the action, absolutely privileged and immune from attack as defamation, even if such statements are made maliciously and with knowledge of their falsehood." *McCorkle v. McCorkle*, 811 So. 2d 258, 266 (Miss. Ct. App. 2001). Therefore, Defendant's alleged statements to their own counsel (whether retained for purposes of a foreclosure proceeding or for this case) or Plaintiff's counsel can not be the subject of a defamation claim.

F. Supp. 2d 552, 555 (S.D. Miss. 2012) (explaining that one can be liable for republication of a previous defamatory statement) (citing *Mitchell v. Random House, Inc.*, 703 F. Supp. 1250, 1252-53 (S.D. Miss. 1988)).

The Court finds that Plaintiff failed to provide any evidence that either of the two Defendants in this case made any defamatory statements. The Court grants their Motions for Summary Judgment [212, 217] and denies Plaintiff's Motion for Partial Summary Judgment [226] as to her defamation claims.

## XI. SLANDER OF TITLE [226]

Plaintiff did not assert any claim for slander of title in the Amended Complaint [136]. The Amended Complaint [136] contains no reference to a claim for slander of title, or to any alleged clouds on Plaintiff's title. Therefore, no such claim is properly before the Court. *Cutrera*, 429 F.3d at 113. The Court denies Plaintiff's Motion for Partial Summary Judgment [226] as to this issue.

## XII. FRAUD [212, 217]

Both Defendants seek summary judgment [212, 217] as to Plaintiff's fraud claims. The elements of fraud are: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury." *Trim v. Trim*, 33 So. 3d 471, 478 (Miss. 2010).

### A.   *Fannie Mae*

In her response [296] to Fannie Mae's Motion for Summary Judgment [212], Plaintiff failed to identify or provide evidence of any specific false representation by Fannie Mae. *Id.* (requiring evidence of a representation and its falsity). Instead, Plaintiff's fraud claims appear to arise from the actions of Fannie Mae's loan servicers. As explained above, Fannie Mae is not liable for those actions. Therefore, the Court grants Fannie Mae's Motion for Summary Judgment [212] as to Plaintiff's fraud claim.

**B.    *Green Tree***

Plaintiff failed to cite any specific statement or representation by Green Tree which forms the basis of a fraud claim. She broadly argues that any statement by Green Tree that the amount owed on the loan was more than what it was in November 2010 – before GMAC wrongfully charged Plaintiff additional interest, fees, and other charges – constitutes a fraudulent statement. However, she has not provided any evidence that Green Tree knew that the information provided to it by GMAC was wrong. In fact, Green Tree's representative provided undisputed testimony [217-5] that Green Tree did not know about the fire, insurance proceeds, and GMAC's failure to apply the funds until it researched the matter in response to Plaintiff's inquiry. Plaintiff also failed to demonstrate that she relied upon Green Tree's alleged misrepresentation, as she consistently testified that she never believed she owed more than the principal amount owing in November 2010. Furthermore, she eventually contacted Green Tree and asked that they fix GMAC's error – an action she would not have taken had she relied upon any alleged misrepresentations concerning the amount owed on the loan.

40

Plaintiff also apparently argues that Green Tree's force-placement of insurance in April 2013 constitutes a fraudulent misrepresentation. Assuming that the force-placement of insurance can even be considered a "representation" or "statement," Plaintiff failed to demonstrate that she relied upon Green Tree's actions in any way.

Finally, Plaintiff also contends that Green Tree fraudulently threatened her with foreclosure in a letter [217-30] dated October 22, 2013. Assuming that Plaintiff's description of the letter is accurate, she failed to provide any evidence that she relied upon the letter, or that she was injured because of her reliance on it. Green Tree's investigation in response to Plaintiff's written inquiry was well under way by October 22, 2013, and her loan was paid in full [217-31] approximately two weeks after the letter was sent.

## C.    *Conclusion*

Plaintiff failed to provide sufficient evidence to create a genuine dispute of material fact as to a fraud claim against either Defendant. The Court grants their Motions for Summary Judgment [212, 217] as to those claims.

## XIII. CONVERSION [212, 217, 225]

Plaintiff contends that Defendants converted the Alfa Insurance funds by failing to apply them to her loan. "[T]o make out a conversion, there must be proof of a wrongful possession, or the exercise of a dominion in exclusion or defiance of the owner's right, or of an unauthorized and injurious use, or of a wrongful detention after demand." *Wilson v. GMAC*, 883 So. 2d 56, 68 (Miss. 2004). "There is no conversion until the title of the lawful owner is made known and resisted or the purchaser exercises

dominion over the property by use, sale, or otherwise." *Id.* A conversion claim "cannot be maintained without proof that the defendant either did some positive wrongful act with the intention to appropriate the property to himself, or to deprive the rightful owner of it, or destroyed the property." *Id.*

It is undisputed that Fannie Mae has never possessed, used, detained, or otherwise exercised dominion over the funds at issue. Therefore, Fannie Mae can not have committed the tort of conversion. *See id.* (requiring that the defendant wrongfully possessed, exercised dominion over, or wrongfully detained the allegedly converted property). Additionally, the Court already ruled that Fannie Mae is not liable for the actions of its loan servicers.

The record does not indicate that Green Tree committed any "positive wrongful act[s]" with the intention of appropriating the money, exercising dominion over it, depriving Plaintiff of it, or destroying it. Green Tree began servicing Plaintiff's loan on February 1, 2013, and it only knew what GMAC's limited records showed – that the loan was already in foreclosure status, that $99,623.48 of unidentified funds had not been applied to the loan, and that Plaintiff purportedly owed $114,503.29 in principal, interest, and fees. Green Tree did not even know that the property had been destroyed by a fire. It attempted to contact Plaintiff for months, but she failed to respond to several letters. Plaintiff finally contacted Green Tree and submitted a written request to apply the insurance funds in late August 2013. After Plaintiff explained the situation and provided the necessary authorization, Green Tree applied the funds to the loan. By late October 2013, Green Tree had applied the funds to the loan as GMAC

should have done in November 2010.

No reasonable person could infer from these facts that Green Tree intentionally misappropriated Plaintiff's insurance funds or deprived her of their benefit. Once Green Tree had the necessary facts, it fixed the mess that GMAC had created. It did not convert Plaintiff's funds. Additionally, the Court already ruled that Green Tree is not liable for GMAC's actions.

The Court grants both Defendants' Motions for Summary Judgment [212, 217] and denies Plaintiff's Motion for Partial Summary Judgment [225] as to her conversion claims.

## XIV. PUNITIVE DAMAGES [212, 217]

Punitive damages are available where "the claimant . . . prove[s] by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." MISS. CODE ANN. § 11-1-65(1)(a). "The totality of the circumstances and the aggregated conduct of the defendant must be examined before punitive damages are appropriate." *Wise v. Valley Bank*, 861 So. 2d 1029, 1034 (Miss. 2003). Punitive damages are generally allowed only "where the facts are highly unusual and cases extreme." *Id.* at 1035.

None of the evidence indicates that the named Defendants – Fannie Mae and Green Tree – "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." MISS. CODE ANN. § 11-1-65(1)(a). Furthermore, as the Court has stated numerous times,

Fannie Mae and Green Tree are not liable for GMAC's actions. The Court grants Defendants' Motions for Summary Judgment [212, 217] as to any claim for punitive damages.

## XV. IIED [212, 217, 231]

A plaintiff may recover on a claim for intentional infliction of emotional distress "[w]here there is something about the defendant's conduct which evokes outrage or revulsion, done intentionally . . . even though there has been no physical injury." *Bowden v. Young*, 120 So. 3d 971, 980 (Miss. 2013). The defendant's conduct "must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Liability will not attach for mere insults, threats, indignities, petty oppression, annoyances, or other trivialities. *Funderburk v. Johnson*, 935 So. 2d 084, 1100 (Miss. Ct. App. 2006).

None of the evidence indicates that the named Defendants – Fannie Mae and Green Tree committed intentional acts "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Bowden*, 120 So. 3d at 980. Furthermore, Fannie Mae and Green Tree are not liable for GMAC's actions. The Court denies Plaintiff's Motion for Partial Summary Judgment [231] as to her claims for emotional damages and intentional infliction of emotional distress, and the Court grants Defendants' Motions for Summary Judgment [212, 217] as to the same.

## XVI. Injunctive Relief [212, 217]

As the Court has granted summary judgment in Defendants' favor as to each of Plaintiff's causes of action, she has no valid claim for injunctive relief. Regardless, her claims for injunctive relief are moot; the note was paid in full, the excess funds were remitted to Plaintiff, and the Deed of Trust was released.

## XVII. Conclusion

Plaintiff provided ample evidence to support potential claims against GMAC. Unfortunately, GMAC is not a party to this lawsuit. Instead, Plaintiff blamed GMAC's errors on two other parties – Fannie Mae and Green Tree. For the reasons stated above, the Court **grants** Defendants' Motions for Summary Judgment [212, 217] in all respects, and it **denies** Plaintiff's Motions for Partial Summary Judgment [214, 223, 225, 226, 228, 231].

As all Plaintiffs' claims have been resolved, the parties' remaining motions [219, 358, 360, 362] are **denied as moot**. The Court will enter a separate judgment consistent with this opinion.

SO ORDERED AND ADJUDGED this 6th day of February, 2015.

*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE

45